805 A.2d 292

**In the Matter of LEGISLATIVE DISTRICTING OF THE STATE.**

**Nos. 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, Sept. Term, 2001.**

Court of Appeals of Maryland.

Aug. 26, 2002.

316

---

Sam Hirsch (Kali N. Bracey, of Jenner and Block, Washington, D.C.) for Wayne Curry et al., Misc. No. 20, September Term, 2001, for petitioners.

Paul D. Raschke (Alan A. Abramowitz, Michelle E. Stawinski, of Bouland and Brush, Baltimore) for Eugene E. Golden et al., Misc. No. 22, Sept. Term, 2001.

Barry Steve Asbury, pro se, Parkville, Misc. No. 23, Sept. Term, 2001.

M. Albert Figinski (Saul Ewing, Baltimore; John K. Phoebus, Crisfield) for J. Lowell Stoltzfus et al., Misc. No. 24, Sept. Term, 2001.

M. Albert Figinski (Saul Ewing, Baltimore) for Norman R. Stone, Jr. et al., Misc. No. 25, Sept. Term, 2001.

Robert H. Levan (Richard T. Colaresi, of Levan, Colaresi, Ferguson and Levan PA, Columbia) for Mayor and Council of the City of College Park, Misc. No. 27, Sept. Term, 2001.

Harry C. Storm (Abrams, West & Storm, PC, Bethesda) for Gandal and Schofield, Misc. No. 28, Sept. Term, 2001.

E. Mark Braden (Amy Henson, Lee T. Ellis, Jr., Matthew S. Dolan, Ralph G. Blasey, III, of Baker & Hostetler, Washington, DC) for Michael S. Steele, Misc. No. 29, Sept. Term, 2001.

Dana M. Dembrow, pro se, Silver Spring, Misc. No. 30, Sept. Term, 2001.

Paul D. Raschke (Alan A. Abramowitz and Michelle E. Stawinski, of Bouland & Brush, LLC, Baltimore) for Katharina Eva Dehaas et al., Misc. No. 31, Sept. Term, 2001.

Paul D. Raschke (Alan A. Abramowitz and Michelle E. Stawinski, of Bouland & Brush, Baltimore) for Rayburn Smallwood et al., Misc. No. 32, Sept. Term, 2001.

Jefferson L. Blomquist (Charles D. MacLeod, Cynthia L. McCann of Funk & Bolton, PA, Baltimore) for John W. Cole et al., Misc. No. 33, Sept. Term, 2001.

Joseph M. Getty, pro se, Hampstead, Misc. No. 34, Sept. Term, 2001.

(Gail M. Wallace, pro se, Owings Mills) for Coalition to Keep the Tow of Owings et al., Misc. No. 26, Sept. Term, 2001.

Carmen M. Shepard, Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Maryland, Maureen M. Dove, Asst. Atty. Gen., Steven M. Sullivan, Asst. Atty. Gen., Baltimore; Robert A. Zarnoch, Asst. Atty. Gen. and Kathryn M. Rowe, Asst. Atty. Gen., Annapolis) for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

A majority of the Court concurring, by Order dated June 11, 2002, we concluded, for reasons to be set forth in an opinion later to be filed, that significant portions of the Governor's 2002 Redistricting Plan were not consistent with the requirements of Article III, § 4, of the Constitution of Maryland that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population" and that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions" and, for that reason, "the Plan [wa]s in violation of the Maryland Constitution and [wa]s invalid." In that Order, we advised the parties that "this Court will endeavor to prepare a constitutional plan." We invited the parties to recommend one or more technical consultants to assist us in that endeavor.[1]

After considering the recommendations of the parties, by Order dated June 17, 2002, this Court appointed Nathaniel A.

---

1. This is not the first time that this Court has declared a redistricting plan unconstitutional and promulgated its own. In *In re Legislative*

Persily and Karl S. Aro, as technical consultants to assist the Court in preparing a redistricting plan that complied with applicable federal and state law.[2] On June 21, 2002, consistent with our June 11th Order, we promulgated and adopted a legislative redistricting plan that is in compliance with both state and federal constitutional and statutory requirements. We now give our reasons for the June 11th Order.

## INTRODUCTION

A fairly apportioned legislature lies at the very heart of representative democracy. That is the message behind the

---

*Districting,* 271 Md. 320, 317 A.2d 477, *cert. denied sub. nom. Twilley v. Governor of Md.,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974), having determined that the Governor's districting plan was invalid for failure to comply with Article III, § 5's requirement that the Governor conduct public hearings prior to submitting his legislative districting plan to the General Assembly, the Court promulgated and adopted its own districting plan, albeit substantially the Governor's plan.

**2.** Mr. Persily is a Professor at the University of Pennsylvania School of Law. He is the former Associate Counsel for the Brennan Center for Justice at the New York University School of Law, where he specialized in voting rights law. He filed amicus briefs in *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) and *California Democratic Party v. Jones,* 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). He has testified on voting rights issues before the United States House Judiciary Committee, Subcommittee on the Constitution in respect to "Legal and Policy Issues Raised by the States' Choice of Voting Systems Act." He currently is acting as an expert consultant to a federal court in the State of New York in respect to a Voting Rights Act case. He was one of the persons that was recommended by both the State and a number of the petitioners responding to the Court's invitation to submit recommendations.

Karl Aro is the Director of the Maryland Department of Legislative Services.

Although draft plans were prepared by the consultants, they did so only under the guidance and direction of the Court. Essentially, they were told to prepare a plan that, without regard to political consider-ations, complied with federal law, including the Voting Rights Act, and met the Maryland constitutional requirements of substantial equality of population, compactness, and contiguity, and contained as few breach-es of natural and political subdivision boundaries as possible. Of particular consequence to our disregard of political considerations, we directed that the portion of the redistricting software program that identified the location of the residences of incumbent state legislators

Supreme Court's landmark decisions in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which invalidated the apportionment of state legislatures purely on a county or other subdivision basis, as Maryland had done, and mandated legislative districts of substantially equal population. Reapportionment of Maryland's General Assembly following each decennial national census, therefore, is a matter of interest to every citizen of the State, not just the candidates or the political parties and groups who support or oppose them. Because it involves redrawing the lines of legislative districts, the process of reapportionment is an intensely political process. But it is also a legal one, for there are constitutional standards that govern both the process and the redistricting plan that results from it.

The constitutional provisions that now govern the redistricting process were adopted by the voters, in 1970 and 1972, through amendments to the State Constitution. In addition to setting forth the procedure for the decennial redistricting, these sections provide for forty-seven legislative districts, each to elect one senator and three delegates. As we explain in greater detail later in this opinion, the Governor and the General Assembly are the key players in the development and adoption of the plan but, on petition of any registered voter, this Court must review that plan to insure that it conforms with constitutional requirements, and, if the Court finds that the plan "is not consistent with the requirements of either the Constitution of the United States of America or the Constitution of Maryland," grant appropriate relief. Four plans have been adopted pursuant to those 1970 and 1972 amendments, each of which has been challenged in this Court. We found the plan for the 1974 and subsequent elections unconstitutional because of a procedural violation and, using the Governor's plan as a guide, promulgated our own plan. *In re Legislative*

be disabled for purposes of the Court's work in developing a constitutional plan.

*Districting,* 271 Md. 320, 317 A.2d 477 (1974). We upheld the 1982 plan, finding no violations. *In re Legislative Districting,* 299 Md. 658, 475 A.2d 428 (1984). A divided Court approved the 1992 plan, but cautioned that it came "perilously close to running afoul" of the requirement that due regard be given to natural and political subdivision boundaries. *Legislative Redistricting Cases,* 331 Md. 574, 614, 629 A.2d 646, 666 (1993).

When, in 1970 and 1972, the constitutional provisions on apportionment were redrafted, the only legal constraint the drafters were under was that the factors chosen to govern the development and promulgation of a redistricting plan be consistent with supervening federal constitutional and statutory law. Had the framers of the constitution wished, therefore, instead of requiring that significant weight be given to natural or political subdivision boundaries, they could have proposed such things as defining and preserving communities of interest, promoting regionalism, retaining (or not retaining) incumbents and the preservation of urban (or rural) areas. And had the people agreed, those factors would have become the constitutional guideposts.

Instead, however, the Legislature chose to mandate only that legislative districts consist of adjoining territory, be compact in form, and be of substantially equal population, and that due regard be given to natural boundaries and the boundaries of political subdivisions. That was a fundamental and deliberate political decision that, upon ratification by the People, became part of the organic law of the State. Along with the applicable federal requirements, adherence to those standards is the essential prerequisite of any redistricting plan.

This is not to say that, in preparing the redistricting plans, the political branches, the Governor and General Assembly, may consider only the stated constitutional factors. On the contrary, because, in their hands, the process is in part a political one, they may consider countless other factors, including broad political and narrow partisan ones, and they may pursue a wide range of objectives. Thus, so long as the plan does not contravene the constitutional criteria, that it

may have been formulated in an attempt to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity.

On the other hand, notwithstanding that there is necessary flexibility in how the constitutional criteria are applied—the districts need not be exactly equal in population or perfectly compact and they are not absolutely prohibited from crossing natural or political subdivision boundaries, since they must do so if necessary for population parity—those non-constitutional criteria cannot override the constitutional ones. We made this clear in both our 1984 and 1993 decisions. Specifically, we acknowledged the importance of natural and subdivision boundaries and rejected the argument that such things as the promotion of regionalism and the protection of non-official communities of interest could overcome that requirement. The Legislature apparently understood and acquiesced in that ruling, as no attempt was made in the intervening decades to amend the Constitution and, thereby, include those or any other factors in the constitutional framework.

When the plan adopted by the Governor or Legislature is challenged, it becomes our lot to review it for constitutionality. We first look at the plan on its face, in light of the challenges, to see whether, and to what extent, the federal and state legal requirements have been met. When, from the petitions and the answers alone, we perceive deviations that do not appear to be permissible, but for which there may be some explanation that could serve to justify them, we have appointed a special master, thus affording the State and the petitioners the opportunity to present evidence and argument to supply that explanation. Following those proceedings, if we conclude that the deviations are within a permissible range or for a permissible purpose, we have approved the plan. On the other hand, if we are satisfied that, despite the proffered explanation, the deviations are constitutionally impermissible, we have but one choice: declare the plan unconstitutional and void. The former is exemplified by the 1982 and, as held by the majority,

1992 plans. As indicated, we declared the 1972 Plan unconstitutional, albeit for procedural, rather than substantive, default.

The Maryland Constitution requires us, in addition to reviewing the plan, to provide a remedy—appropriate relief—when the plan is determined to be invalid. Although it is possible, when the time constraints do not prohibit it—when there is no legislative election imminent, as was the case in 1972 and 1992—to give the political branches another opportunity to produce a new or amended plan, thus allowing the Governor and the Legislature to continue to seek political or other non-constitutional objectives, we have opted for developing the plan ourselves. When, as now, legislative elections are imminent, there simply is no time to return the matter to the political branches.

When the Court drafts the plan, it may not take into account the same political considerations as the Governor and the Legislature. Judges are forbidden to be partisan politicians. Nor can the Court stretch the constitutional criteria in order to give effect to broader political judgments, such as the promotion of regionalism or the preservation of communities of interest. More basic, it is not for the Court to define what a community of interest is and where its boundaries are, and it is not for the Court to determine which regions deserve special consideration and which do not.

Our only guideposts are the strict legal requirements. Accordingly, in drafting our plan, we directed the consultants to remove even from view where any incumbents lived. Our instruction to the consultants was to prepare for our consideration a redistricting plan that conformed to federal constitutional requirements, the Federal Voting Rights Act, and the requirements of Article III, § 4 of the Maryland Constitution.

## I.

Article III, § 5 of the Maryland Constitution provides: "Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for

electing of the members of the Senate and the House of Delegates.

"The Governor shall present the plan to the President of the Senate and Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census, and the Governor may call a special session for the presentation of his plan prior to the regular session. The plan shall conform to Sections 2, 3 and 4 of this Article. Following each decennial census the General Assembly may by joint resolution adopt a plan setting forth the boundaries of the legislative districts for the election of members of the Senate and the House of Delegates, which plan shall conform to Sections 2, 3 and 4 of this Article. If a plan has been adopted by the General Assembly by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the plan adopted by the General Assembly shall become law. If no plan has been adopted by the General Assembly for these purposes by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the Governor's plan presented to the General Assembly shall become law.

"Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

Pursuant to this section, after each decennial census, the Governor must prepare, with public input via public hearings, an apportionment plan that conforms to §§ 2,[3]

---

3. Section 2 provides:

"The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates."

3,[4] and 4 [5] of Article III and sets forth "the boundaries of the legislative districts for electing of the members of the Senate and the02 House of Delegates." In addition to these constraints, the plan also must comply with federal constitutional and statutory requirements. Under the United States Constitution, the states are required to apportion both houses of their legislatures on an equal population basis,[6] to assure that one citizen's vote is approximately equal in weight to that of every other citizen, *see In re Legislative Districting, supra,* 299 Md. at 672, 475 A.2d at 435, citing *Reynolds v. Sims, supra; Maryland Committee for Fair Representation v. Tawes,* 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), *rev'd on other grounds, Maryland Committee v. Tawes,* 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), and are prohibited from intentionally discriminating through the apportionment process against racial or ethnic minorities.[7] In

---

4. Section 3 provides:

 "The State shall be divided by law into legislative districts for the election of members of the Senate and the House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district."

5. Section 4 provides:

 "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

 As we have seen, while contiguousness and compactness principles predate 1972, the provision mandating respect for the boundaries of political subdivisions and natural boundaries was the result of a constitutional amendment, passed by the voters that year.

6. Otherwise known as the "one person, one vote" principle, this requirement is rooted in the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." *See Reynolds v. Sims, supra; see also Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

7. Both the Fourteenth and Fifteenth Amendments to the United States Constitution prohibit such invidious discrimination. *See White v. Reges-*

addition, the Federal Voting Rights Act prohibits denying minorities an equal opportunity to participate in the political process and to elect candidates of their choice.[8]

Obviously, the purpose for redistricting the State is to reflect the changes and shifts in the state's population. *See Legislative Redistricting Cases, supra,* 331 Md. at 578, 629 A.2d at 648. Section 5 of Article III requires the Governor to submit the apportionment plan to the President of the Senate and the Speaker of the House of Delegates for introduction as a joint resolution in the General Assembly not later than the first day of that regular session of the General Assembly occurring in the second year following the census or at a

---

*ter,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

8. Congress enacted the Voting Rights Act of 1965 to enforce the Fifteenth Amendment. *See NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973); *see also Legislative Redistricting Cases, supra,* 331 Md. at 602, 629 A.2d at 660. Section 2 of the Voting Rights Act, the only provision at issue in this case, generally prohibits states and political subdivisions from enforcing voting practices that undermine minority voting strength. As amended, it provides in full:

 "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 USCS § 1973b(f)(2)], as provided in subsection (b).

 "(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

 42 U.S.C. § 1973.

special session of the General Assembly prior to that regular session called for the purpose of presenting the plan.

The General Assembly may, but is not required to, adopt its own plan for the redistricting of the State's legislative districts. If it does adopt a plan, that plan, like the Governor's plan, must conform to the constitutional requirements of §§ 2–4 of Article III and be passed by joint resolution prior to the 45th day of the session, in which event, that plan thereafter will become law. If it does not adopt its own plan, or does so after the 45th day of the session, the Governor's plan becomes law.

In either event, on petition of any registered voter, this Court is given original jurisdiction to review the legislative districting plan of the State and to grant appropriate relief, "if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland." Md. Const. art. III, § 5.

## II.

Pursuant to Article III, § 5, after receiving the results of the 2000 decennial census, Governor Parris N. Glendening, undertook to develop a redistricting plan setting forth the boundaries of the legislative districts. To assist him with this constitutional responsibility, the Governor appointed a five-member Redistricting Advisory Committee (hereinafter "the Committee").[9] The Committee held its organizational meeting on June 12, 2001. At that meeting, according to a Declaration of the Committee Chair, the Committee was briefed as to the legal standards applicable to its work: "the Equal Protection Clause of the Fourteenth Amendment to the United States

9. The members of the Committee were: John T. Willis, Secretary of State, Chairman; Thomas V. Miller, Jr., President of the Senate and Senator from Legislative District 27; Casper R. Taylor, Speaker of the House and Delegate from Legislative District 1C; Isiah Leggett, Montgomery County Councilman; and Louise L. Gulyas, Worcester County Commissioner.

Constitution, § 2 of the Voting Rights Act, and the concepts of contiguity, compactness, population equality, and due regard for natural boundaries and the boundaries of political subdivisions, expressed in Article III, § 4 of the Maryland Constitution." Thereafter, between June 27, and September 6, 2001, the Committee held 12 public meetings, each advertised in advance in newspapers and on the websites of the Maryland Department of Planning, the Secretary of State, and the General Assembly, as well as at various locations throughout the state. Citizens were invited to, and did, attend these public meetings. In fact, more than one thousand citizens attended the meetings, nearly three hundred actually testified, and members of the public submitted thirty-eight third party plans to the Committee.

The Committee released its preliminary recommendations as to the boundaries of Maryland's legislative districts on December 17, 2001. On December 21, 2001, a public hearing was held that the Governor and over two hundred people attended. After making several changes to the Committee's preliminary recommendations, pursuant to, and consistent with, Article III, § 5, the Governor timely submitted the plan to the President of the Senate and to the Speaker of the House of Delegates. They, in turn, introduced it on January 9, 2002,[10] the first day of the General Assembly session, as Senate Joint Resolution 3 and House Joint Resolution 3. By the 45th day of its regular session, the General Assembly had not adopted its own plan for the legislative districting of the State. Therefore, the plan submitted by the Governor became law on February 22, 2002 (hereinafter the "State's Plan" or the "Plan").

---

10. The joint resolutions describing the plan received a "second printing." According to a letter from the Governor's Chief Legislative Officer and Special Legal Counsel to the President of the Senate and the Speaker of the House of Delegates, "several technical, nonsubstantive corrections to drafting errors" were necessary "because the report generator used to draft the legislative districting plan at times incorrectly assigned census tracts and blocks to the wrong precincts."

Wayne K. Curry, the County Executive of Prince George's County, having filed in this Court, on February 25, 2002, a petition challenging the validity of the State's Plan and the Attorney General, predicting that other such challenges would be forthcoming, having requested that this Court promulgate procedures to govern all such actions brought to challenge the validity of the Plan or any part of it, by Order dated March 1, 2002, the Court did just that.[11] In addition to setting deadlines for the filing of petitions and answers thereto, the Order scheduled a hearing on the facial validity of the State's Plan and to define any issues that may need to be referred to a Special Master. In anticipation that further proceedings before the Special Master may be required, it also set dates for the hearing before the Special Master, for the filing of his report with this Court, for the filing of exceptions to the Special Master's Report, and for a hearing on exceptions. That Order also extended the deadline for candidates to establish their residence in a new district from May 5, 2002 to July 1, 2002, and extended from July 1, 2002 to July 8, 2002 the deadline for the filing of certificates of candidacy for seats in the State Senate and House of Delegates as well as some State Central Committees.

In all, registered voters of the State who were dissatisfied with the State's Plan, filed fourteen petitions challenging its validity, each requesting the Court to review the Plan for consistency with the requirements of the constitutions and laws of the United States and Maryland and to grant appropriate relief. The violations alleged by the various petitions

---

11. The Order prescribed the content of the petitions as follows:

"The petition shall set forth the petitioner's objection to the plan, the particular part or parts of the plan claimed to be unconstitutional under the Maryland Constitution or federal law, the factual and legal basis for such claims, and the particular relief sought, including any alternative district configuration which may be suggested or requested by the petitioner."

It also invited, but did not require, the parties to "file a legal memorandom (a) addressing the facial validity of the plan under Article III, §§ 4 and 5 of the Maryland Constitution or federal law, and (b) issues that should be referred to a Special Master."

ran the gamut from the equal population requirement of the Equal Protection Clause of the Fourteenth Amendment and the Maryland Declaration of Rights and the Voting Rights Act to the constituent components (contiguity, compactness, substantial equality of population, and due regard for political and natural boundaries) of Article III, § 4 of the Maryland Constitution.

In Misc. No. 20, Wayne K. Curry, the County Executive of Prince George's County and an African–American, joined by other African–American residents and registered voters of Prince George's County, contended that the Plan denied African–American, Latino and other minority voters generally throughout the State, but specifically in Prince George's and Montgomery Counties, "an equal opportunity to participate in the political process and to elect candidates of their choice to the Maryland General Assembly," in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Section 2 of the Voting Rights Act, Articles 2, 7, and 24 of the Declaration of Rights, and Article I, § 7 of the Maryland Constitution.[12]

---

**12.** Articles 2, 7, and 24 of the Maryland Declaration of Rights provide, respectively, as follows:

"Article 2. Constitution, laws and treaties of United States to be supreme law of State. The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which shall be made, under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding.

"Article 7. Elections to be free and frequent; right of suffrage. That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage.

"Article 24. Due process. That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

In Misc. No. 22, Eugene E. Golden and other registered voters in the former 7th and 31st Legislative Districts, joined by Jacob J. Mohorovic and John R. Leopold, members of the House of Delegates, complained that District 44, a district shared by Baltimore City and Baltimore County, and District 31, a district shared by Baltimore County and Anne Arundel County, in the Plan, violated Article III, § 4, in that they were neither compact nor contiguous and did not give due regard to natural boundaries and the boundaries of political subdivisions. Moreover, they asserted, because under the Plan Baltimore City controlled seven legislative districts and Baltimore County only five, that the Plan violated Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment, and also that "the Governor's plan for redistricting punishe[d] voters in Baltimore County with *reduced* representation and reward[ed] voters in the City with *increased* representation," thus evincing "a feckless regard for the principle of proportionality, central to representative government that defie[d] both law and reason."

In Misc. No. 23, Barry Steven Asbury,[13] a registered voter in Baltimore County, generally decried the number of subdivision and natural boundary crossings that the Plan sanctioned and, therefore, contended that the Plan violated the Maryland Constitution.

Lack of due regard for natural and political subdivision boundaries, compactness, and contiguity were the primary focus of Misc. No. 24, filed by J. Lowell Stolzfus, a registered voter in Somerset County and member of the Maryland Senate, John W. Tawes, also a registered voter in Somerset County, and Lewis R. Riley, a registered voter in Wicomico County. In particular, they maintained that, under the Plan, Districts 37 and 38, which separated Somerset County from the "Lower Shore," its traditional alliance with Worcester County and part of Wicomico County, were not compact and

---

13. Mr. Asbury filed no exceptions to the Special Master's recommendations, but did present oral argument at the exceptions hearing. We will not further address Mr. Asbury's challenge.

were not configured giving due regard to the boundaries of political subdivisions or natural boundaries. In addition, they observed "the Governor's Plan just 'happened' to gerrymander [14] two incumbent Republican Senators into the newly ordained 37th District."

Norman R. Stone, Jr., a member of the Maryland Senate, and John S. Arnick and Joseph J. Minnick, members of the House of Delegates, joined by other Baltimore County registered voters, challenged in Misc. No. 25, Districts 7, 34, 44, and 46 of the Plan as being neither compact nor contiguous. They also contended that due regard was not given to natural boundaries and the boundaries of political subdivisions when the districts were configured. Like the petitioners in Misc. 22, these petitioners asserted that the Plan gave "peculiar and clear preference for the City which lost population in derogation of Baltimore County which gained population" and contended that the many Districts that Baltimore County shared with other political subdivisions under the Plan—twelve in all—reflected the "balkanization" of the County and the diminution of the representation of Baltimore County voters. [15]

In Misc. No. 26, Gail M. Wallace, a registered voter in Calvert County, claimed that Subdistrict 27A in the Plan

---

**14.** The term "gerrymandering" is defined generally as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Black's Law Dictionary 696 (7th ed.1999). In *In re Legislative Districting, supra,* 299 Md. 658, 475 A.2d 428, writing for the majority, Chief Judge Murphy discussed the origin of the word, noting that it "was given birth in 1812 following a cartoonist's drawing of a Massachusetts legislative district that he described as appearing like a 'salamander.' An astute observer suggested that the district might more properly be described as a 'gerrymander' after then Governor of Massachusetts Eldridge Gerry who had a role, albeit a minor one, in the construction of the district." *Id.* at 676, fn. 8, 475 A.2d at 436, fn. 8, citing Hardy, "Considering the Gerrymander," 4 Pepperdine L.Rev. 243, 255 (1977).

**15.** The State's Plan included five shared districts between Baltimore County and Baltimore City, as well as four additional districts that Baltimore County shared with each of Howard, Harford, Carroll, and Anne Arundel Counties.

violated the State Constitution because it was not compact and also because it failed to give due regard to boundaries of political subdivisions. She further asserted that because Calvert County residents would comprise less than 9% of the district, which included residents of Prince George's, Anne Arundel, and Charles Counties, they would be denied effective representation.

In Misc. No. 27, Stephen A. Brayman and other residents of the incorporated municipality of College Park, as registered voters in Prince George's County, complained that the Plan divided the City between Districts 21 and 22, thus failing to give due regard to the boundaries of political subdivisions.

Gabriele Gandel and Dee Schofield, registered voters in Montgomery County, contended, in Misc. No. 28, that Districts 18 and 20 were not compact, had boundaries that were the product of impermissible reasons and political gerrymandering, and were configured without giving due regard to natural boundaries or the boundaries of political subdivisions. They further alleged that, in violation of Article 7 of the Maryland Declaration of Rights, the Federal Equal Protection Clause, and Section 2 of the Voting Rights Act, the Plan undermined and diluted minority voting strength in District 20, which, again, due to impermissible reasons, like political gerrymandering, also was not substantially equal in population or proportional in size to other Montgomery County districts.

In Misc. No. 29, Michael S. Steele a registered voter in Prince George's County, the Chairman of the Maryland Republican party, and an African–American, challenged the Plan in its entirety on several grounds. He alleged that it diluted minority voting rights, thus violating Section 2 of the Voting Rights Act, was a racial gerrymander that discriminated against minority voters in violation of the Fourteenth and Fifteenth Amendments, created legislative districts which were neither compact nor contiguous and that also failed to give due regard to natural boundaries and the boundaries of political subdivisions in violation of Article III, § 4, violated the "one person, one vote" guarantee of the Federal Equal

Protection Clause, was a partisan gerrymander that discrimi-
nated against Republican voters in violation of the Fourteenth
Amendment, and penalized Republican voters in violation of
the First Amendment.

The Plan was invalid, asserted Dana Lee Dembrow, a
registered voter in Montgomery County and member of the
House of Delegates, in Misc. No. 30, because District 20 was
not compact in form, the changes to its boundary with District
14 were implemented without due process, and the boundary
disregarded the natural boundary of Randolph/Cherry Hill
Road, "splitting precincts and dividing along residential
streets well established neighborhoods, communities, and
homeowners' associations." In addition, he maintained that
the Plan was implemented without due process and that it
undermined the right of opportunity of minority representa-
tion to the citizens of Montgomery County by "gerrymander-
ing of the boundary for District 20 with an extension to the
west from its southern end . . . to place a particular Caucasian
incumbent out of his existing district, District 18, and into
District 20."

Katharina Eva DeHaas and other Anne Arundel County
registered voters argued, in Misc. No. 31, that by creating a
new Subdistrict 23A, "which crosse[d] the Patuxent and
carve[d] out a tiny, isolated segment of Anne Arundel County,
consisting of two precincts, that were formerly part of the
33rd Legislative District," they were thereby denied effective
representation, as required by the Equal Protection Clause of
the Fourteenth Amendment and Article 24 of the Maryland
Declaration of Rights. They also complained that the Plan, as
to them, "flout[ed] the Constitutional mandates of Article III,
§ 4," by failing to give due regard to natural boundaries and
the boundaries of political subdivisions.

In Misc. No. 32, Rayburn Smallwood and other Anne Arun-
del County registered voters voiced similar concerns. They
complained that the Plan placed "a tiny, isolated portion of
Anne Arundel County, consisting of three full precincts and
one partial precinct, that were formerly part of the 32nd

Legislative District," in District 13, which was principally a Howard County district. They argued that, in doing so, the Plan failed to give due regard to natural boundaries or the boundaries of political subdivisions and that it deprived them of any real representation.

In Misc. No. 33, John W. Cole, Franklin W. Prettyman and John S. Lagater, registered voters in, and also the County Commissioners of, Caroline County, asserted that the State's Plan was invalid because it: created legislative districts that were not compact or contiguous and that lacked due regard for natural boundaries and the boundaries of political subdivisions; violated the concept of proportionality of representation embodied in Article 7 of the Declaration of Rights; limited the counties on the Eastern Shore to three senators and 11 delegates in the House of Delegates; and, created Subdistrict 38A as a majority minority district in violation of the Equal Protection Clause.[16]

In Misc. No. 34, Joseph M. Getty, a member of the House of Delegates from Carroll County and a registered voter in that County, challenged the entire Plan on the ground that certain counties, including Carroll, have populations that exceed that required for an ideal legislative district (112,691 persons), but the Plan failed to include a district within their boundaries. He further asserted that the Plan failed to observe the state constitutional requirement that each legislative district be compact and that due regard be given to the boundaries of political subdivisions.

---

**16.** The Cole petitioners raised another issue, whether the Plan improperly repealed Md.Code State Gov't § 2–201(d)(2) (1984, 1999 Repl.Vol., 2001 Supp.). Section 2–201 required that the delegates from an interjurisdictional district come from separate counties. The Cole petitioners claimed that the joint resolutions by which the Plan was adopted unconstitutionally deleted that provision of § 2–201. As we have invalidated the State's Plan, the joint resolutions by which it was presented to the Legislature are no longer effective because they are not part of a legitimate constitutional process. The plan adopted and promulgated by this Court does not delete any statutes that preexisted the joint resolutions and the State's Plan. Moreover, our Order adopting this Court's Plan specifically noted that § 2–201(d)(2) remains in the Maryland Code.

**336**

■ The hearing on the facial validity of the Plan and what, if any, issues should be referred to the Special Master was held on April 11, 2002.[17] Following that hearing, by order of the same date, having concluded "that sufficient evidence ha[d] been presented to preclude a finding that the Governor's Legislative Redistricting Plan [wa]s valid as a matter of law," the Court referred the petitions and responses to the Special Master "for the taking of further evidence and the making of a report to the Court in conformance with the Order of this Court entered March 1, 2002." Addressing the burden of proof at the hearing before the Special Master, while allocating it to the petitioners with respect to the federal issues, we ordered:

> "with respect to challenges based upon Article III, Section 4, of the Maryland Constitution, the State shall have the burden of producing sufficient evidence to show:
>
> "1. that the districts in the Governor's Legislative Redistricting Plan are contiguous,
>
> "2. that they are compact, and

---

17. Such a preliminary hearing is not unprecedented in the modern history of Maryland legislative districting jurisprudence. Although not a common occurrence, such a precautionary prelude to the assignment of a districting challenge to a special master is not unlike in function what the Court did in 1974. *See In re Legislative Districting, supra,* 271 Md. 320, 317 A.2d 477. Then, challengers to the Governor's 1973 redistricting plan, in addition to filing petitions raising a myriad of issues, filed with the Court motions for summary judgment asking that the 1973 Plan summarily be declared invalid based on, among other reasons, the Governor's failure to conduct required public hearings prior to preparation of the plan. As the Court's order of July 31, 1973, makes clear, the Court: (1) considered memoranda and affidavits submitted by the parties for and in opposition to the motions for summary judgment; (2) considered stipulations submitted by the parties; and, (3) heard arguments. In the same order, the Court "cured" the Governor's procedural error by declaring, pursuant to its constitutional power to "grant appropriate relief," the 1973 Plan as nonetheless duly adopted for the purpose of considering the remaining challenges mounted by the petitioners, and referred the matter to a special master for further evidentiary hearings and a written report before taking final action. This procedure, for all intents and purposes, is substantially similar to that followed by the Court in scheduling its April 11, 2002, hearing in the present case.

"3. that due regard was given to natural and political subdivision boundaries."

Two days earlier, by order dated April 9, 2002, the Court had appointed the Honorable Robert L. Karwacki, a former Judge of this Court, as the Special Master, designating in that Order the date of the hearing for the taking of further evidence and setting May 24, 2002 as the deadline for his report to the Court.

The Special Master held hearings on April 25, 26, and 29, 2002. Thereafter, he filed his Report of the Special Master (hereinafter the "Report") with the Court on May 21, 2002. In the Report, the Special Master initially reviewed the contentions of each of the petitioners. Distilling those contentions down to three issues—alleged violations of the equal population requirement of the Fourteenth Amendment of the United States Constitution and Maryland Constitution Article III, § 4, alleged violations of the Voting Rights Act, and alleged violations of one or more of the component requirements of Maryland Constitution, Article III, § 4—he discussed each in turn.[18]

The contentions with respect to population equality and those premised on the Voting Rights Act were all rejected by the Special Master, who recommended that we do likewise. As to the former, the Special Master included Misc. Nos. 20,[19] 23, 28 29 and 34. As Article III, §§ 2 and 3 of the Maryland Constitution provide for 47 legislative districts, from each of which one senator and three delegates are to be elected, and for the election of delegates to be at large, from single member districts or multiple member districts, whether there is an equal population problem depends upon the State's population and its distribution in forming the required number of districts. The census data indicated that Maryland had a

---

18. The Special Master summarily rejected petitioner Curry's claims based on the First Amendment to the United States Constitution and Articles 2, 7, and 24 of the Maryland Declaration of Rights.

19. Petitioner Curry denies that he made such a claim and a review of his petition and amended petition in Misc. 20, confirms that he did not.

population in 2002 of 5,296,486 residents, which translates into "ideal" legislative districts containing 112,691 persons, "ideal" single member subdistricts containing 37,563 persons, and "ideal" two member subdistricts containing 75,126 persons. From the evidence as to population deviation among the districts and subdistricts, the Special Master found, citing *Legislative Redistricting Cases,* 331 Md. at 594, 600–01, 629 A.2d at 656, 656–60, that "[s]ince all legislative districts and subdistricts under the State's plan fall within a range of ± 5%, the population disparities are sufficiently minor so as not to require justification by the State under the Fourteenth Amendment ... or under Article III, Section 4 of the Maryland Constitution." [20] Although, quoting *Legislative Redistricting Cases,* 331 Md. at 597, 629 A.2d at 676, and, therefore, recognizing that this Court has not closed the door on a petitioner overcoming the 10% rule by presenting compelling evidence that the drafters of the plan created the deviations solely to benefit one or more regions at the expense of another or others, the Special Master further found that no such compelling evidence was presented in this case.

Both petitioners Curry and Steele mounted challenges relying on Section 2 of the Voting Rights Act and petitioner Steele also offered claims that relied on the Fourteenth and Fifteenth Amendments. In addition, the Cole petitioners brought a Voting Rights claim related to Subdistrict 38A, a majority-minority district for which they claimed the State had not established any need. The Special Master recom-

---

**20.** The Cole petitioners, and only the Cole petitioners, dispute this finding. To the contrary, they maintain that the population spread or dispersion between the smallest and largest districts is 10.4%, rather than 9.91%, and that the spread or dispersion between the smallest and largest single member districts is 11.0%, instead of the 9.89% as the Special Master determined. The Cole petitioners submit that the disparity stems from the Special Master using a State exhibit, rather than the tables attached to the Plan or the joint resolutions that introduced it in the General Assembly.

We need not resolve this issue, however. As we have declared the Plan unconstitutional and promulgated a new one that meets both state and federal standards, the issue is moot.

mended that the Court reject each of these claims. With regard to petitioners Curry and Steele, he reasoned:

"These challenges fail since the Petitioners cannot satisfy the threshold conditions mandated by *Gingles*[21] that require the plaintiffs in the instant case to identify a geographically compact minority and a pattern of polarized voting by that minority as well as the surrounding white community. The evidence offered before me showed that more than 60% of Maryland's African American population is concentrated in two political subdivisions, Baltimore City and Prince George's County. Thus, the contention that African Americans have suffered vote dilution clearly is not based upon a specific 'geographically compact' minority population. Likewise, these statewide challenges are not supported by evidence of racially polarized voting by both the minority population and the surrounding white population. It is not enough to show a general pattern of racial polarization to require that district lines be drawn to maximize the number of majority black districts, at least up to a number constituting the same proportion that African Americans constitute of the total state population. *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022, 1048 (D.Md. 1994)."

With respect to the Cole petitioners' challenge, the Special Master concluded, contrary to their argument that it was the State's burden, that the burden of proving a vote dilution claim under the Voting Rights Act was the plaintiff's. Moreover, he noted that "Subdistrict 38A under the State's plan [wa]s substantially similar to Subdistrict 37A under the current plan" and that plan was created as a result of a decision of the United States District Court as a result of finding a Voting Rights Act violation.

Only one petition raising a state law claim, Misc. No. 24, filed by Senator J. Lowell Stoltzfus, Lewis R. Riley and John W. Tawes, was found by the Special Master to have any merit,

---

**21.** *Thornburg v. Gingles,* 478 U.S. 30, 49–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25, 46–47 (1986).

but only as it related to the Eastern Shore districts that were its principal focus.[22] That petition challenged the configuration of Districts 37 and 38 as violating Article III, § 4's admonition that legislative districts be compact in form and pay due regard to political subdivision boundaries. The petitioners argued for the "traditional longitudinal division of the Eastern Shore" into a Lower Shore district, consisting of Somerset, Worcester and part of Wicomico Counties, a Middle Shore district, consisting of all of Dorchester, Talbot, and Caroline Counties and part of Wicomico County, and an Upper Shore district. They maintained:

"Separating Somerset from its traditional, territorial 'close union' with Worcester and Wicomico,

"(a) [wa]s facially contrary to this Court's previous discussion of compactness;

"(b) [wa]s contrary to the configuration recognized by Maryland's Department of Planning . . . ;

"(c). disrupt[ed] the Tri–County Council for the Lower Eastern Shore of Maryland . . . ; and

"(d) demean[ed] the historic fact that Somerset County (created by an Order in Council in 1666) originally comprised Worcester and Wicomico Counties—with Worcester being created in 1742 and Wicomico being carved out of Somerset and Worcester in 1867."

As to the configuration of the districts, the petitioners argued:

"The Plan concocted by the Governor for the 37th and 38th Legislative District [wa]s contemptuous of geography and, on a map, appear[ed], weirdly, as ink blots or worse. Indeed, the 38th District contrived in the Governor's Plan meander[ed] from Cambridge to Salisbury and then spread[ ] through part of Wicomico County and all of

---

22. The petition also stated that the petitioner "generally, but assuredly, claim[ed] that the Governor's Plan, *as a whole,* gives *no regard* to political subdivision boundaries in cavalier disregard for the strictures of § 4 of Article III of the Maryland Constitution." This suggests that they challenged the Plan as a whole on due regard grounds. It is clear, however, that the Special Master did not credit this challenge.

Worcester County. This configuration defie[d] description, having neither symmetry nor form." [23]

The solution, the petitioners proposed was simple, requiring no more than the movement of proposed delegate District 38A

---

**23.** Prior to the Legislative Plan, the Stoltzfus district included Somerset County, Worcester County and portions of Wicomico County. By reconfiguring that district, the Plan extended the district from the southern border of Somerset County into a portion of Wicomico County, then across the Wicomico River, and then across the boundary line between Wicomico County and Dorchester County, across the Nanticoke River at its widest point, and into the southern half of Dorchester County. The district then proceeded west to the Chesapeake Bay and on to the shores of the Choptank River, where its land area wraps around a majority-minority district (38A in the State's Plan) and proceeded up river, at one point appearing to be separated by the majority-minority district (although it is not readily apparent, we have been assured that this district includes some land that takes it past the majority-minority district so as not to comprise contiguousness principles).

Next, after its fast land managed to skirt around the majority-minority district, it crossed the Choptank River to encompass Talbot County, thereby also crossing the subdivision boundary between Dorchester and Talbot Counties. It then crossed the subdivision boundary between Talbot and Caroline Counties to take in a portion of Caroline County. Because it was separated from its other area by the majority-minority district, the district line then crossed the Caroline/Dorchester County boundary line just east of the majority-minority district. Its arrangement was almost impossible to describe in geographical terms. It was clearly, on its face, non-compact.

The district, as contemplated in the Plan, ran from Delaware to the middle of the Chesapeake Bay, and from Virginia to north of the northerly boundary of Talbot County. In the process, it took in portions of Somerset, Wicomico, Dorchester, Talbot and Caroline Counties. It crossed the subdivision boundary between Caroline County and Dorchester County twice (because it wrapped around another district), crossed the subdivision boundary between Caroline and Talbot Counties, crossed the subdivision boundary between Talbot and Dorchester Counties, the subdivision line between Dorchester County and Wicomico County, and crossed the subdivision boundary between Wicomico County and Somerset County. In the process, it crossed over the Wicomico River at its widest point, over the Nanticoke River at its widest point, and over the Choptank River at its widest point. From Shelltown, in the southeast corner of Somerset County, to approximately the farthest point in Caroline County, in the vicinity of Bridgetown, the approximate mileage, using all roads, between the points, is approximately 105 miles, according to the Maryland Official Highway Map. Using major highways where possible, the distance between the easterly

back into District 37 and the movement of proposed delegate District 37A back into District 38.

The Special Master found as fact that following the plan submitted by petitioner Stoltzfus, would not affect the population equality of Districts 37 and 38, which would have 118,193 and 118,326 residents, respectively, within the range of acceptable deviation from the ideal district. He also determined that the shore counties of Somerset, Worcester and part of Wicomico had been in the same legislative district since *In re Legislative Districting,* 271 Md. at 332, 317 A.2d at 483, and consistently had formed alliances, such as the Tri–County Council for the Lower Eastern Shore and the Lower Eastern Shore Heritage Committee, to promote their interests. Moreover, the Special Master concluded, the Stoltzfus plan for these districts, would not affect the composition of the majority-minority district created by *Marylanders for Fair Representation, Inc. v. Schaefer, supra.*

Rejecting, therefore, the State's reason for designing such noncompact districts—the "more favorable split of the voters in Wicomico County and in the City of Salisbury so that those voters would supposedly enjoy a better chance of electing a senator of their choice—the Special Master was not persuaded that the State carried its burden of proof to establish that Districts 37 and 38 complied with the constitutional requirements of compactness and due regard for political subdivision boundaries. He recommended that the Stoltzfus petition be granted, reasoning as follows:

"Furthermore, District 38B proposed by the State includes portions of five counties: Caroline, Talbot, Dorchester, Wicomico and Worcester Counties stretching from the Atlantic Ocean to Caroline County. I do not believe that this configuration of District 38B demonstrates that its drafters gave due regard to the boundaries of political subdivisions. The State's configuration of Districts 37 and 38 divides Somerset County from Worcester County and part of Wi-

boundary of Somerset County, at Pocomoke City, to Tilghman, in Talbot County, is approximately 125 miles.

comico County. Those three areas have been aligned in one legislative district since 1966. No acceptable reason has been presented, in my view, to justify divergence from the longstanding tradition of including the lower shore counties in one legislative district."

As to the remaining state law claims, the Special Master recommended that we reject them as being without merit.

The Special Master noted that Districts 31 and 44 and Subdistricts 34A, 38A, and 37B, because they were divided by rivers—the Patapsco in the case of Districts 31 and 44, the Nanticoke, Wicomico, and Choptank rivers, in the case of Subdistricts 38A and 37B, and the Patuxent in the case of Subdistrict 34A—were alleged, in Misc. No. 22, Misc. No. 24, Misc. No. 25, Misc. No. 29 and Misc. No. 33, to be noncontiguous, *i.e.*, not consisting of adjoining property. Tracing the phrase, "adjoining property" to the proposed 1968 Constitution, the Special Master reviewed the floor debate on the subject as an aid to determining its meaning and, from that review, concluded that the intent was to preclude a district intersected by the Chesapeake Bay, but not one intersected by a river.

Summarizing, he reported that an amendment offered to substitute "adjoining land area" for "adjoining property" prompted the Chairman of the Committee on the Legislative Branch to conclude that "we can't use a prohibition about crossing a body of water." *See* Report of the Special Master at 18 (quoting Minutes of the Proceedings at 6315–16, 6332–35). Another amendment that would have prohibited the creation of a district "that crosses the center of the Chesapeake Bay," *id.* (quoting Minutes of the Proceedings at 6525–31, 6439–42), was withdrawn, *id.* (quoting Minutes of the Proceedings at 6541–42), when it appeared that it might also prevent the creation of a district that crossed the Susquehanna River. The Committee Chairman expressed concern that "if we start adding tributaries, estuaries, and other bodies of water ... we won't know where we stand," *id.*, and stated that he would support the amendment only if it was limited to the Bay. *Id.* (quoting Minutes of the Proceedings at 6529–31).

The Committee of the Whole of the Convention placed on the record a statement of its intention: "that under the interpretation of the words adjoining and compact . . . a redistricting commission or the General Assembly could not form a district, either a Senate district or a Delegate district by crossing the Chesapeake Bay." *Id.* at 19 (quoting Minutes of the Proceedings at 6574–75). In addition, citing *Anne Arundel County v. City of Annapolis*, 352 Md. 117, 721 A.2d 217 (1998) (under municipal annexation statute, separating areas of land by water does not render them non-contiguous), the Special Master noted that we have, in other contexts, interpreted the term "adjoining territory" so that the separation of two areas by water does not render the areas non-contiguous.

Having reviewed our cases discussing the concept of compactness and the due regard requirements, *Legislative Redistricting Cases*, 331 Md. at 590–92, 629 A.2d at 654; *In re Legislative Districting*, 299 Md. at 681, 475 A.2d at 440, and found facts as to challenged districts,[24] the Special Master

---

24. The Special Master found as a fact that Baltimore County gained population, 62,158 residents over the last ten years, but that the gain was not evenly distributed throughout the County. Thus, southeastern Baltimore County, where Baltimore County was joined with Baltimore City and Anne Arundel County, respectively, to form Districts 44 and 31, lost population, whereas the northern and western County grew. The Special Master concluded that, "[a]s a result, a portion of the county's population must share districts with residents of another county, because Baltimore County has too much population for six legislative districts and not enough for seven legislative districts." This conclusion was consistent with other redistrictings from 1966 to the present, he determined, in which the County shared districts with Carroll, Harford and Howard Counties and, beginning in 1992, with Baltimore City.

He further explained that the Committee had decided to preserve the core of most Baltimore County districts and to minimize incumbent contests, which meant keeping the same number of crossings between Baltimore County and Baltimore City. Finally, he noted that although there were more crossings between Baltimore County and other subdivisions in this Plan than in the 1992 plan, there was less territory and a smaller percentage of the County's population involved.

Preserving the core of districts and minimizing incumbent contests were recurring themes throughout the Special Master's fact-finding, as these were the reasons found for many of the subdivision crossings. *See* Report of the Special Master at 24, 27 (discussing findings of fact as

separately discussed the dispositive factors pertaining to each. Addressing the due regard provision first, the Special Master proceeded on two premises: 1) "[t]he requirement of 'due regard' for natural boundaries and boundaries of political subdivisions may be subordinated to achieve a 'rational goal,' such as avoiding the additional loss of senior legislators, reducing the number of incumbent contests and 'achieving racial balance among the districts,'" (quoting *In re Legislative Districting*, 299 Md. at 691, 475 A.2d at 445), and 2) balancing the various conflicting constitutional requirements of Article III, § 4 in the drafting of the legislative districting plan required the exercise of discretion.

As to the Stone and Golden petitions, Misc. Nos. 22 and 25, the Special Master found "the effect of the State's plan leaves undisturbed the core of existing districts, minimizes incumbent conflicts, and preserves for its African–American voters the opportunity to elect candidates of their choice." Crediting the testimony of the Secretary of State, therefore, he determined that the principles underlying compactness as well as all other constitutional concerns had been fairly considered and applied in designing Districts 31 and 44. Moreover, he pointed out that no more districts crossed the boundary between Baltimore City and Baltimore County under this Plan than under the plan approved by the Court in 1993. *See Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646. In addition, the Special Master found support for the Plan by noting the weaknesses in the petitioners' alternative plans, as well as relying on the testimony of a senator who represented a shared district that such districts worked well and the testimo-

---

to District 31, as well as District 13). Maintaining districts within the ten percent tolerance of the ideal district was another reason given to justify crossings, as was that shared districts work well or, at least, that there was no evidence that a representative of a shared district had failed to respond to the concerns in that district. Yet another was that the breach of subdivision boundary preserved, or enhanced, African–American voters' opportunity to elect representatives of their choice. *See* Report of the Special Master at 27, 31, 38–40, 22–23 (discussing findings of fact as to District 13, District 22, Districts 37 and 38, and District 44).

ny of a potential candidate in such district that he would do his best to represent the district if the Plan was approved.

Having already found that the population of Anne Arundel County was too large for four districts, but too small for five and, thus, had to share districts with other subdivisions, the Special Master found that the placement of Anne Arundel County residents in Subdistrict 23A, (Misc. No. 31) which encompassed part of Prince George's County, was justified, reiterating that "[d]ue to the population of Anne Arundel County, it [wa]s not possible for all residents of Anne Arundel County to be placed in legislative districts entirely within Anne Arundel County." He also observed the absence of evidence that any representative of a shared district had failed to address concerns raised by residents of a political subdivision within the district or that the Patuxent River, a natural boundary, posed any obstacle to travel or effective representation.

A similar finding was made with respect to the Smallwood petition, Misc. No. 32, which challenged the propriety of a shared District, 13, between Anne Arundel and Howard Counties. Noting the absence of testimony or evidence that the concerns of a resident of a shared district had not been addressed and that the District 13/District 32 boundary line followed a natural boundary, the Baltimore–Washington Parkway, the Special Master concluded:

"The State's plan was based on appropriate criteria, including preserving the core of the existing districts in Anne Arundel County, recognizing the population restraints presented by District 22, which is close to the maximum allowable deviation, and not diluting the African American population in District 13."

Rejecting the Cole petition, Misc. No. 33, the Special Master pointed out that Caroline County, which has shared a district with other counties since 1966, was considerably below the ideal population for a single member district. Moreover, recognizing that the Cole petitioners conceded that either Caroline or Talbot County had to be split between District 36

and District 37, he reasoned that the Committee's decision as to which to split was discretionary and, therefore, did not establish the failure to give due regard for political subdivision or natural boundaries.

In rejecting the Steele petition, Misc. No. 29, the Special Master, as he did in Misc. Nos. 22, 25, 31 and 32, relied on the failure of the petitioner to identify an instance in which a representative had not responded to the concerns of residents of a political subdivision within a shared district. In addition to suggesting that the Steele petition's aim was partisan, the Special Master found that the petitioner had not justified, by evidence, the need to abandon "the State's long-standing multimember districts."

The Getty petition, Misc. No. 34, having conceded that the five Western Maryland Counties, including Carroll, had to share legislative districts and, as they had since 1966, Frederick and Carroll Counties shared districts with neighboring counties, also was found to be without merit for failing to identify an instance in which a representative had not responded to the concerns of residents of a political subdivision within a shared district. The Special Master further determined that the crossing of the Carroll County and Baltimore County line and the splitting of Hampstead were necessary due to the substantial population equality requirement. He also observed: "The State's plan responded to population changes and recognized municipalities when it created a district in the City of Frederick. That the Getty petitioners present no legally valid claim is confirmed by their alternative plan for that area, which advances partisan interests, but not constitutional requirements."

Concerning the complaint of the Brayman petitioners, Misc. No. 27, that the State did not give due regard to natural boundaries and the boundaries of political subdivision because, under the Plan, the City of College Park was located in both Districts 21 and 22, the Special Master noted first that every alternative plan submitted, except the partial one submitted by the Brayman petitioners, split College Park. That was

consistent, he asserted, with the redistricting for the Prince George's County Council, which similarly split College Park between districts. Furthermore, he reasoned, because the City is located in an area where there are a number of adjacent municipalities and the creation of substantially equal districts required that the boundaries of some of them be split, it was a matter of discretion which to divide and that choice should not be disturbed.

The Special Master found the Brayman petitioners' proposal to unite the City of College Park unacceptable, believing that the relocation of three City of Laurel precincts from District 21 and District 23, would have had the effect of splitting another political subdivision, the City of Laurel, among those districts. He also observed that, despite their complaints, the Brayman petitioner's plan "d[id] nothing to rectify the sharing of District 21 among Prince George's and Howard Counties. Under the Brayman petitioners' plan, District 21 would still cross the Patuxent River into Howard County. This [wa]s because, as the State lan recognize[d], population from Howard County [wa]s needed to make District 21 of substantially equal population."

Despite the testimony of petitioners Gandal and Schofield, and Delegate Sharon Grosfeld that the Plan split the neighborhood of Rollingwood, placing part of it in District 18 and part of it in District 20, instead of leaving it entirely within District 18, as formerly, relying on Delegate Grosfeld's further testimony that the residents of both districts would be represented by incumbent senior representatives, "in terms of both tenure in Annapolis and leadership in the General Assembly" and the lack of evidence that those elected "would or could not be responsive to the needs of Rollingwood," the Special Master found that Rollingwood's ability to participate in the political process would not be adversely affected by the Plan. The districts did give due regard to natural boundaries and the boundaries of political subdivisions, in any event, he concluded. District 20's eastern boundary was the Montgomery/Prince George's County line, the bottom of the district was the Montgomery County/District of Columbia line, and most of

its remaining boundaries were precinct lines, consisting of roads and other natural boundaries. Like District 20, District 18, the Special Master determined, also followed natural boundaries, although not all major roads, for the entire boundary. That latter decision was explained, he said, by the need to maintain population equality.

Perceiving the Dembrow petition, Misc. No. 30, as alleging that the "well recognized thoroughfare of Randolph/Cherry Hill" should have been the dividing line between Districts 14 and 20, in addition to complaining about the splitting of precincts and dividing well established neighborhoods, communities, and homeowners' associations along residential streets,[25] the Special Master denied that Randolph Road had ever been the sole dividing line for District 20. He pointed out that, in fact, the State's Plan came closer to following Randolph Road than had any past plan.

## III.

In accordance with this Court's initial scheduling Order of March 1, 2002, the State and most of the petitioners filed exceptions to the Report of the Special Master. We held a hearing on those exceptions on June 10, 2002. As we have seen, a majority of the Court concurring, by Order dated June

---

**25.** In the plan the Committee submitted to the Governor on December 17, 2001, the Redistricting Advisory Committee recommended that District 20's northern boundary run along Randolph and Cherry Hill Roads, a fairly straight thoroughfare that already divides the surrounding precincts. However, the plan the Governor presented to the General Assembly, ultimately the State's Plan, did not follow this recommendation. Rather, as drawn in the State's Plan, District 20's northern boundary stretched beyond Randolph and Cherry Hill Roads at three separate locations, dividing the precincts to the north and resulting in irregularly shaped outgrowths. Petitioner Dembrow alleged that "[t]he gerrymandering of the boundary for District 20 with an extension to the west from its southern end was deliberately designed to place a particular Caucasian incumbent out of his existing district and into District 20." Although we express no opinion on the legitimacy of this allegation, we agree that, as drawn, the boundary showed no regard for the requirement that districts be compact in form and, moreover, that its design cannot be justified on the basis of any other mandatory requirements.

11, 2002, we invalidated the State's Plan, indicating that our reasons for doing so would be set forth in an opinion later to be filed, that we would "endeavor to prepare a constitutional plan," and that we intended to appoint one or more technical consultants to assist. By Order dated June 17, 2002, this Court appointed technical consultants, Nathaniel A. Persily and Karl S. Aro. On June 21, 2002, we promulgated and adopted a legislative redistricting plan that is in compliance with both state and federal constitutional and statutory requirements.

We have already set out the findings and recommendations of the Special Master with regard to the Stoltzfus petition. It is to those findings and that recommendation to which the State's exceptions are directed. Not surprisingly, the State denies that it failed to meet its burden to prove the compactness of Districts 37 and 38 or to demonstrate that they were drawn with due regard for political subdivision boundaries. With regard to the former, the State says that considerations of minority electoral opportunity were important in shaping the Districts. As to those districts, it submits, the Plan had two important objectives:

> "First, the Plan creates a Somerset County-oriented District 37A, which not only enhances electoral opportunity for African–Americans, but will also serve the interests of all Somerset residents by helping to redress the anomaly that the delegate supposedly elected to represent Somerset County as a resident delegate in the 1998 election did not receive the most votes cast by Somerset County voters, but was effectively elected by residents of other counties who combined to defeat the choice of Somerset voters. Second, by combining Worcester with portions of Dorchester and Wicomico counties in the new 38th, it places the existing minority subdistricts in a Democratic Legislative district with two senior Democratic incumbent delegates and no incumbent Senator, and with other communities where considerable minority populations have successfully elected minority candidates to office."

Both objectives, the State asserts, will enhance minority electoral opportunities now and in the future.

Concerning the latter, the State maintains that the requirement of due regard for political subdivision boundaries was neither implicated nor violated, there being no more shared districts or counties on the Eastern Shore split under the State's Plan than were split in the 1992 plan. Moreover, citing *In re Legislative Districting*, 299 Md. at 691, 475 A.2d at 445, the State argues that a due regard claim may be trumped by a rational goal, in this case, "the Governor's attempt to address the issue of stability and growth of minority representation in a new Democratic district." As to compactness, the State asserts that the shape, or "geographic contours," of the districts is dictated by the boundaries established by prior Voting Rights Act challenges, which cannot render a boundary non-compact and that, in any event, they are "not oddly shaped." The State also contends that the ground of the Special Master's decision, the inappropriateness of separating Somerset County from Worcester and Wicomico Counties, its traditional allies, is neither a compactness nor a "due regard" issue but, rather, an acceptance of a regionalism argument that this Court rejected in *Legislative Redistricting Cases*, 331 Md. at 614, 629 A.2d at 666 (acknowledging that reliance on "communities of interest—where districts cross local jurisdictional lines and group communities that share interests" and "regional interests through the intra-regional sharing of districts" in formulating the City/Baltimore County region of the Governor's plan constituted use of "improper non-legal criteria.").[26]

---

26. The Stoltzfus petitioners filed a memorandum in support of the Special Master's Report, in which, among others, they raised the following points: their plan, unlike the Governor's, was compact at a glance; their plan preserved the core of the former district and the configuration that had existed for three decades; their plan preserved the majority-minority district created by the federal district court in 1994; their plan avoided pitting incumbents, albeit Republican incumbents, against each other, they also pointed out; and their plan could be implemented without affecting other districts.

As indicated, most of the petitioners filed exceptions to the Special Master's Report. Although the exceptions certainly were not confined to a single issue,[27] the primary focus of most of them, as it was in the Special Master's Report, was on those findings and recommendations with respect to which this Court's April 11th Order provided that the State had the burden of proof: those pertaining to Article III, Section 4's requirements of compactness, contiguity, and due regard. As to those exceptions, a consistent theme is that the State did not carry its burden, placed on it by this Court in its April 11, 2002 Order, to prove the constitutionality of the challenged districts, i.e., that the districts were, in fact, compact and contiguous and, as to shared districts, that due regard was, in fact, given to natural and political subdivision boundaries in their configuration. Some assert that the State has offered no valid explanation for the excessive number of subdivision crossings (Misc. Nos. 20, 22, 25, 28, 29, 30, 31, 32, 33, and 34) and, further, touting alternative plans that have been offered that they contend contain fewer such crossings while also satisfying state and federal constitutional and statutory requirements, that any claim that the crossings were necessary

---

**27.** Petitioner Curry (Misc. No. 20)'s exceptions were to the findings and recommendations concerning the alleged Voting Rights Act violations and due regard for natural and political subdivision boundaries; the Golden, DeHaas and Smallwood petitioners (Misc. No. 22, 31, 32) challenged the Special Master's findings and conclusions as to compactness, contiguity and due regard and for sustaining the use of "regional" principles in upholding the Plan; the Stone petitioners (Misc. No. 25) excepted on essentially the same grounds; petitioners Gandal and Schofield (Misc. No. 28) filed exceptions, which in addition to challenging the Special Master's findings with respect to compactness and due regard, raised an issue as to the equality of the population between districts in Montgomery County; the Steele (Misc. No. 29) exceptions involved the Voting Rights Act and the constitutional components of Article III, § 4, compactness, contiguity and due regard; petitioner Dembrow (Misc. No. 30) excepted on the basis of due regard and compactness; the Cole petitioners (Misc. No. 33) filed exceptions to the Special Master's conclusions as the population equality claims, due regard, compactness, contiguity and the Voting Rights Act; petitioner Getty (Misc. No. 34)'s exceptions are to the compactness and due regard findings. Only the Brayman petitioners (Misc. No. 27) excepted only on the due regard ground.

to satisfy federal requirements is disingenuous (Misc. Nos. 20, 22, 27, 28, 29, 31, 32, 33, and 34). Some accuse the State of sacrificing mandatory requirements under the State Constitution to nonlegal considerations such as regionalism (Misc. Nos. 22, 25, 29, 31, 32, and 33) and political gerrymandering (Misc. Nos. 28, 29, 30, 33, and 34).

## IV.

We have determined that significant portions of the State's Plan violate Article III, § 4 and, in particular, the "due regard" provision such that we held the Plan unconstitutional. We begin our analysis, as we must, with the State Constitution itself.

At the outset, we make clear, "We do not tread unreservedly into this 'political thicket'; rather, we proceed in the knowledge that judicial intervention . . . is wholly unavoidable." *Burton v. Sheheen,* 793 F.Supp. 1329, 1338 (D.S.C. 1992) (footnote omitted), *vacated and remanded on other grounds, Statewide Reapportionment Advisory Comm. v. Theodore,* 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993). Article III, § 5 of the Maryland Constitution expressly entrusts to this Court the responsibility, upon proper petition, to review the constitutionality of districting plans prepared and enacted by the political branches of government and the duty to provide appropriate relief when the plans are determined to violate the United States and Maryland Constitutions or other laws. In other words, it is this Court's duty to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards unconstitutional.[28] Non-compliance with a state constitutional requirement is permitted only when it conflicts

---

**28.** The United States Constitution does not contain specific contiguity, compactness, or due regard for political subdivision boundaries requirements. The discussion of such factors in the federal cases is in the context of whether such matters constitute a "rational basis" for deviating from the one person, one vote mandate.

with a federal requirement or another more important Maryland constitutional requirement.

Courts have recognized that when the political branches of government are exercising their constitutional duty to prepare a constitutional redistricting plan, politics and political decisions will impact the process. *Gaffney v. Cummings,* 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298, 312 (1973) ("[p]olitics and political considerations are inseparable from districting and apportionment. . . . The reality is that districting inevitably has and is intended to have substantial political consequences"). This does not automatically or necessarily render the process, or the result of the process, unconstitutional; rather, that will be the result only when the product of the politics or the political considerations runs afoul of constitutional mandates. *In re Legislative Districting,* 299 Md. at 685, 475 A.2d at 442.

■ It is different, however, when the judiciary is required to undertake to promulgate a districting plan. In that circumstance, politics or political considerations have no role to play. *Wyche v. Madison Parish Police Jury,* 769 F.2d 265, 268 (5th Cir.1985); *Johnson, v. Miller,* 922 F.Supp. 1556, 1561 (S.D.Ga. 1995), *aff'd Abrams v. Johnson,* 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *Burton, supra,* 793 F.Supp. at 1340. *See also Hays v. Louisiana,* 862 F.Supp. 119, 125 (W.D.La. 1994), *vacated on other grounds, United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The districts that we drew split only 6 parishes of the sixty-four, followed traditional lines, only one town of approximately 3000 was divided, and the plan met all Constitutional one man—one vote requirements. It did ignore all political considerations.").

In *Burton,* for example, having concluded that it was necessary due to deadlock in the South Carolina Legislature to "assume the 'unwelcome obligation' of devising and approving redistricting plans for the General Assembly," the United States District Court for the District of South Carolina stated:

"Discharge of the duty thrust upon this court requires us to adhere more strictly than state legislatures to those consti-

tutional and statutory standards governing the redistricting process. A federal court must act 'circumspectly, and in a manner "free from any taint of arbitrariness or discrimination." ' "

*Burton,* 793 F.Supp. at 1340 (citations omitted). Similarly, in *Wyche,* the United States Court of Appeals for the Fifth Circuit opined, in relevant part:

"However, as defendants conceded at argument, 8C is not a legislative plan, but one devised by the special master at the order of the court. A court-ordered plan is subject to a more stringent standard than is a legislative plan. *Many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts* . . . .

"Plan 8E as modified adheres to the guidelines established in our 1981 opinion. It avoids diluting minority voting strength while fixing boundaries that are 'compact, contiguous and that preserve natural, political and traditional representation.' The duty of the federal courts in this matter is complete."

769 F.2d at 268 [emphasis added, citations omitted]. And the United States District Court for the Southern District of Georgia, explained:

"Since the Court is not limited to Georgia's current unconstitutional plan, the Court's task is akin to those cases in which states had no plans. Thus, when devising the remedy, the Court was bound by the stricter guidelines applicable to court plans. These guidelines include the one person-one vote requirement and the state's traditional districting principles." [29]

---

**29.** Those traditional redistricting principles were maintaining: political subdivisions, four traditional "corner districts," an urban majority-black district in the Atlanta area, district cores and protecting incumbents. The court subordinated the latter to the others because it was "inherently more political." *Johnson, v. Miller,* 922 F.Supp. at 1564–65.

*Johnson, v. Miller,* 922 F.Supp. 1556, 1561 (S.D.Ga.1995), *aff'd Abrams v. Johnson,* 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). More recently, the Supreme Court of New Hampshire opined, "While political considerations are tolerated in legislatively-implemented redistricting plans, they have no place in a court-ordered plan." *Burling v. Chandler,* 804 A.2d 471, 482 (2002). *See Wilson v. Eu,* 1 Cal.4th 707, 4 Cal. Rptr.2d 379, 823 P.2d 545, 576 (1992).

Article III, § 4 of the Maryland Constitution, as we have seen, requires that each legislative district shall be contiguous, *i.e.,* consist of adjoining territory, be compact in form, and substantially equal in population, and also that due regard be given to natural boundaries and the boundaries of political subdivisions. These requirements are mandatory and not "suggestive," as asserted by the State. *In re Legislative Districting,* 299 Md. at 681, 475 A.2d at 439.

Although exclusively a state constitutional provision, the rationale underlying Article III's component requirements is well recognized and stated by the United States Supreme Court. In *Reynolds v. Sims, supra,* having held that the Equal Protection Clause requires state legislatures to make an "honest and good faith effort" to construct districts "as nearly of equal population as is practicable," *id.,* 377 U.S. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536, the Court acknowledged that there are legitimate reasons for states to deviate from creating districts with perfectly equal populations, among them, maintaining the integrity of political subdivisions and providing compact and contiguous districts. Reasoning that "[s]o long as divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible," the Court explained:

> "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting,

without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering."

*Id.*, 377 U.S. at 579, 84 S.Ct. at 1391, 12 L.Ed.2d at 537. The Court provided a specific rationale for according respect to subdivision boundaries, stating:

"A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering."

*Id.*, 377 U.S. at 580–81, 84 S.Ct. at 1391, 12 L.Ed.2d at 538.

Our jurisprudence provides another rationale for being protective of subdivision boundaries. Political subdivisions have played, and continue to play, a critical role in the governance structure of this State. *See Maryland Committee for Fair Representation v. Tawes, supra,* 229 Md. at 411–12, 184 A.2d at 717–18; *see also Hughes v. Maryland Committee,* 241 Md. 471, 498–509, 217 A.2d 273, 289–295 (Barnes, J., dissenting), *cert. denied,* 384 U.S. 950, 86 S.Ct. 1569, 16 L.Ed.2d 547 (1966); *see generally* Matthew P. Andrews, History of Maryland 617 (1929) ("In the matter of representation Maryland has been likened to a 'confederacy of counties,' or a federated republic—the counties and the city of Baltimore ... being comparable to the states in the Federal Union"); Theodore J.

Maher, State–County Relations in Maryland 312–319 (1971) (discussing the importance of county governments within the organization of the State).

Although reversed because a mandatory requirement for each county, regardless of population, to have one senator violated the one man, one vote principle, what the Court said in *Maryland Committee for Fair Representation v. Tawes, supra,* with regard to the important role counties play in the governance scheme remains accurate:

> "The counties of Maryland have always been an integral part of the state government. St. Mary's County was established in 1634 contemporaneous with the establishment of the proprietary government, probably on the model of the English shire.... Indeed, Kent County had been established by Claiborne before the landing of the Marylanders.... We have noted that there were eighteen counties at the time of the adoption of the Constitution of 1776. They have always possessed and retained distinct individualities, possibly because of the diversity of terrain and occupation.... While it is true that the counties are not sovereign bodies, having only the status of municipal corporations, they have traditionally exercised wide governmental powers in the fields of education, welfare, police, taxation, roads, sanitation, health and the administration of justice, with a minimum of supervision by the State. In the diversity of their interests and their local autonomy, they are quite analogous to the states, in relation to the United States." [Citation omitted.]

Subsequently, in *Hughes,* rather than dispute or debate the extensive discussion about the importance of Maryland's political subdivisions in Judge Barnes' dissent, the majority "concede[d] the postulates" of that discussion. 241 Md. at 481, 217 A.2d at 278. And, dissenting in *Legislative Redistricting Cases,* 331 Md. at 621, 629 A.2d at 670, Judge Eldridge offered the following elaboration on this point:

> "Unlike many other states, Maryland has a small number of basic political subdivisions: twenty-three counties and Balti-

more City. Thus, '[t]he counties in Maryland occupy a far more important position than do similar political divisions in many other states of the union.'

"The Maryland Constitution itself recognizes the critical importance of counties in the very structure of our government. *See, e.g.,* Art. I, § 5; Art. III, §§ 45, 54; Art. IV, §§ 14, 19, 20, 21, 25, 26, 40, 41, 41B, 44, 45; Art. V, §§ 7, 11, 12; Art. VII, § 1; Art. XI; Art. XI–A; Art. XI–B; Art. XI–C; Art. XI–D; Art. XI–F; Art. XIV, § 2; Art. XV, § 2; Art. XVI, §§ 3, 4, 5; Art. XVII, §§ 1, 2, 3, 5, 6. After the State as a whole, the counties are the basic governing units in our political system. Maryland government is organized on a county-by-county basis. Numerous services and responsibilities are now, and historically have been, organized at the county level.

"The boundaries of political subdivisions are a significant concern in legislative redistricting for another reason: in Maryland, as in other States, many of the laws enacted by the General Assembly each year are public local laws, applicable to particular counties. *See Reynolds v. Sims,* 377 U.S. 533, 580–581, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506, 538 (1964) ("In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions"). Many of Maryland's counties have not established local legislative bodies. (for these "non-home rule" counties, the Maryland General Assembly is the local legislature.) In practice, members of the General Assembly from such county (the county delegation) decide upon the legislation for the county and are the de facto local legislature. Home rule counties under Art. XI–A of the Constitution, which have local legislative bodies, may enact laws on subjects enumerated in the Express Powers Act, Code (1957, 1990 Repl.Vol., 1992 Cum.Supp.), Art. 25A, § 5, and in Art. 4, § 6, of the Code of Public Local Laws of Maryland. On subjects not covered by these grants of express powers, however, the county delegation in the General Assembly serves as the legislative body even for a home rule county.

In addition, the General Assembly regularly makes exceptions to and variations in public general laws on a county-by-county basis. In addition, the State's annual Budget frequently makes appropriations on a county-by-county basis."

*Id.* (quoting *Hughes,* 241 Md. at 499, 217 A.2d at 290, in turn, quoting the Maryland Geological Survey, The Counties of Maryland, Their Origin, Boundaries and Election Districts 419 (1907) (footnotes omitted)).

We have considered each of the component requirements of Article III, § 4. *Legislative Redistricting Cases,* 331 Md. at 578, 629 A.2d at 648; *In re Legislative Districting,* 299 Md. at 672, 475 A.2d at 435. *In In re Legislative Districting,* we discussed contiguity and compactness. Noting that courts with similar constitutional provisions have construed the contiguity and compactness requirements, we reported their conclusion, "that the contiguity and compactness requirements, and particularly the latter, are intended to prevent political gerrymandering." 299 Md. at 675, 475 A.2d at 437, citing *Schrage v. State Board of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981); *Preisler v. Doherty,* 365 Mo. 460, 284 S.W.2d 427 (1955); *Schneider v. Rockefeller,* 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972); *Opinion to the Governor,* 101 R.I. 203, 221 A.2d 799 (1966). We then observed, our only other mention of it, that "the contiguity requirement mandates that there be no division between one part of a district's territory and the rest of the district; in other words, contiguous territory is territory touching, adjoining and connected, as distinguished from territory separated by other territory." *Id.* at 675–66, 475 A.2d at 436–37, citing *Schneider, supra; see also In re Sherrill,* 188 N.Y. 185, 81 N.E. 124 (1907).

Our consideration of the compactness requirement was much more detailed, consisting of a review and analysis of the various court decisions on the subject. We concluded,

"that the state constitutional requirements of § 4 work in combination with one another to ensure the fairness of

legislative representation. That they [state constitutional requirements] tend to conflict in their practical application is, however, a plain fact, viz, population could be apportioned with mathematical exactness if not for the territorial requirements, and compactness could be achieved more easily if substantially equal population apportionment and due regard for boundaries were not required."

*In re Legislative Districting*, 299 Md. at 681, 475 A.2d at 440. We rejected the compactness claims raised in that case, explaining as follows:

"We are essentially in agreement with those cases which view compactness as a requirement for a close union of territory (conducive to constituent-representative communication), rather than as a requirement which is dependent upon a district being of any particular shape or size. Of course, in determining whether there has been compliance with the mandatory compactness requirement, due consideration must be afforded, as the cases almost uniformly recognize, to the 'mix' of constitutional and other factors which make some degree of noncompactness unavoidable, i.e., concentration of people, geographic features, convenience of access, means of communication, and the several competing constitutional restraints, including contiguity and due regard for natural and political boundaries, as well as the predominant constitutional requirement that districts be comprised of substantially equal population."

*Id.* at 688, 475 A.2d at 443. We also acknowledged that the redistricting process is a political exercise for determination by the legislature and, therefore, that the presumption of validity accorded districting plans applied with equal force to the resolution of a compactness challenge. *Id.* Thus, we instructed, "the function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations," and not to insist that the most geometrically compact district be drawn. *Id.*

Although we acknowledged and commented on the due regard provision in the 1974 redistricting litigation, construing the term, "political subdivisions" to include incorporated municipalities, *see In re Legislative Districting, supra,* 271 Md. 320, 317 A.2d 477, and made more extensive, but still general, observations in our 1984 redistricting opinion concerning the due regard provision's relationship to the compactness and contiguity requirements, *see In re Legislative Districting,* 299 Md. at 681, 475 A.2d at 439 (noting they "all involve the physical configuration of District lines"), our most expansive consideration of the provision occurred during the last redistricting cycle. *See Legislative Redistricting Cases,* 331 Md. at 611–13, 629 A.2d at 665. In the 1984 case, we observed:

> "The primary intent of the 'due regard' provision is to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas. Like compactness and contiguity, the 'due regard' requirement is of mandatory application, although by its very verbiage it would appear to be the most fluid of the constitutional components outlined in § 4. . . . Thus it is that the state constitutional requirements of § 4 work in combination with one another to ensure the fairness of legislative representation. That they tend to conflict in their practical application is, however, a plain fact, viz, population could be apportioned with mathematical exactness if not for the territorial requirements, and compactness could be achieved more easily if substantially equal population apportionment and due regard for boundaries were not required."

*In re Legislative Districting,* 299 Md. at 681, 475 A.2d at 439–40 (footnotes omitted). Applying the requirement, we rejected an argument that it protected "communities of interest," a concept we found "nebulous and unworkable," pointing out that such communities, "involving concentrations of people sharing common interests," are virtually unlimited and admit of no reasonable standard. *Id.* at 692–93, 475 A.2d at 445–46.

In the 1992 case, *Legislative Redistricting Cases,* 331 Md. 574, 629 A.2d 646, the petitioners argued that due regard was not given to the subdivision boundaries of Baltimore City and

Baltimore County when drawing the legislative lines, as demonstrated by the fact that five legislative districts, one of which was subdistricted into a two member City district and a single member County district, crossed the border between those subdivisions, with three being dominated by City voters and two by County voters. *Id.* at 583, 629 A.2d at 650. The petitioners also pointed to two of the stated rationales given for the districts as drawn by the Chair of the Redistricting Advisory Committee: to "[r]ecognize communities of interest—where districts cross jurisdictional lines and to group communities that share interests" and "[t]o support regional interests through the intra-regional sharing of districts." *Id.* at 613–14, 629 A.2d at 666. Despite reiterating our rejection of the concept of communities of interest as being within the ambit of the due regard provision, agreeing that the Redistricting Advisory Commission appeared to have relied "to some extent" on improper non-legal criteria that "possibly diluted the full application of the 'due regard' provision," and acknowledging that the presumption of validity to which a districting plan is entitled is overcome "when compelling evidence demonstrates that the plan has subordinated constitutional requirements to substantial improper considerations," a divided Court applied the presumption and upheld the districting plan. *Id.* (quoting *In re Legislative Districting*, 299 Md. at 688, 475 A.2d at 443). The Court cautioned, however, that, in the Baltimore City/County region, the plan came "perilously close to running afoul of" the due regard provision. *Id.* Explaining that "[t]he danger lurking in legislative districts which cross jurisdictional boundaries ... is that representatives from those districts may face conflicting allegiances as to legislative initiatives which benefit one of their constituencies at the expense of the other," *id.* at 614–15, 629 A.2d at 666, the Court was satisfied that "the danger of divided loyalties [wa]s minimized" because only in one of the inter-jurisdictional districts would a legislator be called upon to represent numerous persons in two different jurisdictions. *Id.* at 615, 629 A.2d at 666.

In 1992, there were eighteen shared senatorial districts. Baltimore County was involved in seven of them, for the first time, its boundary with Baltimore City being crossed on five occasions (Districts 8, 10, 42, 46, 47), as well as its boundaries with Harford (District 6) and Howard Counties (District 12), once each. Harford County also shared a district with Cecil County (District 35). And Howard County's boundary was breached three times. In addition to the Baltimore County crossing, it shared districts with Prince George's County (District 13) and Montgomery County (District 14). Prince George's County also shared a district (27) with both Anne Arundel and Calvert Counties, which, in turn, shared another district with St. Mary's County (District 29). On the Eastern Shore, Somerset, Wicomico and Worcester Counties, Caroline, Dorchester, Talbot and Wicomico Counties, and Caroline, Cecil, Kent, Queen Anne's and Talbot Counties, all shared districts. Four of the shared districts consisted of more than two counties: 27 (Prince George's, Anne Arundel and Calvert); 36 (Caroline, Cecil, Kent, Queen Anne's and Talbot); 37 (Caroline, Dorchester, Talbot and Wicomico) and 38 (Somerset, Wicomico and Worcester).

The State's Plan for 2002 had twenty-two inter-jurisdictional, or shared, senatorial districts, an increase of four. While the number of districts shared by Baltimore City and Baltimore County remained static, at five (Districts 8, 42, 43, 44, 46), the number of times Baltimore County's boundary was crossed increased by two, from seven to nine. Thus, counting its wholly contained districts, Baltimore County was in twelve senatorial districts. In addition to sharing a district with each of Howard (District 12) and Harford (District 7) Counties, under the State's Plan, the County also would have shared a district with Anne Arundel (District 31) and Carroll (District 5) Counties. Moreover, whereas Anne Arundel County's boundary was breached once in 1992, under this Plan it was breached five times (Districts 31 and 13 with Howard County, 23 with Prince George's County, and 27 with Prince George's, Calvert and Charles Counties). The number of shared districts involving Howard County also increased, from three to

four. In addition to Prince George's (District 21) and Baltimore Counties, as in 1992, Howard County would have shared a district with Anne Arundel and Carroll Counties (District 9). And, while it only shared a district with Frederick County in 1992, under the State's Plan for 2002, Washington County would have shared two districts, the one with Frederick County (District 3) as well as another with Allegany and Garrett Counties (District 1).

Similarly, the number of districts consisting of more than two counties increased by one, as the State's 2002 Plan included five such districts: Districts 1 (Allegany, Garrett, and Washington Counties) 27 (Anne Arundel, Calvert, and Charles Counties) 36 (Caroline, Cecil, Kent, and Queen Anne's Counties), 37 (Caroline, Dorchester, Somerset, Talbot, and Wicomico Counties), and 38 (Dorchester, Wicomico, and Worcester Counties), with two, (Districts 27 and 36) rather than one, as in 1992 (District 37), consisting of four counties. In addition, the State's Plan split the City of College Park between two districts, Districts 21 and 22.

As indicated, most of the petitioners filed exceptions to the Special Master's findings and conclusions, challenging the breach of subdivision and natural boundaries. Noting that they consisted of four counties, in the case of District 27, one more than in the last cycle, and crossed two natural boundaries, the Patuxent River and the Mattawoman Creek, Curry maintains that District 27 and its component delegate district were prima facie violative of the due regard provision. The Golden, DeHaas and Smallwood petitioners argue that the Special Master used "regional" principles to the detriment of Baltimore County to sustain the Baltimore County/Baltimore City districts, noting in particular that four of the five shared districts were controlled by the City, notwithstanding its population being more than 100,000 residents smaller than the County's population. They also contend that Anne Arundel County was one of the most heavily divided of the counties, sharing four of the seven districts into which it was divided with other counties and, in two instances, Subdistrict 23A and

District 31, supplying so few residents "as to hardly merit the attention of non-resident legislators."

Petitioner Stone's exceptions are to similar effect. He argues that Districts 31 and 44 "both defied a natural boundary [the Patapsco River] and crossed subdivision lines." The Brayman petitioners maintain that they have demonstrated viable alternatives for the splitting of the City of College Park, that the reasoning of the Special Master in rejecting their alternative plans is flawed and based on false information, and that the division of the City is both unnecessary and unconstitutional. Petitioner Steele's exceptions state that the Plan increased significantly the number of subdivisions split and the pieces of subdivisions created over the numbers in 1992 and that the Special Master failed to address these increases. Complaining that the Plan divided neighborhoods and precincts, thus, failing to preserve fixed and known features that enable voters to maintain an orientation to their territorial areas, petitioners Gandal and Schofield dispute that the neighborhood of Rollingwood is not a political subdivision. They assert that "[p]recincts are . . . legislatively recognized 'subdivisions' that are regulated by very 'political' boards," also established under the Election Code. Petitioner Dembrow's exceptions include his objection to the irrational and unjustified split, without good cause, of numerous precincts and several residential subdivisions.

The State describes the requirements of Article III, § 4 as "secondary requirements," that are "relative,[ ] must yield to mandatory requirements of population equality and compliance with the Federal Voting Rights Act, tend to conflict with one another in application, and can be subordinated to the achievement of legitimate rational goals." It asserts further that "the language, history and purpose of the due regard provision and previous decisions of this Court demonstrate that its application must of necessity be the most fluid and must give way to more important considerations." Further, the State maintains that "[t]his Court has also said that due regard can be sacrificed to achieve a rational goal, such as

avoiding additional loss of experienced Baltimore City legislators, reducing the number of incumbent contests, and achieving racial balance among the districts" and that "crossings that involve 'minimal overlap' or subdistricts within one county are 'safe harbors' that the Court will not disturb." The State argues that each of the challenged crossings was necessary to achieve population equality, to protect or enhance opportunities for minority representation, to preserve the core of existing districts, or to accommodate a combination of these factors. Otherwise, the State claims that the challenged crossings involve minimal overlap or the creation of subdistricts within a single jurisdiction.

The State's arguments are consistent with the findings and conclusions of the Special Master, as well as the premise underlying those findings, that avoiding the additional loss of senior legislators, reducing the number of incumbent contests and achieving racial balance among the districts are discretionary decisions to which deference is required and rational goals that trump the due regard provision. Accepting the testimony of the Secretary of State with respect to the reasons for the districts, as indicated, the Special Master offered as justification for many of the districts as drawn, the maintenance of the core of existing districts, thus, perpetuating the plan adopted in 1993, the minimization of incumbent contests, and the preservation of African American opportunity to elect representatives of their choice. That was the explicit rationale for the Baltimore City/County districts, and the Anne Arundel County shared districts, 31, 23A and 13, and the implicit rationale for the others. In addition, the Special Master relied on testimony that the shared districts worked well and the absence of any evidence to the contrary. Additional support for the districts was found in the flaws and weaknesses of the various plans offered by the petitioners; that none of them resolved all of the issues raised by the petitioners was an acceptable basis, the Special Master concluded, for deferring to the Plan. Yet another justification accepted for the Plan was the need to maintain acceptable population variances.

As we have seen, when we referred the State's Plan to the Special Master, we placed the burden of proof on the State to justify the Plan with regard to state constitutional requirements. By so doing, we made clear that the Plan raised sufficient issues with respect to those requirements as to require further explanation. We hold that the State has failed to meet its burden to establish the constitutionality of the Plan and, in particular, that in its formulation, due regard was given to natural boundaries and the boundaries of political subdivisions.

As Judge Eldridge has pointed out, prior legislative redistricting plans, 1992 being the exception,[30] considered the counties and Baltimore City "the primary element in apportionment," only crossing subdivision lines to achieve population equality. *Legislative Redistricting Cases,* 331 Md. at 619, 629 A.2d at 669 (Eldridge, J., dissenting) (citing Report to the Governor of Maryland by the Commission to Study Reapportionment of the General Assembly (January 31, 1964) and Final Report of the Committee on More Equitable Representation in the General Assembly of Maryland (January 15, 1960)). There is simply an excessive number of political subdivision crossings in this redistricting plan such that the evidence presented to the Special Master did not justify it and it cannot be justified as necessary to meet federal constitutional and statutory requirements. This holding is consistent with the decisions of our sister states with constitutional provisions similar to the due regard provision of Article III, § 4. *See, e.g., In Re Reapportionment of the Colorado General Assembly,* 45 P.3d 1237, 1243 (Colo.2002) ("A direct line of accountability between citizens, their elected city councils and county com-

---

**30.** Indeed, in *Legislative Districting of State, supra,* 299 Md. at 691 n. 22, 475 A.2d at 445 n. 22, we acknowledged this historical fact: "H.J.R. 32's maintenance of the city's boundaries represents a continuation of a long practice of preserving the city's integrity as a discrete and insular jurisdiction—a practice which cannot be faulted on constitutional grounds so long as it does not impair equality in apportionment, or violate principles of compactness and contiguity or disregard natural or political boundaries."

missioners, and their elected state representatives is at the heart of responsive government in Colorado and is built into the county-oriented design of the Constitution's reapportionment provisions."); *Davenport v. Apportionment Commission,* 124 N.J.Super. 30, 304 A.2d 736, 745 (1973) ("The citizens of each county have a community of interest by virtue of their common responsibility to provide for public needs and their investment in the plants and facilities established to that end") (quoting *Jackman v. Bodine,* 43 N.J. 453, 205 A.2d 713, 718 (1964)); *In re Reapportionment,* 160 Vt. 9, 624 A.2d 323, 330 (1993) ("Local governmental units have various responsibilities incident to the operation of state government in a wide range of areas, including the court system, law enforcement, education, mental health, taxation, and transportation. Consequently, unnecessary fragmentation of these units limits the ability of local constituencies to organize effectively and increases voter confusion and isolation."); *Carstens v. Lamm,* 543 F.Supp. 68, 88 (D.Colo.1982)("These political subdivisions [counties and municipalities] should remain undivided whenever possible because the sense of community derived from established governmental units tends to foster effective representation."). *But see Town of Brookline v. Secretary of the Commonwealth,* 417 Mass. 406, 423–24, 631 N.E.2d 968, 978 (1994).

To be sure, it is the responsibility of the Governor, initially, and the Legislature ultimately, if it chooses to act, to draw the legislative districts. Fulfillment of that responsibility involves the exercise of discretion in the balancing of the various constitutional requirements, as well as other considerations, to the extent they do not undermine the requirements. And because the process is partly a political one, entrusted to the political branches, political considerations and judgments may be, and often are, brought to bear as this balance is struck. Such considerations and judgments, as reflected in a districting plan that meets constitutional muster, will not be, indeed, cannot be, second guessed by the Court.

But neither discretion nor political considerations and judgments may be utilized in violation of constitutional standards. In other words, if in the exercise of discretion, political considerations and judgments result in a plan in which districts: are non-contiguous; are not compact; with substantially unequal populations; or with district lines that unnecessarily cross natural or political subdivision boundaries, that plan cannot be sustained. That a plan may have been the result of discretion, exercised by the one entrusted with the responsibility of generating the plan, will not save it. The constitution "trumps" political considerations. Politics or non-constitutional considerations never "trump" constitutional requirements.

That being said, we flatly reject the State's characterization of the due regard and other provisions of Article III, § 4 as "secondary requirements." While it is true that, consistent with Article 2 of the Maryland Declaration of Rights, *supra* n. 8, state constitutional requirements necessarily yield to federal requirements, state constitutional requirements are nonetheless mandatory, as *In re Legislative Districting*, 299 Md. at 681, 475 A.2d at 439, on which the State so heavily relies for the opposite conclusion, expressly states. Thus, the State's assertion that the due regard provision is suggestive rather than mandatory, relying on its comparison of Article III, § 4 to comparable provisions of other state constitutions,[31] the interpretation, by other courts, of the term

---

31. The subdivision boundaries provisions of the constitutions of other States differ from Article III, § 4, many using more mandatory terms: Pa. Const., Article II, § 16 ("Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a Senatorial or Representative District"); Ca. Const. Article XXI, § 1, Section 1(e) ("the geographical integrity of any city, county or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section"); Co. Const. Article V, § 47(2) ("except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts"); Me. Const. Article 4, Part 1, § 2 ("Each Representative District shall be formed of contiguous and compact territory and shall cross political subdivision lines the least number of

"due regard," as used in other contexts, and the legislative history of the provision, is just plain wrong.

 The premise on which the Special Master proceeded, that the due regard requirement may be subordinated to achieve a "rational goal," and the State's argument that the provision must give way to "more important considerations," also are wrong. Both rely, inappropriately, on our discussion in *In re Legislative Districting,* 299 Md. at 691–92, 475 A.2d at 445, of the compactness requirement as applied to the districting of Baltimore City. Support also may be sought in the Court's characterization, in that case, *id* at 681, 475 A.2d at 440, of the due regard provision as the most fluid of the Article III, § 4 components.

In *In re Legislative Districting,* we noted that, due to population loss, Baltimore City's eleven districts were reduced to nine, all of which, the State decided, would continue to lie entirely within the City's borders. Recognizing the massive undertaking the redrawing of the lines had been, we commented:

"Since Baltimore City would thereby lose two seats in the Senate and six seats in the House of Delegates, the rational goal of avoiding additional loss of senior legislators by reducing the number of contests between incumbents was adopted, as was the legitimate achievement of racial balance among the nine districts. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Necessarily these goals required careful adjustment of district lines and resulted in some sacrifice of ideal geometric

times necessary to establish as nearly as practicable equally populated districts").

The due regard provision of the Maryland Constitution, however phrased, nevertheless clearly was meant to be a limitation on the power of the Governor and/or the Legislature in the redistricting process and to afford protection to the political subdivisions of Maryland. Given the importance in Maryland of counties and the fact that the provision, though phrased in terms of "due regard," is a mandatory constitutional provision, the responsibility for the interpretation of which rests with the Court, it would be an abdication of the Court's responsibility to interpret the provision as the State proposes.

compactness and due regard for natural boundaries, although the requirement for substantial equality of population among the districts was in no way compromised." *In re Legislative Districting*, 299 Md. at 691–92, 475 A.2d at 445. Despite this comment, we nonetheless held that the districts in Baltimore City "were 'compact in form' in light of the constraints upon geometric form imposed by other constitutional commands and the geography of the city itself." Id. at 692, 475 A.2d at 445. Conspicuous by its absence is any acknowledgment that the decision was dictated by any of the political considerations that went into the drawing of the boundaries. Thus, in light of the reference to the constraints imposed by constitutional commands, one of which, subdivision boundaries, was a significant factor in determining the scope of the constraint, the achievement of these "rational goals" obviously did not result in unconstitutional non-compactness.

Nor can solace be obtained from the Court's characterization of the due regard provision as "the most fluid." As the context of that language, and indeed the language itself, confirms the comparison was to the other "constitutional components outlined in § 4." That point was emphasized earlier in the discussion of § 4, when we acknowledged that the component requirements "work in combination with one another to ensure the fairness of legislative representation" and "tend to conflict in their practical application," illustrating the latter by speculating that "population could be apportioned with mathematical exactness if not for the territorial requirements, and compactness could be achieved more easily if substantially equal population apportionment and due regard for boundaries were not required." Id. at 681, 475 A.2d at 440. It was not a comment on the priority of the due regard provision vis-a-vis a non-constitutional factor. But, had that issue been presented, there is little doubt as to its outcome.

The Maryland Constitution is the expression of the will of its citizens. That will is binding on all the parties to the redistricting process, including the Governor and the General Assembly. Any change in the constitutional require-

ments of a districting plan must be effected via the process of amending the Constitution. Article III, § 4 is quite clear in setting out the requirements for legislative districts. That being the case, accepting a "rational goal" as a basis for avoiding a clear requirement under that section is to allow a constitutional mandate to be overridden by a non-constitutional one. Indeed, to interpret this constitutional provision as to subjugate it or any of its component constitutional requirements to lesser principles and non-constitutional considerations or factors would be to amend the constitution without the involvement of the most critical players: the State's citizens. This we cannot, and are not willing, to do. We hold that the goals of avoiding the loss of experienced legislators and reducing incumbent contests, though rational, do not override the constitutional requirement that due regard be given the subdivision boundaries.

While we recognize that a legislative districting plan is entitled to a presumption of validity, we also have stated that the presumption "may be overcome when compelling evidence demonstrates that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations," *Legislative Redistricting Cases*, 331 Md. at 614, 629 A.2d at 666, or when, having been allocated the burden of proof, the State fails to carry it. *See id.; see also In re Legislative Districting*, 299 Md. at 688, 475 A.2d at 443. At the very least, the latter is the situation, here.

Another persistent theme in the Report of the Special Master, touted as a "rational goal" and offered as justification for the drawing of some of the district lines and, in particular, for disregarding subdivision boundaries, was the preservation of the core of existing districts. Of course, while it may be an appropriate and even laudable goal, that consideration also is not a constitutional requirement. Therefore, although it may be considered and used as a factor in drawing the lines so long as there is no violation of the constitutional mandates, preserving district cores may not, as we have seen, excuse a constitutional violation. Moreover, preserving the core of a district

may, and often will, be in conflict with the due regard provision and, perhaps, the compactness requirement, in that it tends to perpetuate the status quo. By incorporating this goal in a districting plan, subdivision crossings already in existence will likely continue, or in the case of compactness, non-compactness may be inevitable. The Golden petitioners have it right when they suggest that, to use an existing plan as a constraint, especially if that constraint were allowed to over-ride constitutional requirements, is to dictate a continuation of the deficiencies in the old plan. Due regard, under such an approach, would certainly be undermined, if not completely nullified as to shared districts already in existence, as the Baltimore City/Baltimore County districts in the State's Plan demonstrate.

We have declared the State's Plan unconstitutional in its entirety, having concluded that there were substantial violations of the due regard provision. With that declaration, we undertook to promulgate a constitutional districting plan. Our obligation under that undertaking was to promulgate a plan that would pass constitutional muster. Consequently, we do not address the other exceptions; since we have promulgated a constitutional plan and did so without political considerations, those other grounds likely have been addressed and resolved.

With the assistance of technical consultants, as previously indicated, we have promulgated a plan that we believe to be constitutional and to address all of the issues raised by the parties. It adopts the Special Master's recommendation to implement the Stoltzfus plan. Accordingly, the State's exceptions on that point are overruled. The Court's Plan differs considerably from the Plan we declared unconstitutional. Containing many fewer shared senatorial districts and many fewer subdivision crossings, it acknowledges the importance of the political subdivisions by giving due regard, as the Constitution demands, to their boundaries.

All five of the Baltimore City/Baltimore County shared districts have been eliminated, with two becoming solely County Districts and three solely City Districts. The result is that

Baltimore City now has six fully self-contained districts, consistent with its population, while Baltimore County has six fully within its borders and shares three, one with each of Harford, Howard and Carroll Counties. Thus, Baltimore County is in only nine, as compared with twelve senatorial districts and its boundaries have been crossed only three, rather than nine times. Whereas Anne Arundel County, under the Plan, shared four districts, we have reduced that number to one. Rather than sharing Districts 31, with Baltimore County, 13 with Howard County, 23 with Prince George's County, and 27 with Prince George's, Calvert and Charles Counties, it will share only District 21 with Prince George's County. Prince George's County's three shared districts have been reduced to two, District 21 with Anne Arundel and District 27 with Calvert and Charles, District 23A having been absorbed entirely in Prince George's County. Thus, District 27 has been reduced from a four county district to a three county district. Carroll County's shared districts number three (District 5 with Baltimore County, District 9 with Howard and District 4 with Frederick), the same as under the State's Plan, while Harford (District 7 with Baltimore County and District 34 with Cecil County) and Howard (District 12 and District 9) share two. And the twenty-two shared senatorial districts proposed in the State's Plan have been reduced by eight, to fourteen in the Court's Plan. In addition, the Court's Plan contains districts still substantially equal in population—remaining, in fact, within the ten percent deviation—and that are more compact than those in the State's Plan, having been constructed without regard to considerations extraneous to the constitutional requirements. Finally, the City of College Park has been united in a single district, without the necessity of splitting any other City or subdivision.

## V.

It is for the foregoing reasons that, pursuant to the authority vested in this Court by Article III, § 5 of the Constitution of Maryland, we declared the State's Plan invalid as inconsistent with the requirements of the State Constitution.

The costs, including the fee and expenses of Nathaniel A. Persily, one of the Court's technical consultants, are to be paid by the State of Maryland.

RAKER, J., dissenting:

"Despite the reality that redistricting is now almost always resolved through litigation rather than legislation, we are moved to emphasize the obvious: redistricting remains an inherently political and legislative—not judicial—task. Courts called upon to perform redistricting are, of course, *judicially legislating*, that is, *writing* the law rather than *interpreting* it, which is not their usual—and usually not their proper—role. Redistricting determines the political landscape for the ensuing decade and thus public policy for years beyond. The framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to make precisely these sorts of political and policy decisions, is preferable to any other."

*Jensen v. Wisc. Elections Bd.*, 249 Wis.2d 706, 639 N.W.2d 537, 540 (2002) (internal citations omitted).

I respectfully dissent from the Court's Order. I would adopt the Report of the Special Master, attached hereto as an appendix. Although I might have made different choices than those set out in the State's 2002 redistricting plan, it is not for me to substitute my judgment for that of the Governor or the Legislature, unless, and only when, the plan submitted violates constitutional criteria.

As this Court explained in *Legislative Redistricting*, 331 Md. 574, 629 A.2d 646 (1993), "the constitutional requirements for legislative districting tend to conflict with one another." *Id.* at 615, 629 A.2d at 667. Successful redistricting requires careful planning and detailed preparation in order to navigate the narrow waters between two often competing sets of requirements: those of the Maryland Constitution and those of the federal Voting Rights Act of 1965 ("VRA"), 42 U.S.C.

§ 1971 (1994).[1] The majority asserts, in its description of the process that the Court undertook in promulgating "a legislative redistricting plan that is in compliance with both state and federal constitutional and statutory requirements," maj. op. at 350, that the Court did not take into account the same partisan political considerations that the Governor and the General Assembly can. The majority also claims that its "only guideposts" were "strict legal requirements" and that it eliminated considerations, such as incumbency. Maj. op. at 323. If only such a feat were possible. Unfortunately, however, there is no such accomplishment as promulgating a redistricting plan without political considerations.

Redistricting involves a host of discretionary policy and political choices for reconciling the many competing interests at stake in the allocation of political power, such as respect for communities of interest,[2] maintenance of existing district and precinct lines, protection of incumbents,[3] and enhancing minority voting opportunities. The decision not to consider incumbency, regionalism, or communities of interest is itself a political decision. As one experienced commentator noted:

---

1. Unless otherwise indicated, all subsequent statutory references are to 42 U.S.C. § 1971 (1994), *et seq.*

2. We have previously defined *communities of interest* as "identifiable concentrations of population which share one or more common interests." *In Re Legislative Districting*, 299 Md. 658, 686 n. 21, 475 A.2d 428, 442 n. 21 (1982).

3. The Supreme Court has recognized specifically the protection of incumbents as a legitimate redistricting objective. *See Bush v. Vera*, 517 U.S. 952, 964–65, 116 S.Ct. 1941, 1954, 135 L.Ed.2d 248 (1996); *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) (permitting states to deviate from ideal population equality for the purpose of avoiding contests between incumbents); *see also Legislative Redistricting*, 331 Md. 574, 610, 629 A.2d 646, 664 (1993) (recognizing that drawing districts so as to minimize contests between incumbents, without more, did not mandate finding that the State's plan was unconstitutional); *In Re Legislative Districting*, 299 Md. 658, 673–74, 475 A.2d 428, 436 (1982). This protection even extends to "functional incumbents," *i.e.*, members of the state legislature who have declared an intention to run for open congressional seats. *See Vera*, 517 U.S. at 959, 116 S.Ct. at 1952, 135 L.Ed.2d 248.

"Redistricting ... is thoroughly and relentlessly political." Gene R. Nichol, Jr., *New Challenges in Voting: the Practice of Redistricting,* 72 U. COLO. L.REV. 1029, 1033 (2001). The United States Supreme Court has concurred in that sentiment, opining: "Politics and political considerations are inseparable from districting.... The reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings,* 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973). *See LaPorte County Republican Cent. Comm. v. Board of Commissioners of County of LaPorte,* 43 F.3d 1126 (7th Cir.1994); *Legislative Redistricting,* 331 Md. at 609–10, 629 A.2d at 664.

The redistricting authority must balance carefully many relevant factors, including the application of the VRA's objective of ensuring that minority voters are not denied the chance effectively to influence the political process. On the one hand, the State must construct districts capable of withstanding challenges on the basis of compactness, contiguity, and due regard for natural and political subdivision boundaries. *See* MD. CONST., art. III, § 4. On the other hand, the State must avoid potential liability under § 2 of the VRA. *See* § 1973.[4] Unfortunately, however, for the purposes of VRA compliance, "[m]inorities are not always located in perfectly compact, contiguous locales." David M. Guinn, et al., *Redistricting in*

---

4. Section 2 provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision of the United States to vote on account of race or color.... (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to a nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. § 1973. ·

*2001 and Beyond: Navigating the Narrow Channel Between the Equal Protection Clause and the Voting Rights Act,* 51 BAYLOR L.REV. 225, 250 (1999).

## I. Equality of Population Between Districts

Perhaps the most fundamental requirement that the law imposes on legislative redistricting is population equality, as reflected in the "one person, one vote" standard. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Population equality requirements for state legislative districts are governed by the Equal Protection Clause of the Fourteenth Amendment[5] and by Article III, § 4 of the Maryland Constitution.[6] According to the Supreme Court, the federal constitution requires that population equality be the *primary* redistricting consideration. *See Karcher v. Daggett,* 462 U.S. 725, 732–33, 103 S.Ct. 2653, 2659, 77 L.Ed.2d 133 (1983); *White v. Weiser,* 412 U.S. 783, 790, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973); *Gray,* 372 U.S. at 379–80, 83 S.Ct. at 808, 9 L.Ed.2d 821.[7] Population equality has been described as the *"sine qua non* of fair representation." *Legislative Districting,* 299 Md. at 672, 475 A.2d at 435. *See Maryland Comm. for Fair Representation v. Tawes,* 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964).

---

**5.** The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

**6.** Art. III, § 4 requires: "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

**7.** As to state legislatures, "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). The Court permits some deviations from the equal population principle with respect to apportionment of the two houses of a bicameral state legislature, "[s]o long as the divergences ... are based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579, 84 S.Ct. at 1391, 12 L.Ed.2d 506.

In analyzing state legislative plans, courts consider their deviation from the "ideal" population of the district, which is formulated by dividing the entire voting population by the number of persons to be elected. *See* Guinn, et al., *supra,* at 263. A plan with less than a ten percent top-to-bottom deviation is *prima facie* constitutional under the Equal Protection Clause, which means that it "is generally considered acceptable without any justification at all." J. Gerald Hebert, *Redistricting in the Post 2000 Era,* 8 GEO. MASON L.REV. 431, 472 (2000). *See Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2695–96, 77 L.Ed.2d 214 (1983).[8] Since the State's 2002 Plan is within a ten percent deviation from ideal population equality, it is entitled to a *prima facie* presumption of constitutionality.[9]

## II. Maryland Constitutional Requirements

Although the Maryland Constitution grants this Court the power to review and "grant appropriate relief" to petitioners, it may do so only if it first "finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland." MD. CONST. art III, § 5. The majority, however, seems to have put the cart before the horse in its review of the State's 2002 Plan, by jumping straight to the imposition of its "remedy" without first engaging in a serious analysis of whether, how, or why the State's plan violates State or federal law. The Special Master found, subject to a single change in the lower Eastern Shore, that the State's 2002 Plan satisfies

---

8. While this Court has not reached the question of whether the Maryland Constitution may impose a more lenient population equality standard than the Equal Protection Clause, we have held that Article III, § 4 does not impose a stricter standard than the ten percent rule imposed by the Fourteenth Amendment. *See Legislative Redistricting Cases,* 331 Md. 574, 600–01, 629 A.2d 646, 659 (1993).

9. The Special Master found that, under the State's plan, the maximum total deviation was 9.91% among legislative districts, 9.89% among single-member subdistricts, and 7.12% among two-member subdistricts.

Maryland constitutional requirements and is, therefore, valid. *See* MD. CONST., art. III, § 4. I agree with that finding.

There is no single practical measure of compactness, in geometric terms, that is generally accepted by social scientists as definitive and, likewise, this Court has failed to provide a definition of the term.[10] The vast majority of jurisdictions have concluded that the compactness requirement, in the context of state legislative redistricting, is a relative standard. *See Schrage v. State Bd. of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981); *Preisler v. Kirkpatrick,* 528 S.W.2d 422, 426 (Mo.1975); *Davenport v. Apportionment Comm'n,* 65 N.J. 125, 319 A.2d 718 (1974); *Schneider v. Rockefeller,* 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972); In Re: *Reapportionment Plan for Pa. Gen. Assembly,* 497 Pa. 525, 442 A.2d 661 (1981); *Opinion to the Governor,* 101 R.I. 203, 221 A.2d 799 (1966); *see also Legislative Districting,* 299 Md. at 676, 475 A.2d at 438. The compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints that interact with and operate upon it, including those factors that make some degree of noncompactness unavoidable, such as concentration of population, geography, convenience of access, means of communication, as well as the competing state constitutional constraints of contiguity and due regard for natural and political subdivision boundaries, the predominant constitutional requirement of substantial population equality, and the requirements of the VRA. *See Legislative Districting,* 299 Md. at 688, 475 A.2d at

---

**10.** Attempts have been made to quantify compactness for the evaluation of redistricting plans through the use of methods, such as dispersion (which calculates the ratio of the district's area to the area of the minimum circle that could circumscribe it) and perimeter measure (which represents the irregularity or jaggedness of a district's border by calculating the ratio of the district's area to the square of the district's perimeter). *See* Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election District Appearances After Shaw v. Reno,* 92 MICH L.REV 483, 554–55 (1993).

To date, Colorado appears to be the only jurisdiction that has defined or applied the compactness requirement in purely geometric terms. *See Acker v. Love,* 178 Colo. 175, 496 P.2d 75 (1972).

443.[11] Thus, compactness ordinarily cannot be determined by a mere visual examination of an electoral map. *See id.* As we explained in *Legislative Districting:*

"As the cases so plainly indicate, the compactness requirement in state constitutions is intended to prevent political gerrymandering. Oddly shaped or irregularly sized districts of themselves do not, therefore, ordinarily constitute evidence of gerrymandering and noncompactness. On the contrary, an affirmative showing is ordinarily required to demonstrate that such districts were intentionally so drawn to produce an unfair political result, that is, to dilute or enhance the voting strength of discrete groups for partisan political advantage or other impermissible purposes. Thus, irregularity of shape or size of a district is not a litmus test proving violation of the compactness requirement."

*Id.* at 687, 475 A.2d at 443.

Contiguity has generally been defined as the ability "to travel from one part of the district to any other part without

---

**11.** In *In Re Legislative Districting,* 299 Md. 658, 475 A.2d 428 (1984), this Court denied a compactness challenge to the State's 1982 redistricting plan, which was implemented after the 1980 census and which disclosed a decline in Baltimore City's population in relation to the population of the rest of the state. We described the competing interests that were balanced in drawing the districts in Baltimore City as follows:

"Since Baltimore City would thereby lose two seats in the Senate and six seats in the House of Delegates, the rational goal of avoiding additional loss of senior legislators by reducing the number of contests between incumbents was adopted, as was the legitimate achievement of racial balance among the nine districts. Necessarily these goals required careful adjustment of district lines and resulted in some sacrifice of ideal geometric compactness and due regard for natural boundaries, although the requirement for substantial equality of population among the districts was in no way compromised. We thus conclude that the legislature, in adopting [the Governor's plan], did construct districts in Baltimore City, all of which were 'compact in form' in the light of the constraints upon geometric form imposed by other constitutional commands and the geography of the city itself."

*Id.* at 691–92, 475 A.2d at 445 (internal citations omitted). That description is equally apt with regard to the State's 2002 Plan.

crossing the district boundary—in other words, a contiguous district is one that is not divided into two or more discrete pieces." Hebert, *supra*, at 451; *see also Legislative Districting*, 299 Md. at 675–76, 475 A.2d at 437. In the context of the requirement in Article III, § 4 that districts must "consist of adjoining territory," during the adoption of the 1968 Constitution, the Committee of the Whole Convention placed on the record a statement that it was the members' understanding that the contiguity and compactness requirements were a prohibition against the General Assembly forming a district that crossed the Chesapeake Bay. Mere separation of a district by any body of water does not render it noncontiguous. *Cf. Anne Arundel Co. v. Annapolis*, 352 Md. 117, 721 A.2d 217 (1998) (finding that areas of land separated by water were not noncontiguous pursuant to the Annapolis municipal annexation statute).

Both compactness and contiguity are functional, rather than visual, considerations. They cannot be considered in isolation. *See Beaubien v. Ryan*, 198 Ill.2d 294, 260 Ill.Dec. 842, 762 N.E.2d 501 (2001); *Cole–Randazzo v. Ryan*, 198 Ill.2d 233, 260 Ill.Dec. 826, 762 N.E.2d 485 (2001). Compactness and contiguity, in application, are affected and influenced by the population equality requirement. They also include consideration of the shared political and economic interests of a community. *See Bush v. Vera*, 517 U.S. 952, 964, 116 S.Ct. 1941, 1954, 135 L.Ed.2d 248 (1996).

The majority recognizes that the compactness and contiguity requirements are intended to prevent political gerrymandering, *see* maj. op. at 360–61, but fails to provide a workable definition of political gerrymandering or standards by which to determine whether an irregularly shaped district is the result of impermissible gerrymandering. The majority defines gerrymandering as " '[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength.' " Maj. op. at 332 n. 14. A district is not gerrymandered, however, simply because it may have irregular boundaries—even if such irregularity is the

result of political considerations. To be unconstitutional, a plaintiff raising a gerrymandering claim must establish that there was intentional discrimination against an identifiable political group and that there was an actual discriminatory effect upon that group. *See Davis v. Bandemer*, 478 U.S. 109, 127, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

No such affirmative showing of gerrymandering was made by petitioners in these cases, and, to the extent that the Court's Order or the majority opinion today shift the burden to the State to prove compactness and contiguity, they are an incorrect application of our prior case law.

Section 4 of the Maryland Constitution provides that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." A redistricting plan demonstrates due regard for natural and political subdivision boundaries by keeping counties, cities, and towns intact, where it is possible to do so without doing violence to other legitimate redistricting considerations. *See* Hebert, *supra*, at 451. This Court has stated previously that the due regard requirement, while of mandatory application, "by its very verbiage it would appear to be the most fluid of the constitutional components outlined in § 4." *Legislative Districting*, 299 Md. at 681, 475 A.2d at 439. As one commentator explains: "Because [political subdivisions like cities and counties] vary tremendously in geographic size and population density, it is very difficult to make comparative judgments about decisions to split them." Hebert, *supra*, at 465 n. 163. Unfortunately, however, the majority's analysis of the due regard provision of Article III seems to be limited to a mere counting of the number of boundary crossings in the State's plan. *See* maj. op. at 368–69 ("There is simply an excessive number of political subdivision crossings in this districting plan. . . ."); *see generally* maj. op. at 368.

The majority maintains that the due regard provision of § 4 is mandatory. *See* maj. op. at 370–71. I agree. The question is not whether the due regard *provision* is mandatory (obvi-

ously "shall" in this context signals mandatory operation), but the real question is what "due regard" means.

The majority asserts that, while the goals of avoiding the loss of experienced legislators and reducing incumbent contests are rational, they "do not override the constitutional requirement that due regard be given the subdivision boundaries." Maj. op. at 373. Again, I agree with that simple statement. Protection of incumbents did not "override" the due regard provision in the State's redistricting plan; rather, due regard is necessarily a relative consideration that incorporates other permissible redistricting goals.

"Due regard," it seems to me, is analogous to the language contained in the Massachusetts Constitution, which requires, *inter alia,* that the Legislature shall divide the Commonwealth into representative districts of contiguous territory and that such districts shall be formed, "as nearly as may be," without uniting two counties, towns, or cities. *See* MASS. CONST., art. 101. In *Mayor of Cambridge v. Secretary of the Commonwealth,* 436 Mass. 476, 765 N.E.2d 749 (2002), the Massachusetts redistricting statute was challenged because portions of the city of Cambridge were placed in six representative districts when all of the Commonwealth's constitutional requirements could have been met with fewer divisions. Rejecting the challenge, and interpreting the "as nearly as may be" requirement, the Massachusetts Supreme Judicial Court stated:

"Because the redistricting process involves the consideration of these competing factors, the clause requiring the Legislature to avoid the division of cities, towns, and counties 'as nearly as may be' cannot be interpreted to require that the Legislature adopt the plan with the absolute minimum number of districts that cross county, town, or city lines. The Legislature must adopt a plan for the entire State, and the divisions of a particular city, town, or county may be reasonable in light of the need to meet Federal and State requirements for the state as a whole. Thus, the phrase 'as nearly as may be' requires the Legislature to adopt the plan with the fewest divisions, while taking into consideration all the other relevant factors. The Massachu-

setts Constitution does not require the Legislature simply to devise mathematically the plan with the least division of cities, towns or counties and then adopt that plan; its determination necessarily involves the use of discretion and, as in all legislation, compromise on the part of the Legislature.

We have traditionally accorded the Legislature substantial deference in determining how to strike the proper balance among the various directives and goals laid out by State and Federal Law. The issue we must resolve is not whether a better plan exists, but 'whether, once these various mandates and considerations are taken into account, the Legislature has unduly departed from the directive in art. 101 on which the plaintiffs rely.' The plaintiffs bear the burden of showing that the Legislature's plan violates art. 101 'beyond reasonable doubt.' As long as the legislature took 'reasonable efforts to conform to the requirements of the Constitution,' we will uphold the Legislature's redistricting plan. The Legislature must consider each of the Federal and State requirements, but is not required to demonstrate explicitly how the plan meets each of those requirements.

Although the plaintiffs have presented three alternatives to the redistricting statute, whether any of these plans is potentially superior to the redistricting statute is not determinative of the question we must decide. We consider the alternative plans as evidence that a plan with fewer divisions of Cambridge was possible. As long as the Legislature had a reasonable justification for drawing the districts as it did, we shall not question the Legislature's determination by comparing its selected plan to alternative plans that were not before it. The Constitution does not require that the Legislature adopt the best plan 'that any ingenious mind can devise.' .... As long as the Legislature's actions are reasonably justified by an attempt to conform with the criteria laid out by Federal and State law, and do not clearly

violate these laws, we shall not usurp the Legislature's role by selecting among competing plans."

*Id.* at 755 (internal citations omitted).

The formulation of redistricting plans involves complicated considerations requiring careful study and a weighing of factors. State constitutional requirements are but one of several different criteria that the legislative districts must satisfy. Districts also must be substantially equal in population, and they must be configured in such a way as to provide adequate representation to minorities and other special interests protected by federal law. No matter how compact, contiguous, or respectful of natural and political subdivision boundaries a proposed district may be geographically, it will not suffice under the law unless it complies with each of these other factors. Accordingly, perfect compactness, contiguity, and regard for boundaries is not required. Districts need only be reasonably compact and contiguous, and natural and political subdivision boundaries need be respected only when reasonably feasible to do so. Nonetheless, the majority, in striking down the State's 2002 plan and substituting its own, elevates Maryland constitutional redistricting requirements to a position of primary importance, far in excess of the weight given them in this Court's prior redistricting jurisprudence.

A redistricting plan, approved and filed by the General Assembly, is presumed to be valid. *See Legislative Redistricting*, 331 Md. at 595, 629 A.2d at 656; *Legislative Districting*, 299 Md. at 688, 475 A.2d at 443; *cf. Erfer & Albert v. Commonwealth of Pa.*, 794 A.2d 325 (Pa.2002) (stating that, as with any statute, a redistricting plan enjoys a presumption of constitutionality and will be declared unconstitutional only if it is clearly, palpably, and plainly unconstitutional). The majority makes the oblique statement that the presumption of validity may be overcome "when, having been allocated the burden of proof, the State fails to carry it." Maj. op. at 373. This argument is a nonsequitur. By definition, a *presumption* of validity requires that the burden of proof is upon the party attempting to overcome the presumption. The plaintiffs challenging the plan bear the burden of establishing that the

adopted plan is unconstitutional. With the exception of districts 37 and 38, they have failed to do so.[12]

The State's 2002 plan is not discernibly different, in terms of Maryland constitutional requirements, from the plan approved by this Court in *Legislative Redistricting Cases,* 331 Md. 574, 629 A.2d 646 (1993), following the last federal decennial census. For example, the number of districts crossing the boundary between Baltimore City and Baltimore County remains the same as it was in the 1992 plan approved by this Court, less territory is involved in the 2002 crossings than in the 1992 plan, and a smaller percentage of Baltimore County's population shares a district with another jurisdiction under the State's 2002 plan (54.5%) than under the 1992 plan (55.5%). Furthermore, the State's 2002 plan rigorously adheres to population equality requirements and provides adequate representation to minorities and other special interests protected by federal law. Under these circumstances, there is insufficient basis for holding that the challenged districts in the State's 2002 plan are not reasonably compact or contiguous or do not show due regard for natural and political subdivision boundaries.

In striking down the State's 2002 plan, the majority relies heavily upon the premise that it is possible to formulate alternative districts that would be more compact and contiguous and that would give greater regard to natural and political subdivision boundaries. The ability to devise more compact and contiguous formulations, with fewer boundary crossings, however, is not a sufficient basis for invalidating a map duly approved and filed according to law. *See Legislative Districting,* 299 Md. at 688, 475 A.2d at 443; *accord Beaubien,* 260

---

12. I recognize that the Court's Order placed the burden on the State to justify the plan with regard to state constitutional requirements. *See* maj. op. at 361–62. Although I joined in that Order, upon further reflection, I believe that the Court erred in placing the burden of proof upon the State with respect to state constitutional requirements. In the instant case, it matters little, because the Special Master found, and I agree with him, that the State met that burden at the hearing below. The issue of the presumption of validity and the allocation of the burden, however, is important for future cases.

Ill.Dec. 842, 762 N.E.2d at 505.[13] As this Court explained in *Legislative Districting:* "[I]t is not for the judiciary to determine whether a *more* compact district could have been drawn than that under challenge; the court's province is solely to determine whether the principles underlying the requirement of compactness of territory have been considered and properly applied considering all relevant circumstances." *Id.* at 680–81, 475 A.2d at 439 (emphasis added).

The majority posits that preserving the core of existing districts, as a redistricting consideration, often will conflict with the due regard and compactness requirements in that it "tends to perpetuate the status quo." Maj. op. at 374. I fail to see the constitutional problem with perpetuation of the status quo, particularly in light of the fact that this Court held the existing legislative districts (presumably the "status quo"), as drawn in 1992, to be constitutional. *See Legislative Redistricting,* 331 Md. at 616, 629 A.2d at 667. What better way is there to ensure stability and predictability in the process of decennial redistricting than to use existing judicially-approved districts as a starting point for reapportionment?

## III. Voting Rights Act

The Final Plan adopted by the Court today raises concerns pursuant to § 2 of the VRA. *See* § 1973. Congress enacted the VRA in an effort to eradicate persistent assaults on the ability of minorities effectively to vote. Congress's goal in passing the act was to enforce the Fifteenth Amendment's guarantee that "[t]he right of citizens of the United States to

---

13. For example, the arguments presented by petitioners with respect to Districts 18 and 20 essentially are that by reconfiguring the two districts, the map could be improved to make districts 18 and 20 more compact than they are under the State's plan, relying solely on visual observation. The majority does not attempt to justify the Court's changes and redrawn lines and in fact, never says what was unconstitutional about the lines as originally drawn. Although the changes might make the map appear more visually compact, that is not a justification for redrawing the map. This is especially true when changes are not made to other districts that appear to be far less compact by a visual examination.

vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." *See Legislative Redistricting*, 331 Md. at 602–03, 629 A.2d at 660.

Section 2 of the VRA prevents minority vote dilution, by preventing states from enforcing voting practices that undermine minority voting strength.[14] *See* §§ 1971 and 1973; *Legislative Redistricting*, 331 Md. at 602–03, 629 A.2d at 660. Section 2 prohibits the imposition of any electoral "standard, practice or procedure" (including redistricting plans) that "results in a denial or abridgment of the right of any citizen ... to vote on account of race or color." § 1973(a). A violation of § 2 exists if, "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protection by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." § 1973(b). It is not necessary for a plaintiff to demonstrate intentional discrimination in order to prove a violation of the VRA.

In the context of redistricting, § 2 raises questions about how and when state governments must create districts that provide minority voters with an effective opportunity to elect candidates of their choice. *See* Hebert, *supra*, at 434. In order to raise successfully a VRA challenge to a redistricting

---

14. *Minority vote dilution* is the denial of equal opportunity to participate successfully in the electoral process. There are several accepted methodologies for determining the racial composition of the electoral support for successful minority candidates, including ecological inference, retrogression analysis, exit polling, and vote shares based on homogeneous precincts (*i.e.*, those precincts in which more than ninety percent of registered voters are either black or white). *See* Charles S Bullock, III & Richard E. Dunn, *The Demise of Racial Districting and the Future of Black Representation*, 48 Emory L.J. 1209, 1223–24 (1999); David M. Guinn, et al., *Redistricting in 2001 and Beyond: Navigating the Narrow Channel Between the Equal Protection Clause and the Voting Rights Act*, 51 Baylor L.Rev. 225, 264 n. 258 (1999).

plan, petitioners must demonstrate the existence of three factors: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in the district; (2) that the minority group is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority group's preferred candidate. *See Growe v. Emison*, 507 U.S. 25, 39–40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993); *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986).[15] Furthermore, in its efforts vigorously to enforce the VRA, the United States Department of Justice has regularly compelled state legislatures to create majority-minority districts. *See* Guinn, et al., *supra*, at 227–28; *see, e.g., Miller v. Johnson*, 515 U.S. 900, 905–07, 115 S.Ct. 2475, 2483–84, 132 L.Ed.2d 762 (1995).[16]

---

**15.** Numerous empirical studies demonstrate both a general cohesiveness of black political preferences and voting behavior and significant differences from white preferences and behavior, as well as white bloc voting, which excludes black Americans from the fair and equal representation required by § 2 of the VRA. *See* DAVID A. BOSITIS, JOINT CENTER FOR POLITICAL AND ECONOMIC STUDIES, 1996 NATIONAL OPINION POLL: POLITICAL ATTITUDES (1996); THOMAS E. CAVANAGH, INSIDE BLACK AMERICA. THE MESSAGE OF THE BLACK VOTE IN THE 1984 ELECTION 125 (1985); MICHAEL C. DAWSON, BEHIND THE MULE: RACE AND CLASS IN AFRICAN AMERICAN POLITICS 183 tbl. 8.1, 206 (1994); JENNIFER L. HOCHSCHILD, FACING UP TO THE AMERICAN DREAM: RACE, CLASS, AND THE SOUL OF THE NATION 61 (1995); WARREN E. MILLER & SANTA TRAGOTT, AMERICAN NATIONAL ELECTION STUDIES DATA SOURCEBOOK, 1952–1986, 88 (1989); KEITH REEVES, VOTING HOPES OR FEARS. WHITE VOTERS, BLACK CANDIDATES & RACIAL POLITICS IN AMERICA 9, 76–90 (1997); JESSIE CARNEY SMITH & ROBERT L. JOHNS, STATISTICAL RECORD OF BLACK AMERICA 806, 831–32 (3d. ed.1996); DORIS WARRINER, JOINT CENTER FOR POLITICAL AND ECONOMIC STUDIES, AFRICAN AMERICANS TODAY: A DEMOGRAPHIC PROFILE 7 (1996); Lani Guinier, *The Triumph of Tokenism: the Voting Rights Act and the Theory of Black Electoral Success*, 89 MICH. L.REV 1077, 1129–30, 1134 (1991); Amy Gutmann, *Responding to Racial Injustice, in* ANTHONY APPIAH & AMY GUTMANN, COLOR CONSCIOUS: THE POLITICAL MORALITY OF RACE 166 (1996); Pamela S. Karlan & Daryl J. Levinson, *Why Voting Is Different*, 84 CAL L.REV. 1201, 1220–21, 1231 (1996); James Etienne Viator, *The Losers Know Best the Meaning of the Game: What the Anti-Federalists Can Teach Us About Race Based Congressional Districts*, 1 LOY. J. PUB. INT. L. 1, 24 n. 99 (2000).

**16.** The Equal Protection Clause generally prohibits the use of race as the predominant factor in the placement of district boundaries. *See* U.S. CONST. amend. XIV; *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995). Nonetheless, not all racial

Under ideal conditions, the State's redistricting plan would be created by adhering to traditional redistricting principles, while reflecting an awareness of race but not being dominated by it, and it would not retrogress in terms of minority voting opportunity in comparison to the benchmark of the legally enforceable legislative districts adopted in 1992. Nonetheless, creating districts in which minority population is sufficiently concentrated [17] to ensure that minority voters have a realistic

---

considerations are prohibited. In the context of redistricting, strict scrutiny is triggered only where traditional redistricting principles are subordinated to consideration of race. *See Bush v. Vera,* 517 U.S. 952, 959–60, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Miller,* 515 U.S. at 916, 115 S.Ct. at 2488, 132 L.Ed.2d 762; *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). The Supreme Court has made clear that the intentional creation of majority-minority districts is not *per se* unconstitutional. *See Vera,* 517 U.S. at 958–59, 962, 116 S.Ct. at 1951–52, 135 L.Ed.2d 248. Furthermore, compliance with § 2 of the VRA is a compelling governmental interest. *See King v. Illinois Bd. of Elections,* 522 U.S. 1087, 118 S.Ct. 877, 139 L.Ed.2d 866 (1998); *Vera,* 517 U.S. at 958–59, 962, 116 S.Ct. at 1951–53, 135 L.Ed.2d 248. In *DeWitt v. Wilson,* 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995), the Supreme Court upheld California's 1992 redistricting plan, which intentionally improved minority voting opportunity in congressional districts. *See id.* at 1170, 115 S.Ct. at 2637, 132 L.Ed.2d 876. It is the presence of racially polarized voting that necessitates the drawing of majority-minority districts if minority candidates are to have a fair opportunity to win office. When the VRA requires the creation of a majority-minority district, however, racial considerations must be narrowly tailored to the extent necessary to accomplish the specific statutory obligations of § 2. *See Vera,* 517 U.S. at 994, 116 S.Ct. at 1970, 135 L.Ed.2d 248.

17. There are many competing definitions of majority-minority district, none of which has been universally accepted by courts. Some courts have looked to whether the minority group constitutes a majority of the voting age population, *see, e.g., McNeil v. Springfield Park Dist.,* 851 F.2d 937, 947 (7th Cir.1988), while others have looked to whether the relevant minority group comprises a majority of the citizen voting age population. *See, e.g., Campos v. City of Houston,* 113 F.3d 544, 548 (5th Cir.1997).

Courts and commentators have also disagreed on whether and to what extent a particular district must have a numerical majority-minority population in order to provide minority groups an opportunity to elect candidates of their choice. *See* J. Gerald Hebert, *Redistricting in the Post 2000 Era,* 8 GEO. MASON L.REV. 431, 437 (2000). In *United Jewish Org. of Williamsburgh v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the Supreme Court adopted sixty-five percent as

opportunity to elect candidates representative of their interests may necessitate violating state constitutional redistricting precepts, such as compactness, contiguity, and due regard for natural and political subdivision boundaries. Majority-minority districts may have to be crafted carefully in order to capture pockets of black voters while avoiding concentrations of white voters. Black and white neighborhoods may have to be disentangled with surgical precision lest the maximum permissible population be reached before a minority majority can be secured. Preserving majority black districts may necessitate tying together disparate minority concentrations. While some natural and political subdivision boundaries may inevitably have to be sundered to meet population equality requirements, VRA obligations increase the extent to which those boundaries may have to be breached.

One of the primary considerations under § 2 of the VRA is proportionality, or lack thereof, between the number of minority-controlled districts and the minority's share of the state's relevant population. *See* Hebert, *supra,* at 435. The Supreme Court has indicated that, while rough proportionality

---

the level of concentration needed to ensure minorities a fair opportunity to elect their candidate of choice. *See id.* at 164, 97 S.Ct. at 1009, 51 L.Ed.2d 229. Some empirical research has placed the necessary concentration of minority voters significantly lower, in some instances documenting minority voting opportunity in majority-white districts. *See* Charles S. Bullock, III & Richard E. Dunn, *The Demise of Racial Districting and the Future of Black Representation,* 48 EMORY L.J. 1209, 1253 (1999); Charles Cameron, et al., *Do Majority Minority Districts Maximize Substantive Black Representation in Congress?,* 90 AM POL. SCI REV 794, 804, 809–10 (1996) (suggesting that forty-one percent black voting age population was sufficient to ensure that a black candidate could get elected); David Epstein & Sharyn O'Halloran, *A Social Science Approach to Race, Redistricting and Representation,* 93 AM POL SCI. REV. 187, 189 (1999) (suggesting that approximately forty-seven percent black voting age population was necessary to ensure that a black candidate could get elected). Furthermore, in districts that are heavily weighted toward one political party, and in which primary elections determine party nominees, it is even more likely that a district with less than fifty percent minority population can provide an effective opportunity for minority voters to elect a candidate of their choice, because such districts provide minority voters with a "functional majority" even though they lack a "numerical majority." *See* Hebert, *supra,* at 438–39.

does not automatically protect a state from liability under § 2, nor does § 2 require a state to maximize the possible number of majority-minority districts, proportionality is a strong "indication that minority voters have an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice.'" *Johnson v. De Grandy,* 512 U.S. 997, 1020, 114 S.Ct. 2647, 2661, 129 L.Ed.2d 775 (1994) (quoting § 2 of the VRA).

The Special Master found that "[t]he shape of District 44 [under the State's plan] was designed, at least in part, by the need to maintain a sufficient number of African American majority districts in the Baltimore City/Baltimore County area, by including the African American population of Turner's Station within the district." Report of the Special Master at 419. The Special Master also found that, "[w]ith an African American majority in District 44, the number of African American majority districts in Baltimore City and Baltimore County is proportional to the African American population." Report of the Special Master at 420.

The VRA prohibits the creation of electoral districts that tend to dilute the voting power of a minority population by dividing its members among several districts and "packing" minority voting strength into a single district, where the minority population might otherwise have constituted a majority in more than one electoral district. Districts 40, 41, 44, and 45 in the Final Plan adopted by the Court, in contrast to the State's 2002 Plan, contain substantially larger concentrations of black voters than reasonably necessary to avoid minority vote dilution. "Packing" excessive numbers of minority voters into districts, rather than placing them in neighboring districts, prevents those spillover voters from contributing to the election of additional minority-supported candidates who could be expected to be responsive to minority political concerns, thereby substantially weakening minority voting opportunities in adjoining districts (this resulting weakening of minority voting strength in adjoining districts has sometimes been referred to as "bleaching"). *See* Hebert, *supra,* at 456 ("[A] packed 60% black district may

undermine minority voters' effectiveness and influence in an adjoining district...."). Packing is particularly deleterious when the majority white districts adjoining those into which minority voters have been packed used to be minority "influence districts,"[18] as were several adjoining Baltimore County districts in 1992. Furthermore, this type of packing may constitute a VRA violation in light of the fact that minority-preferred candidates increasingly have been elected in majority-white districts in the 1990's. *See supra* note 18; Hebert, *supra*, at 439. The result is that, under the Court's plan, black voters may constitute an effective voting majority in fewer districts than their proportional share of the statewide population. As Gerald Hebert explains:

> "Packing minority voters into a district is a form of vote dilution that minimizes minority voting strength in much the same way as fragmenting a politically cohesive minority group into two or more districts, where their voting power is reduced and rendered ineffective. Indeed, the 'packing' of minority voters into districts in the post 2000 era poses perhaps the greatest potential for minimizing and diluting the voting strength of racial and ethnic minority voters."

Hebert, *supra*, at 439.

## IV. Separation of Powers

While no party has challenged the authority of the Court to draw a redistricting plan, I think it important to comment on the process and the impact on the separation of powers within the State. "The distribution of governmental power among

---

**18.** Several lower courts have issued decisions mandating or favoring the creation of influence districts pursuant to the VRA. *See, e.g., Armour v. Ohio*, 775 F.Supp. 1044, 1052 (N.D.Ohio 1991). The Supreme Court has, on several occasions, expressly declined to rule on whether § 2 requires the creation of influence districts. *See Johnson v. DeGrandy*, 512 U.S. 997, 1008–09, 114 S.Ct. 2647, 2656, 129 L.Ed.2d 775 (1994); *Voinovich v. Quilter*, 507 U.S. 146, 154–60, 113 S.Ct. 1149, 1155–59, 122 L.Ed.2d 500 (1993); *Growe v. Emison*, 507 U.S. 25, 40 n. 5, 113 S.Ct. 1075, 1084 n. 5, 122 L.Ed.2d 388 (1993); *Thornburg v. Gingles*, 478 U.S. 30, 46–47 n. 12, 106 S.Ct. 2752, 2764 n. 12, 92 L.Ed.2d 25 (1986).

different departments, so that the whole power is never concentrated in a single individual or group, is fundamental to the American concept of government." Susan Thompson Spence, *The Usurpation of Legislative Power by the Alabama Judiciary: From Legislative Apportionment to School Reform*, 50 ALA. L.REV. 929, 931 (1999); THE FEDERALIST No. 47, at 245 (James Madison) (warning that " '[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted. . . .' " (citations omitted)).

The Maryland Constitution establishes the familiar American tripartite form of government, dividing the powers of the state government among three departments: the legislative, the executive, and the judicial. The state's judicial power is vested in "a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court." MD. CONST. art. IV, § 1. The Maryland Constitution explicitly assigns to the executive and legislative branches the duty and power periodically to reapportion the legislature by requiring that the Governor and the General Assembly reapportion the state's legislative districts after each decennial United States census. *See* MD. CONST. art. III, § 5.

The Maryland Constitution forbids each branch of government from usurping the power of any other branch. Article VIII of the Maryland Declaration of Rights states: "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." Maryland's horizontal separation of powers clause is the primary constitutional limit on the exercise of judicial power by this Court. While the judicial power in Maryland includes the power of judicial review to determine whether acts of the legislative or executive branches are constitutional, the separation of powers clause precludes Maryland courts from exercising power explicitly vested in the legislative and executive

branches, even as a means to remedy constitutional violations by another branch of government.

Under the Maryland Constitution, establishing boundaries for state electoral districts and subdistricts, in the first instance, is an executive and legislative function, not a judicial one. The duty to redistrict is vested expressly in the Governor and the General Assembly. *See* MD. CONST. DECL. OF RIGHTS art. VIII. "[T]he districting process is a political exercise for determination by the legislature and not the judiciary." *Legislative Districting*, 299 Md. at 688, 475 A.2d at 443.

As this Court explained in *Legislative Redistricting*, the State's final redistricting plan should be given the force and effect of law:

"When the General Assembly passes a bill which becomes law, the people of Maryland have articulated a legitimate state policy through their duly elected officials. That is no less true where, as here, the constitution specifies that the Governor shall develop the law in the first instance, which the General Assembly can then reject or endorse through its own action or inaction."

*Legislative Redistricting*, 331 Md. at 595 n. 16, 629 A.2d at 656 n. 16. Therefore, the State's 2002 plan is entitled to a presumption of validity. *See Legislative Districting*, 299 Md. at 688, 475 A.2d at 443.

As the Supreme Court of Illinois explained:

"In that respect, redistricting plans are directly analogous to statutory enactments, which are also cloaked with the presumption of validity. The presumption of validity means that courts must uphold a statute's constitutionality whenever reasonably possible. Correspondingly, a party challenging the statute's constitutionality bears the burden of clearly establishing the law's constitutional infirmity. So it is with a duly approved and filed redistricting plan."

*Beaubien*, 260 Ill.Dec. 842, 762 N.E.2d at 505 (internal citations omitted). The court concluded:

"Redistricting is a difficult and often contentious process. A balance must be drawn. Trade-offs must be made. In the end, the question turns on who is to make those assessments. Our predecessors on this court answered that question more than a century ago:

'Who, then, must finally determine whether or not a district is as compact as it could or should have been made? Surely not the courts, for this would take from the legislature all discretion in the matter and vest it in the courts, where it does not belong; and no apportionment could stand unless the districts should prove as compact as the judges might think they ought to be or as they could themselves make them. As the courts cannot make a senatorial apportionment directly, neither can they do so indirectly. There is a vast difference between determining whether the principle of compactness of territory has been applied at all or not, and whether or not the nearest practical approximation to prefect compactness has been attained. The first is a question which the courts may finally determine; the latter is [not].' "

*Beaubien,* 260 Ill.Dec. 842, 762 N.E.2d at 507 (citations omitted).

That is precisely what has occurred today. While the majority pays lip service to granting the State's 2002 Plan a presumption of validity, *see* maj. op. at 374, in reality, the Court's Order and opinion reflect that the Court required the State to establish the validity of the plan and ultimately substituted its own redistricting plan without first giving the Governor and Legislature an opportunity to revise their 2002 plan according to newly created constitutional criteria. *See* maj. op. at 322–23. Although time was of the essence, "it is important that the primacy of the legislative role in the redistricting process be honored and that the judiciary not be drawn prematurely into that process." *Cotlow v. Growe,* 622 N.W.2d 561, 563 (Minn.2001). The Governor and the General Assembly did not fail, refuse, or unduly delay to come forth with a valid redistricting plan after having been advised by the

Court that the plan was not constitutional—the Court's Order gave them no such opportunity.

I recognize, of course, that the people of this State have a right to, and a strong interest in, a constitutional redistricting map and that the Court is the final arbiter of the constitutionality of any plan. In my view, however, a plan is drawn properly and ideally by the Legislature and only secondarily by this Court. In light of the overriding policy of deference to the other branches of state government on legislative and executive questions, it is striking that the majority did not offer a compelling explanation for its refusal first to allow the Governor and General Assembly to provide a new redistricting plan to meet the majority's state constitutional concerns, particularly in light of what must be regarded as a stunning reversal of position compared to this Court's opinion in the 1993 *Legislative Redistricting.*

In closing, I think it important to ask the following questions for the next redistricting cycle. *Cf. Leroux v. Secretary of State,* 635 N.W.2d 692 (Mich.2001) (setting forth specific questions to be addressed by the parties in the context of redistricting). What guidance has the Court provided for the Governor and the Legislature in redistricting? What are the definitions of "due regard," "compactness," and "adjoining territory?" What guidelines does the Court apply in reviewing a state redistricting plan? Does the legislative redistricting plan enjoy a presumption of validity? Should the Court's plan, ten years from now, be the baseline for the State's next redistricting plan, or would that constitute impermissible maintenance of "the status quo?" Under separation of power principles set forth in the Maryland Constitution, may this Court reject or modify a redistricting plan adopted by the Legislature and adopt its own redistricting plan without first giving the Legislature the opportunity to offer a revised plan?

Accordingly, I respectfully dissent from the Court's June 21, 2002 Order and its opinion today.

APPENDIX: REPORT OF SPECIAL MASTER

IN THE COURT OF APPEALS OF MARYLAND

SEPTEMBER TERM, 2001

Misc. Nos. 19, 20, 22, 23, 24, 25, 26,
27, 28, 29, 30, 31, 32, 33, 34

IN THE MATTER OF THE 2002 LEGISLATIVE REDIS-
TRICTING OF THE STATE

TO THE HONORABLE CHIEF JUDGE BELL AND THE
ASSOCIATE JUDGES OF THE COURT OF APPEALS OF
MARYLAND

## REPORT OF THE SPECIAL MASTER

As required by Article III, Section 5, of the Maryland
Constitution, after public hearings, Governor Parris N. Glen-
dening submitted a plan for redistricting the State to reflect
the growth and shifting of population in Maryland based upon
the results of the 2000 decennial census of the United States.
*See* Md. Const., art. III, § 5. In further compliance with said
Section 5 of Article III, the Governor presented the plan to
the President of the Senate and Speaker of the House of
Delegates, who in turn introduced it as Senate Joint Resolu-
tion 3 and House Joint Resolution 3 on the first day of the
2002 session of the General Assembly, January 9, 2002. *Id.*
Since the General Assembly did not enact a plan of its own by
the 45th day of the opening of the Session, February 22, 2002,
the Governor's plan became this State's plan for setting forth
the boundaries of the legislative districts. *Id.*

Fourteen petitions have been filed challenging the validity
of the State's plan. After a hearing on April 11, 2002, the
Court referred the petitions and the responses thereto to the
undersigned as Special Master "for the taking of further
evidence and the making of a report to the Court" by May 24,
2002. Pursuant to that order, hearings took place on April 25,
26 and 29, 2002.

## A. The Petitions

In Misc. No. 20, Petitioner Wayne K. Curry, the County Executive of Prince George's County is joined by other African American residents of that county. Their amended petition asserts that the State's plan violates their Fourteenth Amendment guarantee of equal protection of the law under the United States Constitution and that it is invalid under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. They also claim that the plan conflicts with Articles 2, 7 and 24 of the Declaration of Rights of the Constitution of Maryland.

In Misc. No. 22, Petitioner Eugene E. Golden, *et al.*, are registered voters in what were heretofore designated as the 7th and 31st legislative districts. Petitioners Jacob J. Mohorovic and John R. Leopold are members of the House of Delegates. They complain that District 44 of the State's plan is neither compact nor contiguous and fails to indicate that due regard was given "to natural boundaries and the boundaries of political subdivisions" as required by Article III, Section 4 of the Maryland Constitution.[1] They level the same complaint at District 31 as drawn in the State's plan.

In Misc. No. 23, Petitioner Barry Steven Asbury, a registered voter in Baltimore County makes general claims of invalidity of the State's plan.

In Misc. No. 24, Petitioner J. Lowell Stoltzfus is a registered voter in Somerset County, as is Petitioner John W. Tawes. They are joined by Lewis R. Riley, a registered voter in Wicomico County. Mr. Stoltzfus is a member of the Maryland Senate. They assert that the State's plan violates Article III, Section 4 of the Maryland Constitution because it

---

1. Article III, § 4 provides:

 Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions.

 Md. Const., art. III, § 4.

configures Districts 37 and 38 so that they are (1) not compact in form, and (2) in derogation of the constitutional mandate to afford due regard to boundaries of political subdivisions.

In Misc. No. 25, Petitioners Norman R. Stone, Jr., a member of the Maryland Senate, John S. Arnick, a member of the House of Delegates, and Joseph J. Minnick, another member of the House of Delegates, join with other registered voters in Baltimore County in challenging the creation of Districts 7, 34, 44 and 46 under the State's plan. They claim that the State has ignored Article III, Section 4 of the Maryland Constitution because these districts are not compact and contiguous and that due regard was not given to natural boundaries and boundaries of political subdivisions.

In Misc. No. 26, Petitioner Gail M. Wallace, a registered voter in Calvert County, complains that the State's plan in creating District 27A has ignored the requirements of Article III of the Maryland Constitution that legislative districts be compact and that due regard be given to boundaries of political subdivisions. She claims that by being included in District 27A, along with residents of Prince George's County, Southern Anne Arundel County and Northern Charles County, the residents of that portion of Calvert County, who will comprise less than 9% of the voters in District 27A, will be denied effective representation.

In Misc. No. 27, Petitioner Stephen A. Brayman and other residents of the incorporated municipality of College Park, as registered voters in Prince George's County, complain that the division of the City between District 21 and District 22 under the State's plan violates the constitutional mandate that in planning legislative districts due regard be given to the boundaries of political subdivisions.

In Misc. No. 28, Petitioners Gabriele Gandel and Dee Schofield complain that under the State's plan their neighborhood in Montgomery County, where they are registered voters, has been included in District 20 although that neighborhood under prior redistricting was included within District 18. They allege that the Fourteenth Amendment to the Constitution of

the United States, Article 7 of the Maryland Declaration of Rights and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 have been violated by this redistricting.

In Misc. No. 29, Petitioner Michael S. Steele is a registered voter in Prince George's County. He is an African American and is Chairman of the Maryland Republican party. He challenges the State's plan on various grounds, alleging that the State's plan:

1. Dilutes minority voting rights in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973;

2. Is a racial gerrymander that discriminates against minority voters in violation of the Fourteenth and Fifteenth Amendments;

3. Creates legislative districts which are not compact or contiguous and does not give due regard to natural boundaries and boundaries of political subdivisions in violation of Article III, Section 4 of the Maryland Constitution;

4. Violates the "one person, one vote" guarantee of the Fourteenth Amendment;

5. Is a partisan gerrymander that discriminates against Republican voters in violation of the Fourteenth Amendment; and

6. Penalizes Republican voters in violation of the First Amendment.

In Misc. No. 30, Petitioner Dana Lee Dembrow is a registered voter in Montgomery County and is also a member of the House of Delegates. He claims the State's plan is invalid because its legislative districts are not compact, as required by Section 4 of Article III of the Maryland Constitution. Furthermore, he alleges that the State's plan was implemented without due process, and, finally asserts that the State's plan undermines the right of opportunity of minority representation.

In Misc. No. 31, Petitioners Katharina Eva DeHaas, *et al.*, are registered voters in Anne Arundel County who complain

that District 23A fails to give due regard to boundaries of political subdivisions because it has placed that portion of Anne Arundel County in which they reside in a district whose registered voters are principally from Prince George's County.

In Misc. No. 32, Petitioners Rayburn Smallwood, *et al.*, are registered voters in Anne Arundel County. They challenge the State's plan because it places a small portion of Anne Arundel County in which they reside in District 13, which is principally located in Howard County. In doing so, they say the State's plan fails to give due regard to the boundaries of political subdivisions as required by Article III, Section 4 of the Maryland Constitution.

In Misc. No. 33, Petitioners John W. Cole, Franklin W. Prettyman and John S. Lagater are the County Commissioners of Caroline County and are registered voters in that county. They assert that the State's plan is invalid because:

1. It creates legislative districts which are not compact, contiguous and lack due regard for natural boundaries or boundaries of political subdivisions;

2. It violates the concept of proportionality of representation embodied in Article 7 of the Declaration of Rights;

3. It limits the counties on the Eastern Shore to three senators and 11 delegates in the House of Delegates; and

4. It creates Subdistrict 38A as a majority minority district in violation of the equal protection clause of the Fourteenth Amendment.

In Misc. No. 34, Petitioner Joseph M. Getty, is a member of the House of Delegates from Carroll County and a registered voter in that county. He challenges the entire State's plan on the ground that certain counties, including Carroll, have populations that exceed the number of an ideal legislative district (112,691 persons) but failed to receive a district within their boundaries. In addition, he asserts that the State's plan fails to observe the requirements of Article III, Section 4 that each

legislative district be compact and that due regard be given to the boundaries of political subdivisions.

## B. Population Equality

The Petitioners in Misc. Nos. 20, 23, 28, 29 and 34 assert that the State's plan violates the "one-man, one vote" principle guaranteed by the Fourteenth Amendment of the United States Constitution and by Article III, Section 4 of the Maryland Constitution.

The Supreme Court of the United States and this Court have held that substantial equality of population is the primary goal of redistricting. *Reynolds v. Sims,* 377 U.S. 533, 567, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." (footnote omitted)); ("The one person, one vote principle, we noted in 1982, 'is the *sine qua non* of fair representation, assuring that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.' "). *Legislative Redistricting Cases,* 331 Md. 574, 592–93, 629 A.2d 646 (1993) (quoting *In re Legislative Districting,* 299 Md. 658, 672, 475 A.2d 428 (1984)). The Supreme Court, however, in applying the one person-one vote rule has held that minor deviations from mathematical equality among state legislative districts are insufficient to make a *prima facie* case of invidious discrimination under the Fourteenth Amendment so as to require justification by the state. ("Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations."). *Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), (quoting *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *see also Gaffney v. Cummings,* 412 U.S. 735, 745–47, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)). This Court has applied this 10% rule to the requirement of Article III,

Section 4 of the Maryland Constitution that all legislative districts be "of substantially equal population." *Legislative Redistricting Cases,* 331 Md. at 600–01, 629 A.2d 646.

The evidence offered at the hearing showed that the 2000 census determined that Maryland had a population of 5,296,-486 persons.[2] *See* State's Exhibit 16. Sections 2 and 3 of Article III of the Maryland Constitution require that there be 47 legislative districts and that one senator and three delegates be elected from each. Moreover, the delegates may be elected at large throughout the district or from single or multiple subdistricts. Therefore, "ideal" legislative districts would each contain 112,691 persons; each single member subdistrict would contain 37,563 persons; and each two member subdistrict would contain 75,126 residents. Under the State's plan the legislative districts range in population size from 107,065 to 118,242, a disparity of 11,177. This constitutes a deviation range from –4.99 to +4.92 or a total of 9.91%. *See* State's Exhibit 26. Single member subdistricts range in population size from 35,716 to 39,432, a disparity of 3,716. This results in a deviation range of –4.92% to +4.97% or a total of 9.89%. Two member subdistricts, with an ideal population of 75,126, range in size from 73,512 to 78,867, a disparity of 5,355 persons. This constitutes a deviation range from –2.15% to +4.97% or a total of 7.12%.

Since all legislative districts and subdistricts under the State's plan fall within a range of ± 5%, the population disparities are sufficiently minor so as not to require justification by the State under the Fourteenth Amendment, *Legislative Redistricting Cases,* 331 Md. at 594, 629 A.2d 646, or under Article III, Section 4 of the Maryland Constitution. *Id.* at 600–01, 629 A.2d 646. Finally, this Court pointed out in that case:

Possibly, there may be room under *Reynolds* and its progeny for a plaintiff to overcome the "10% rule," if the plaintiff can present compelling evidence that the drafters of the

---

2. The 1990 census revealed that Maryland's population was 4,781,468.

plan ignored all the legitimate reasons for population disparities and created the deviations *solely* to benefit certain regions at the expense of others.

*Id.* at 597, 629 A.2d 646 (footnote omitted). The evidence presented to me does not establish any basis for such a finding.

For these reasons, I recommend that the Court reject the contentions that the State's plan runs afoul of the population equality mandates of the Fourteenth Amendment and the Maryland Constitution.

### C. Voting Rights Act

In *Legislative Redistricting Cases,* this Court explained that § 2 of the Voting Rights Act of 1965 as amended in 1982, prohibits any practice by a state or political subdivision

"which *results* in a denial or abridgement of" minority voting rights, and ... that a minority need only show, in the totality of the circumstances, that it has less opportunity for electoral participation and success in order to establish a Voting Rights Act violation.

331 Md. at 604, 629 A.2d 646. The Supreme Court in *Thornburg v. Gingles* held that the important question in Voting Rights actions

"is whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."

478 U.S. 30, 44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The *Gingles* court directed that to answer that question, courts must weigh "objective factors" such as:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the majority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had a probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 36–37, 106 S.Ct. 2752. The *Gingles* court, however, noted three limits on the effect of these factors:

First, electoral devices, such as at-large elections, may not be considered *per se* violative of § 2. . . . Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish

a violation. *Ibid.* Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it. *Id.* at 46, 106 S.Ct. 2752.

Finally, in *Gingles,* the Supreme Court emphasized that the creation of multi-member districts, "generally will not impede the ability of minority voters to elect representatives of their choice" unless:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. 2752.

In Misc. 20 (Curry) and Misc. 29 (Steele), the State's plan as a whole is alleged to violate § 2 of the Act. These challenges fail since the petitioners cannot satisfy the threshold conditions mandated by *Gingles* that require the plaintiffs in the instant case to identify a geographically compact minority and a pattern of polarized voting by that minority as well as the surrounding white community. The evidence offered before me showed that more than 60% of Maryland's African American population is concentrated in two political subdivisions, Baltimore City and Prince George's County. Thus, the contention that African Americans have suffered vote dilution clearly is not based upon a specific "geographically compact" minority population. Likewise, these statewide challenges are not supported by evidence of racially polarized voting by both the minority population and the surrounding white population. It is not enough to show a general pattern of racial polarization to require that district lines be drawn to maximize the number of majority black districts, at least up to a number constituting the same proportion that African Americans constitute of the total state population. *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1048

(D.Md.1994). As this Court stated in *Legislative Redistricting Cases:*

> The Voting Rights Act simply does not require a state to create every conceivable minority district. *Turner v. State of Ark.,* 784 F.Supp. 553, 573 (E.D.Ark.1991), *aff'd,* [504] U.S. [952], 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992) (§ 2 is not an affirmative action statute, and a state need not enact a districting plan that maximizes black political power or influence).

331 Md. at 609, 629 A.2d 646.

Furthermore, Steele failed to offer any evidence from expert or lay witnesses sufficient to demonstrate that the black population in Maryland, or in the Capital Region (*i.e.,* Montgomery and Prince George's County), is sufficiently compact to create additional majority minority districts. Also, Steele did not meet his burden of proof that the black population statewide, or in the Capital Region, is politically cohesive or that white voters in the State or Capital Region vote sufficiently in a bloc to enable them to defeat the minority's preferred candidate.

Consequently, Steele's claim that the Voting Rights Act requires the creation of single member subdistricts throughout the State cannot be maintained. Nevertheless, had he met his burden of proving the *Gingles* threshold conditions, he introduced no evidence that the "totality of the circumstances" surrounding the opportunities of minorities to take part in the electoral process would have rendered his complaint without merit.

Lastly, his claims that the drafters of the State's plan engaged in invidious racial discrimination in the districting proceedings and engaged in partisan gerrymandering in redistricting the State, are completely unsupported by the evidence.

For these reasons, I recommend that the Court hold that Petitioner Steele's contentions under the Fourteenth and Fif-

teenth Amendments, and the Voting Rights Act are without merit.

The Petitioners in Misc. No. 20 (Curry) challenge the State's plan under the Voting Rights Act on three grounds. First, they allege that under their alternative Curry Plan, a majority Hispanic delegate district, which would be a single member district that is designated 20B, should be created. That district would cross the boundary line between Montgomery and Prince George's Counties, which according to their expert, Dr. Richard H. Engstrom, would have a 50.7% Hispanic voting age population. *See* Engstrom report, p. 23. Dr. Engstrom, however, did not analyze any elections between or among Hispanic and non-Hispanic candidates. Consequently, he found no election results that could provide him with sufficient data to conduct any analysis of the *Gingles* factors. Moreover, Dr. Engstrom testified that he did not know if Hispanic voters are a cohesive voting bloc, nor could he know whether whites would vote to defeat candidates preferred by Hispanics. Dr. Allen J. Lichtman, the State's expert, pointed out in his testimony that Dr. Engstrom could not show political cohesion, the second *Gingles* threshold prong, or its third prong, voting records of non-Hispanic voters in elections where a candidate preferred by Hispanic voters is involved.

Furthermore, Dr. Lichtman, in his report, as well as on the witness stand, demonstrated that in the Hispanic majority subdistrict proposed in the Curry Plan, 20B, registration and voter turnout in the Montgomery and Prince George's County precincts that make up the proposed Hispanic majority subdistrict are so low that the Curry Plan will not improve the ability of Hispanic voters to elect candidates of their choice. Those districts under the current districting are Montgomery (3–41), Prince George's (17–4), and Prince George's (17–10), where the average turnout of the voting age population is 2.9%. Therefore, I find that the Curry Petitioners have failed to establish the threshold conditions to a Voting Rights Act

claim based on the absence of a Hispanic majority district, *i.e.*, that the minority population is cohesive and votes in a bloc.

Second, the Curry Petitioners attempted to prove that in the black opportunity Senate and House districts under the State's plan, the cohesive minority electorate would be unable to elect its candidate of choice. To do so, they depended upon Dr. Engstrom's analysis of the *Gingles* preconditions as they apply to African American voting opportunities in eight elections in Prince George's County where African American and non-African American candidates ran. Six of the eight elections failed to show polarized voting along racial lines. In the three general elections Dr. Engstrom analyzed, African American and non-African American voters shared the same candidate preferences. *See* Curry exhibits 31, 32 and 33. In the 1998 primary election in District 27, the white candidate was the choice of both African Americans and non-African Americans. *See* Curry Ex. 26. In the 1994 Democratic primary election in District 26, African Americans and non-African American voters preferred the same two of the top three candidates, both of whom were African American. In that election, a majority of both African Americans and non-African Americans voted for African American candidates.

In the 1998 Democratic primary election in District 26, two of the top three African American choices were also the choices of non-African Americans. In this election, a majority of both African Americans and non-African Americans voted for African American candidates. I find that the analysis by Dr. Engstrom fails to demonstrate that voting is racially polarized in Prince George's County, either in the current districts or in the State's plan. Furthermore, even if Dr. Engstrom had proven the existence of racially polarized voting, there is no evidence from his analysis to support the other *Gingles* preconditions *i.e.,* a cohesive minority electorate that is usually unable to elect its candidates of choice as a result of whites voting sufficiently as a bloc to usually defeat the minority's preferred candidates. Therefore, I conclude that

the Curry petitioners have not met their burden of proof on the *Gingles* preconditions to a Voting Rights action.

Third, the Curry Petitioners urge the creation of more majority minority districts in Prince George's County, in the Capital Region and statewide. I am not persuaded to that view by the evidence received at the hearing. The State's plan includes five districts in Prince George's County in which the State contends that African Americans have a fair opportunity to elect candidates of their choice, *i.e.,* Districts 22, 24, 25, 26 and 27. District 22 is the only one of these which does not have a majority African American voting age population; rather, in District 22 the African American voting age population is only 42% of the total voting age population in the district. Nevertheless, African Americans turnout to vote in Democratic primaries in District 22 at a much higher rate than non-African Americans, and constitute about 59% of primary voters in this district. *See* Lichtman report, p. 13.

Neither the Curry Plan nor any other plan has suggested or presented evidence that African Americans, or any other minority, constitute a sufficiently numerous and compact group anywhere in the State other than Baltimore City and Prince George's County, and the federal-court created district on the Eastern Shore, to create a minority opportunity district.

I, therefore, find that the State has demonstrated that the number of majority minority districts in the State is proportionate to the number of African Americans and other minorities in areas where the minority is sufficiently compact and numerous to create a minority opportunity district. There is no requirement that the State must create every conceivable minority district. *Legislative Redistricting Cases,* 331 Md. at 609, 629 A.2d 646. Indeed, § 2 of the Voting Rights Act expressly provides that "nothing in this section established a right to have members of a protected class elected in numbers equal to their proportion in the population." The Curry petitioners have not met their burden of proof that the State's plan insufficiently provides for minority opportunity districts.

The Petitioners in Misc. No. 37 (Cole) claim that by creating Subdistrict 38A in order to make a majority minority district, the State has the burden under the Voting Rights Act to establish the *Gingles* factors. The Petitioner's reliance on *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) for that contention is misplaced. The Supreme Court has held that a plaintiff in an alleged vote dilution claim under the Voting Rights Act has the burden of proving the existence of the *Gingles* factors. *Thornburg,* 478 U.S. at 46, 106 S.Ct. 2752; *Voinovich,* 507 U.S. at 155, 113 S.Ct. 1149.

Subdistrict 38A under the State's plan is substantially similar to Subdistrict 37A under the current plan. Current Subdistrict 37A was created as a result of a decision of the United States District Court for the District of Maryland which found a Voting Rights Act violation in the State's 1992 plan. *See Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022 (D.Md.1994).

I recommend that the Cole petition be found to be without merit insofar as it alleges a violation of the Voting Rights Act.

### D. State Law Contentions

With few exceptions, each Petitioner takes issue with the legislative districts drawn in the State's plan as the districts affect their individual interests. They claim that the districts which they challenge were not drawn in compliance with the mandate of Section 4, Article III of the Maryland Constitution. That provision mandates:

> Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and boundaries of political subdivisions.

### 1. Adjoining Territory

This phrase "adjoining territory" in Section 4 was adopted from the Proposed Constitution of 1968. Consequently, the floor debate at the constitutional convention that drafted that document is an aid to the interpretation of "adjoining territo-

ry." During the floor debate on December 1, 1967, an amendment was proposed to substitute the term "adjoining land area" for "adjoining territory." After that proposed amendment failed, the Chairman of the Committee on the Legislative Branch concluded that "we can't use a prohibition about crossing a body of water.". *Id.* at 6315–16, 6332–35. Later, another amendment was offered to prohibit the creation of a district "that crosses the center of the Chesapeake Bay." *Id.* at 6525–31, 6439–42. When it appeared, however, that the proposed amendment might also prevent the creation of a district which crossed the Susquehanna River, the Committee Chairman expressed his concern that "if we start adding tributaries, estuaries, and other bodies of water . . . we won't know where we stand." *Id.* The Chairman stated that he would support the amendment only if it was limited to the Bay. *Id.* at 6529–31. As a result, the proposed amendment was withdrawn. *Id.* at 6541–42.

Subsequently, the Committee of the Whole of the Convention placed on the record a statement that it was "our intention that under the interpretation of the words adjoining and compact . . . a redistricting commission or the General Assembly could not form a district, either a Senate district or a Delegate district by crossing the Chesapeake Bay." *Id.* at 6574–75.

In other contexts, this Court has interpreted the term "adjoining territory" so that separation of two areas by water does not render them non-contiguous. *See Anne Arundel County v. City of Annapolis*, 352 Md. 117, 721 A.2d 217 (1998) (under municipal annexation statute, areas of land separated by water does not render them non-contiguous).

For these reasons I recommend that the Court deny the petitions challenging districts 31, 44, 34A, 38A and 37B which allege that because two parts of the district are separated by a river, the district's territory is not contiguous.

### 2. Compactness and due regard for natural boundaries and boundaries of political subdivisions

In *Legislative Redistricting Cases,* 331 Md. at 590–92, 629 A.2d 646, this Court revisited the compactness requirement which the Court had examined in detail in *In re Legislative Districting,* 299 Md. at 674–81, 475 A.2d 428.

> We pondered the meaning of the compactness requirement in some detail in the 1982 redistricting case, which involved a number of compactness challenges. After surveying the views of other jurisdictions, we found that "the ideal of compactness, in geometric terms, is a circle, with the perimeter of a district equidistant from the center. *In Re Legislative Districting, supra,* 299 Md. at 676, 475 A.2d 428. However, we recognized that
>
>> the compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints which interact with and operate upon the constitutional mandate that districts be compact in form. Thus, it cannot ordinarily be determined by a mere visual examination of an electoral map whether the compactness requirement has been violated....
>
> *Id.* at 680, 475 A.2d 428. We concluded that
>
>> it is not the province of the judiciary to strike down a district as being noncompact simply because a more geometrically compact district might have been drawn.... [T]he function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations.
>
> *Id.* at 688, 475 A.2d 428.

331 Md. at 590–91, 629 A.2d 646.

Also in *In re Legislative Districting,* 299 Md. at 681, 475 A.2d 428, this Court observed:

> the state constitutional requirements of § 4 work in combination with one another to ensure the fairness of legislative representation. That they tend to conflict in their practical application is, however, a plain fact, viz, population could be

apportioned with mathematical exactness if not for the territorial requirements, and compactness could be achieved more easily if substantially equal population apportionment and due regard for boundaries were not required.

The factors relevant to the districts alleged to be in violation of the State Constitutional requirements of compactness, and due regard for natural boundaries and boundaries of political subdivisions will be addressed separately.

## FINDINGS OF FACT

### Baltimore County

Although the population of Baltimore County grew by 62,-158 residents between 1990 and 2000, southeast Baltimore County lost population while the northern and western portions of the county gained population. *See* State's Ex. 20. As a result, a portion of the county's population must share districts with residents of another county, because Baltimore County has too much population for six legislative districts and not enough for seven legislative districts.

Under the State's plan there are six districts in which the majority of population comes from Baltimore County (Districts 6, 7, 8, 10, 11 and 12). *See* State's Ex. 24. Baltimore County shared districts with Carroll, Harford and Howard Counties in prior legislative districting plans from 1966 to 1992, and shared districts with Baltimore City in the 1992 plan. The options for redistricting in Baltimore County were to reconfigure old District 6 and 7 where the loss of population occurred, or to change the core of all county districts to absorb population.

Under the 1992 plan, Baltimore County came to be represented by incumbent senators, including Senator Delores Kelley, leader of the Senate Black Caucus (District 10); Senator Paula Hollinger, Vice Chair, Senate Education, Health and Environmental Affairs Committee (District 11); Senator Barbara Hoffman, Chair, Senate Budget and Taxation Committee (District 42); Senator Thomas Bromwell, Chair, Senate Finance Committee (District 8); and Senator Mike Collins (Dis-

trict 6), all from districts that would need to be redrawn unless the State's plan were focused on the area in which population loss occurred. Senator Barbara Hoffman (whose legislative district is shared by Baltimore City and Baltimore County residents) and Delegate Howard Rawlings, Chair of the House Appropriations Committee, both testified that shared districts worked well and that shared Baltimore City and Baltimore County districts provide effective representation to the city and county residents.

Only two of the alternative plans submitted to the Governor's Redistricting Advisory Committee ("Committee") did not have legislative districts shared by Baltimore City and Baltimore County. The number of districts crossing the boundary between Baltimore City and Baltimore County remains the same as it was in the 1992 plan approved by this Court. *See* State's Exs. 25 and 31. Less territory is involved in the 2002 Baltimore City/Baltimore County crossings than the 1992 crossings. A smaller percentage of Baltimore County's population shares a district with another jurisdiction under the State's plan (54.50%) than under the 1992 plan (55.53%).

**District 44**

The Committee decided to preserve the core of most Baltimore County districts. For example, the boundary lines between District 10 (Kelley) and District 11 (Hollinger) were largely preserved as were the boundary lines between District 11 (Hollinger) and District 42 (Hoffman). Districts 10 and 12A absorbed 1992 District 47B, and District 10, which had formerly crossed from Baltimore County into Baltimore City, was placed entirely in Baltimore County. *Compare* State's Exs. 25 and 31. The Committee then reconfigured District 6 and 7, where the population loss occurred.

District 44 is located in Baltimore City and eastern Baltimore County. The driving distance between Merritt Boulevard in Dundalk, in the easternmost portion of District 44, is only 8.2 miles from the intersection of North Avenue and Fulton Avenue in the Northeastern-most portion of District 44. This distance is significantly less than that across District

47 under the 1992 plan and the variations on District 47 proposed by Petitioner Stone. Delegate Mohorovic testified that he lives in Dundalk, but travels to downtown Baltimore every day to work, and that he imagines quite a few other Dundalk residents also work in Baltimore City. He further testified that Dundalk residents wish to emulate the economic revitalization that has occurred within Baltimore City along the Inner Harbor in Canton and in Highlandtown, and hope to learn from that success. He conceded that he could represent the residents of District 44 under the State's 2002 plan and would do his best to represent them if the Court approves the plan.

The shape of District 44 was designed, at least in part, by the need to maintain a sufficient number of African American majority districts in the Baltimore City/Baltimore County area, by including the African American population of Turner's Station within the district. The portion of District 44 that crosses the Patapsco River includes the Francis Scott Key Bridge.

**District 31**

District 31, under the State's plan, includes territory on both sides of the Patapsco River in Baltimore and Anne Arundel Counties. See State's Ex. 25. One reason for the crossing was population; District 31 needed additional population. The Anne Arundel County portion of District 31 has 105,965 persons, 1,091 persons below the maximum allowable negative deviation. The Baltimore County portion of District 31 has 9,452 persons. See State's Ex. 24. The Baltimore County population within District 31 is too large to add to adjoining Baltimore County District 6. The population of District 6 under the State's plan is 113,685 (0.88% deviation from ideal). See State's Ex. 26. Adding the Baltimore County portion of District 31 to District 6 would cause District 6 to exceed the maximum deviation by 4,811 people. The population of District 46 under the State's plan is 107,065 (4.99% deviation from ideal). See State's Ex. 26. Adding the Baltimore County population of District 31 to that of District 46

would result in a population of 116,508 (within the allowable deviation), but these populations are not contiguous. The Baltimore County population within District 31 cannot be added to adjoining District 44 while maintaining District 44 as a majority African American district. The percentage of the African American population in District 44 would drop from 52.62% to 49.45%. *See* State's Ex. 24. With an African American majority District 44, the number of African American majority districts in Baltimore City and Baltimore County is proportional to the African American population. District 31 was designed to avoid dilution of the newly merged African American majority district (District 44), and to minimize incumbent conflict.

Including the portion of the Patapsco River located in District 31, this district does not have an irregular shape. To the extent that the borders of District 31 are irregular, this is attributable to the extensive coastline on its southern, eastern, and northern sides. *See* State's Ex. 38. The Francis Scott Key Bridge and the Baltimore Beltway are immediately adjacent to District 31, and travel between the two portions of District 31 will require only a few minutes by automobile. *See* State's Ex. 38.

**District 5B**

Most of District 5B is entirely located within the northern portion of Baltimore County. The remainder of District 5B consists of a single extension into Carroll County that was required in order to include sufficient population in District 5B. This area shared a district with Carroll County from 1974 to 1994. The Committee received correspondence from Delegate Wade Kach, requesting that the Baltimore County portion of District 5 be a single member district and that the Carroll County portion of District 5 be a two member district. *See* State's Ex. 47. This single member district was also requested verbally by Petitioner Getty. The State's plan reflects this request. *See* State's Exs. 25 and 47.

**District 7**

Baltimore County and Harford County shared District 5 from 1974 to 1982. The two counties shared District 6 from 1992 to 2002. *See* State's Ex. 31. Harford County is contiguous only with Cecil and Baltimore Counties. Any excess population that it cannot share with Cecil County must be shared with Baltimore County.

## Anne Arundel County

According to the 2000 census, the Anne Arundel County population is 489,656. *See* State's Ex. 19. A portion of Anne Arundel County's population must share districts with residents of other counties, because Anne Arundel County has too much population for four districts and not enough for five districts. If Anne Arundel had four self-contained legislative districts at the maximum 5% deviation, there would still be 16,352 excess people; it is not possible for the county to be self-contained. *See* State's Ex. 19.

The application of shared districts in Anne Arundel County was constrained by the Chesapeake Bay on the eastern boundary side of the county and population totals and population pressure from Calvert County from the south, Prince George's County from the west and Howard County from the north. All of these counties grew substantially in population between 1992 and 2002. *See* State's Ex. 20. The Committee decided to maintain the core of existing districts. The vast majority of Anne Arundel County residents stayed in the same legislative districts, including 98.39% of the residents of District 30; 93.69% of the residents of District 31; 83.91% of the residents of District 32; and 82.28% of the residents of District 33. To put the population of Anne Arundel County that shares a district in one single area, it would be necessary to disturb numerous established and significant communities inside Anne Arundel County and due regard for natural boundaries would be more difficult. For example, the communities of Glen Burnie, Pasadena, Severna Park, Arnold, Millersville, Severn and Annapolis could be affected.

**District 13**

Howard and Prince George's Counties have shared a district since 1982. *See* State's Exs. 28 and 31. Under the State's plan, Howard and Anne Arundel Counties share District 13 and Prince George's and Howard Counties share District 21. *See* State's Ex. 25.

The population of the Anne Arundel County portion of District 13 is 18,794, and the population of the Howard County portion of District 21 is 18,242. *See* State's Ex. 24. The Anne Arundel County portion of District 13 (which includes Maryland City) is divided from the rest of Anne Arundel County by a natural boundary—the Baltimore Washington Parkway (I–295). The southeastern boundary of District 13 follows I–295 and intersects with Maryland Route 175, and includes correctional facilities in Jessup. *See* State's Ex. 65. The Committee attempted to preserve the core of existing districts in Anne Arundel County. In making this determination, the northwest portion of Anne Arundel County had to be placed in a shared district. District 32 is close to the maximum deviation and cannot absorb the excess population in District 13. The population of District 32 is 116,789 (3.64% above ideal district), and the population of District 32 plus the Anne Arundel County portion of District 13 is 135,583. *See* State's Ex. 24. This is 17,257 people more than the maximum allowable 5% deviation above the ideal population.

The African American population in District 13 increased by approximately 85% over the past 10 years. District 13 is represented by an African American representative in the House of Delegates. The Anne Arundel County portion of District 13 has a higher African American population than the Howard County portion of District 21. The all-or-part African American population of the Anne Arundel County part of District 13 is 8,855 or 47.1%; the all-or-part African American population of the Howard County part of District 21 is 1,345 or 7.4%. *Id.* If District 13 included the Howard County portion of District 21, the African American population in District 13 would be decreased by 7,510 people, approximately 25%. *Id.* The percent of African American population (all or part) in

this district would be 19.7%. *Id.* By including the Anne Arundel County portion within District 13, the State's plan preserves the African American population of District 13 (26.19%). *Id.*

**District 23**

District 23 crosses from Prince George's County into Anne Arundel County. In order to create the new African American majority District 47 in Prince George's County, along the Prince George's County/District of Columbia line, the boundary lines of existing districts in Prince George's County were pushed outwards from the District of Columbia line, and District 23 had to surrender population in central Prince George's County. *See* State's Ex. 60. The total population of District 23 under the State's plan is 110,746, and the population of the Anne Arundel County portion of District 23 is 3,729. *See* State's Ex. 24. If the crossing between Anne Arundel and Prince George's Counties was eliminated, the population of District 23 would be 107,017, more than 5% below the ideal population. *Id.* The crossing in District 23 could not be eliminated without significant change in the boundaries of other Anne Arundel County districts, because Districts 32 and 33 are close to the maximum allowable deviation and cannot absorb the excess population from the Anne Arundel County portion of District 23. The population of District 32 is 116,789 (3.64% deviation from ideal). Adding the population of District 32 and the Anne Arundel County portion of District 23A would create a total population of 120,518. *Id.* This is 7,827 in excess of the ideal district population and 2,192 in excess of the maximum allowable deviation. The population of District 33 is 117,768 (4.5% deviation from ideal). Adding the population of District 33 and the Anne Arundel County portion of District 23A would create a total population of 121,497. *Id.* This is 8,806 in excess of the ideal district population and 11,941 in excess of the maximum allowable deviation. *Id.*

**District 27**

In the 1992 plan, District 27 included parts of Prince George's, Anne Arundel, and Calvert Counties. In the 2002 plan, District 27 also includes part of Charles County. The Charles County/Prince George's County crossing in District 27 is discussed at pp. 32–33, *infra.* By 2000, District 27 under the 1992 plan had become the second largest legislative district in the State, with 137,182 residents. *See* State's Ex. 22. District 27 had to give up population, and it gave up population in Anne Arundel County.

District 27 under the 2002 plan contained 4,284 fewer Anne Arundel County residents than District 27 under the 1992 plan. In the 1992 plan, District 27 included 12,001 residents of Anne Arundel County, using 1990 Census figures. *See* State's Ex. 30. In the 2002 plan, District 27 includes 9,509 residents of Anne Arundel County, using 2000 Census figures. *See* State's Ex. 24. The Committee decided that because of geography and the population of the Southern Maryland peninsula, the crossing of District 27 into Anne Arundel County was required. If the crossing of District 27 into Anne Arundel County was eliminated, all of the districts within Anne Arundel County would shift north, and there could be a larger crossing into Baltimore County for District 31.

### Prince George's County

Prince George's County had the second highest population growth of any Maryland county, from 729,268 persons in 1990 to 801,515 in 2000. *See* State's Ex. 20. The County has the second highest percentage of African American residents (64.32%), second to Baltimore City (65.18%). *See* State's Ex. 18. In order to create the new African American majority District 47 in Prince George's County, along the Prince George's County/District of Columbia line, the boundary lines of existing districts in Prince George's County were pushed outwards from the District of Columbia line. *See* State's Ex. 60. Prince George's County has one of the highest concentrations of municipalities of any locality in the State. *See* State's Ex. 38.

### District 21

District 21 crosses from Prince George's County into Howard County in order to acquire additional population, as a result of population taken from District 23 to form new District 47 in Prince George's County. District 21 also absorbed population from District 14, which had the largest population growth of any district in the State from 1990 to 2000. *See* State's Ex. 22.

Under the 1992 plan, District 13B crossed between Prince George's and Howard Counties at the same approximate location. *See* State's Ex. 31. District 13B no longer crosses into Prince George's County. There was no testimony that District 21 would be difficult to traverse or that it would be difficult to communicate with constituents in that district. The portion of District 21 in Howard County follows the political subdivision line created by the Montgomery County/Howard County border.

### District 22

The bulk of District 22 under the State's plan is the same as the previous District 22. District 22 is relatively small compared to other districts across the State and there was no testimony that it would be difficult to traverse District 22 or to communicate with its constituents. In the area of College Park, the shape of District 22 results from moving two precincts into District 22 to acquire additional population, which was required in order that District 22 could give some population on its southern border to the new District 47. *See* State's Ex. 60. Under the State's plan, the town of College Park is located in District 21, with the exception of the two precincts (21–017 and 21–010) that were moved to District 22. *Id.* One of these two precincts (21–017) is the University of Maryland campus, whose residents are students who have a low number of registered voters and an extremely low voting turnout. *Id.* This precinct has a total population of 8,629, a voting age population of 8,577, had 646 total registered voters for the 2000 presidential election and a total voter turnout of 476 for the 2000 presidential election. The other precinct (21–010)

contains 3,289 residents, and is located next to Berwyn Heights, the town in which the new District 22 Delegate, Tawanna Gaines, was the mayor.

College Park is located in an area of Prince George's County where there are numerous, adjacent municipalities, including Berwyn Heights, Greenbelt, Hyattsville, and River-dale Park. *Id.* With the exception of the partial plan submitted by Petitioner Brayman, every third-party plan splits College Park. The redistricting for the Prince George's County Coun-cil similarly splits College Park between proposed District 1 (containing precincts 01–02, 21–04, 22–05, and 21–10) and District 3 (containing precincts 21–01, 21–02, 21–15, and 21–17). To unite College Park, while maintaining substantial equality of population, one could not take the two College Park precincts out of District 22 without obtaining additional population from adjoining districts. This population could not come from adjacent majority African American District 47 without major changes to that district, because it is defined by its borders with the District of Columbia and Montgomery County. Petitioner Brayman has proposed two alternative plans to place College Park in a single district. One plan causes District 22, which is an African American plurality district under the State's plan, to become a plurality white district. The other plan causes the population in District 23A to fall to 6.5% below the ideal population. *See* Brayman Ex. 4 (an analysis of the Brayman Plan prepared by the State).

**District 27**

In the 1992 plan, District 27 included parts of Prince George's, Anne Arundel, and Calvert Counties. In the 2002 plan, District 27 also includes parts of Charles County. The Census 2000 population of Charles County was 120,546. *See* State's Ex. 16. In the 1992 plan, Charles County was entirely within District 28. *See* State's Ex. 31. Charles County now has too much population to remain in a single district. Excess population must be shared with a neighboring jurisdiction. In addition, Calvert County had the largest percentage popula-tion increase of any jurisdiction in Maryland. *See* State's Ex.

20. Thus, Subdistrict 27A is now entirely within Calvert County, and the Anne Arundel portion of District 27 is in Subdistrict 27B.

Because of the geography of Southern Maryland, the only districts contiguous to District 28 that could take the excess population from District 28 were District 27 and District 29. The northern boundaries of District 27 already needed adjustment in order to create the new African American majority District 47 in Prince George's County. In addition, District 29 had one of the largest growths in population from 1990 to 2000, and had to give up population to District 27 in order to stay within allowable deviations. The Committee decided to attach the excess population from District 28 to District 27 rather than creating a new crossing for District 29.

### Montgomery County

Montgomery County had the largest population growth of any county in Maryland. *See* State's Ex. 20. All eight legislative districts in Montgomery County are wholly within the borders of Montgomery County. *See* State's Ex. 25.

**District 20**

District 20 is located entirely within the southwest corner of Montgomery County. Two of its sides are extremely regular, and consist primarily of straight lines formed by the county border. *See* State's Ex. 25. There was no testimony that a delegate or senator would have trouble traversing District 20 and, in terms of its total territory, District 20 is one of the smallest districts in the State. *Id.* The shape of District 20 under the 2002 plan is not more irregular than the shape of District 20 in prior redistricting plans. For example, under the 1982 plan, an appendage of District 20 extended into the central portion of Montgomery County. *See* State's Ex. 28.

The Petitioners who have complained about the division of the neighborhood of Rollingwood, or about the configuration of District 20, have not identified any municipality that is split by District 20. The neighborhood of Rollingwood is not a political subdivision. Districts 18 and 20 were drawn so as to split

existing incumbent delegates into the two districts. Delegate Hurson is the incumbent in District 20 and the remaining two incumbents are still in District 18. Minority candidates are expected to run for the open delegate seats.

### Western Maryland

In all redistricting plans adopted since the 1960s, Frederick County and Carroll County have always shared legislative districts with neighboring counties, and Frederick County has never had a legislative district entirely within its county lines. No witness identified any instance where a representative of a shared district in Western Maryland failed to respond to concerns of residents of a political subdivision within the district. The Western Maryland districts have traditionally been single member districts. *See* State's Exs. 28 and 31. The district crossing into Washington County involves less population than under the 1992 plan. *See* State's Exs. 24 and 30.

### District 3B

District 3B is primarily located in Frederick County, with part of the district in Washington County. Frederick County shares a subdistrict with Washington County under each of the alternative plans, including the plan proposed by Petitioner Getty, which focused on the western four counties. *See* State's Ex. 59. The Washington County portion of Subdistrict 3B includes prisoners incarcerated in State prison institutions. The State's prison facilities in this area were divided between Districts 3B and 2B. Because these prisoners do not vote in elections, it is appropriate to include prisons within subdivision crossings where possible. The inclusion of the non-voting prison population within the crossing minimizes the number of voters who are affected by the crossing, and therefore minimizes any potentially adverse consequences that the crossing may create.

Subdistrict 3A was created to encompass the City of Frederick, which is the largest incorporated municipality in the State, outside of Baltimore City. The Census 2000 population

of the City of Frederick was 52,767, and was larger than the population of eight Maryland Counties. *See* State's Ex. 20.

## The Eastern Shore

Since 1966, because of the population density and number of counties on the Eastern Shore, all of the population in each county has shared a legislative district with people in one or more counties. In the approved 1982 plan, District 36 contained all or part of five counties. In the approved 1992 plan, District 36 contained all or part of five counties and District 37 contained all or part of four counties. In the 2002 plan, District 36 now contains all or part of four counties, and District 37 contains all or part of five counties.

### Districts 34 and 36—Cecil County

The sharing of District 34A between Cecil County and Harford County is due to the population of the Eastern Shore, which requires that a district cross the Susquehanna River in order to stay within allowable deviations. District 36 in the State's plan has a population of 118,176 including 44,542 in Cecil County (only 150 people below maximum tolerance). *See* State's Ex. 24. The balance of the Cecil County population is 41,409, which is 1,967 in excess of maximum tolerance of 39,442 for a single member district. *Id.* District 34B was drawn by the Committee to contain 39,430 persons (only 12 below maximum tolerance), with the remaining Cecil County residents added to District 34A along the Route 95 corridor outside the municipal boundary lines of Perryville and Port Deposit. *See* State's Exs. 24 and 38. District 34A may be traversed by means of the nearby Route 40 bridge across the Susquehanna River or the 1–95 bridge. *See* State's Ex. 38.

### Districts 36 and 37—Caroline County

At least three counties on the Eastern Shore must be split because of population limitations. According to the 2000 Census, Caroline County had a population of 29,772, more than 20% below the ideal population for a single member subdistrict. *See* State's Ex. 16. In every legislative apportionment since 1966, residents of Caroline County have shared

a district with residents of other counties. Since 1982, Caroline County has been divided between two districts, District 36 and District 37. *See* State's Exs. 28 and 31. All but one of the alternative plans submitted to the Committee split Caroline County. The only plan that did not split Caroline County placed it in a shared two member subdistrict with Queen Anne's County, but even this alternative did not guarantee that a Caroline County candidate would be elected to represent the subdistrict because the population of Queen Anne's County outnumbered Caroline's by 40,563 to 29,772.

Caroline County Administrator Hawley acknowledged that, due to population, not every county on the Eastern Shore can have a resident delegate, there will have to be some splitting of counties; Caroline County is a home rule jurisdiction. Because of their geographic location either Talbot or Caroline County has to be split. Under the 1992 plan, both Talbot and Caroline County were split. *See* State's Ex. 31. The Committee for the 2002 plan decided to unite Talbot; this plan also allowed Easton to be unified in District 37B. *See* State's Ex. 38.

In the 1992 plan, the Caroline County line was crossed in two different places. In the 2002 plan, the Caroline County line is only crossed once. The fact that Caroline County is split does not mean that a Caroline County resident could not win election in District 36 or District 37. Senators and Delegates across the State have been elected in split districts in which they reside in the county with a smaller population. Petitioner Getty referred to Senator Ferguson in District 4 as an example. Petitioner Stoltzfus provided another example.

**Districts 37 and 38**

Before the adoption of the 2002 plan, District 38 had a population of 120,548, which exceeded by 7,857 people the ideal district population and was 2,222 people over the maximum allowable deviation. *See* State's Ex. 22. Districts 37 and 38 are bounded by the highly irregular Maryland coastline on the south, east, and west, and by the straight lines of the Maryland Delaware border to the north. Because of the low

population density of the Eastern Shore, Districts 37 and 38 are large districts, and will contain a large amount of territory under any plan. *See* State's Ex. 20 (County Population Data).

Under the 1992 plan, District 36 contained all or part of five counties, and District 37 contained all or part of four counties. District 36 also contained all or part of five counties in the 1982 plan. Districts 37 and 38 are affected by the shape of District 38A, which joins African American communities in compliance with *Marylanders for Fair Representation, Inc., supra,* p. 17. District 38A in the State's plan is the same district as District 37A under the 1994 plan. The changes to District 38A under the State's plan were minor ones required as a result of population changes in the region. The minority population in 1994 District 37A had decreased, and the boundaries had to be modified to maintain it as a minority district. The Committee recommended changes to increase the population of District 38A under the State's plan to 39,375, with an African American population of 52.06% under the Department of Justice measurement standard. *See* State's Ex. 39.

Under the plan submitted by Petitioner Stoltzfus, the State's proposed Delegate District 38A would be put back into District 37, and the State's proposed Delegate District 37A would be returned to District 38. Under that configuration, Districts 37 and 38 would have 118,193 and 118,326 residents, respectively.

Since *In re Legislative Districting,* 271 Md. 320, 332, 317 A.2d 477 (1974), the Eastern Shore has been divided into three legislative districts, one of which was comprised of the shore counties of Somerset, Dorchester and part of Wicomico. The citizens of these lower shore counties have formed alliances, such as the Tri–County Council for the Lower Eastern Shore and the Lower Eastern Shore Heritage Committee, to promote their interests. *See* Stoltzfus Exs. 8 and 12.

The Stoltzfus proposal would not in anyway affect the composition of the majority minority district crafted by *Marylanders for Fair Representation, Inc.* Rather, it would return

that single member district to the middle shore counties from which it was carved.

Under the State's plan, Salisbury was substantially united in District 38. Switching the subdistricts, as proposed by Petitioner Stoltzfus (to create districts from 38A/37B and 37A/ 38B) would result in a larger population of Salisbury being split among two different Senate districts. While Salisbury could not be completely united, because the population of District 38 under the 2002 plan was too close to the maximum allowable deviation, only 763 residents of Salisbury are in District 37A. District 38 contains 22,980 residents of Salisbury, or 96.8%. District 38 could not absorb the remaining population of Salisbury (763 residents) without exceeding the maximum allowable deviation. Switching the 37A and 38A subdistricts would result in 9,420 residents of Salisbury (39.7%) in District 38 and 14,323 residents of Salisbury (60.3%) in District 37.

Under the 1992 plan, as amended by *Marylanders for Fair Representation, Inc.*, Wicomico County was divided between Districts 37 and 38, with 44,320 persons in District 38 (59.6%), and 30,019 persons in District 37 (40.4%). Under the 2002 plan, Wicomico County is less divided, with 61,827 persons in District 38 (71.93%) and 22,817 persons in District 37 (18.07%). *See* State's Ex. 24. If Districts 37A and 38A were switched, there would be 46,835 Wicomico County residents (54.49%) in District 38, and 37,809 residents (45.51%) in District 37.

Districts 38A and 37B have been challenged on the basis that they both cross the Nanticoke and Wicomico Rivers. Districts 37 and 38 do not cross the Nanticoke River at the same point, and the northern and southern portions of District 37B do not adjoin at the same location that District 38A crosses the Nanticoke River. The northern and southern portions of District 37B adjoin on the western side of the district, adjacent to the shore of the Chesapeake Bay (as discussed herein, *supra*, at pp. 18–19, the fact that a district is divided by a river should not prevent the banks of the river

from being contiguous within the meaning of Article III, § 4 of the Maryland Constitution).

## CONCLUSIONS OF LAW RELATING TO STATE CONSTITUTIONAL CLAIMS

The requirements for legislative districting set forth in Article III, § 4 of the Maryland Constitution are intended to work in combination, though they tend to conflict in their practical application. *In re Legislative Districting,* 299 Md. 658, 674, 681, 475 A.2d 428 (1984). Because the conclusions pertinent to the various requirements necessarily overlap, they will be addressed collectively.

This Court noted in *In re Legislative Districting* that:

The provision of § 4 of Article III of the Maryland Constitution that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions" is integrally related to the compactness and contiguity requirements; all involve the physical configuration of district lines.[15] The primary intent of the "due regard" provision is to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas. Like compactness and contiguity, the "due regard" requirement is of mandatory application, although by its very verbiage it would appear to be the most fluid of the constitutional components outlined in § 4.

15 We construed incorporated municipalities as being "political subdivisions" within the contemplation of § 4 in *In re Legislative Districting,* 271 Md. 320, 317 A.2d 477 *cert. denied sub. nom Twilley v. Governor of Md.,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974).

299 Md. at 681, 475 A.2d 428.

As interpreted by this Court, the "due regard" provision is subject to the "overriding goal of equality of population," and is intended to "work in combination with" the other State Constitutional requirements "to ensure the fairness of legislative representation," even though the requirements "tend to conflict in their practical application." *In re Legislative Districting,* 299 Md. at 674, 678, 681, 475 A.2d 428.

The requirement of "due regard" for natural boundaries and boundaries of political subdivisions may be subordinated to achieve a "rational goal," such as avoiding the additional loss of senior legislators, reducing the number of incumbent contests and "achieving racial balance among the districts." *Id.* at 691, 475 A.2d 428. In addition, the various constitutional requirements are conflicting and balancing them requires the exercise of discretionary choice by those drafting the State's plan. *Id.*

Although the term "natural boundaries" may include artificially created boundaries, such as highways and roads, the Constitution cannot possibly prohibit crossing every such line in the formation of a district, nor can it require that any particular natural boundary be used in preference to another.

## Stone Petition (Misc. No. 25) & Golden Petition (Misc. No. 22)

The Stone and Golden Petitioners claim that the State did not give due regard to natural boundaries and boundaries of political subdivisions because, under the 2002 plan, former District 7 has been eliminated, residents of Dundalk will share District 44 with residents of Baltimore City across the Patapsco River, and residents of Edgemere will share District 31 with residents of Anne Arundel County across the Patapsco River. The number of districts crossing the boundary between Baltimore City and Baltimore County remains the same as it was in the plan approved by the Court in *Legislative Redistricting Cases.* The evidence at the hearing demonstrated, through the testimony of the Secretary of State, that the principles underlying compactness as well as all other constitutional concerns had been fairly considered and applied in designing Districts 31 and 44. In the Baltimore City/Baltimore County area, the effect of the State's plan leaves undisturbed the core of existing districts, minimizes incumbent conflicts, and preserves for its African American voters the opportunity to elect candidates of their choice.

By contrast, both the Stone and Golden Petitioners based much of their argument on a perceived lack of community of interest between residents of Dundalk and Baltimore City in the case of District 44, or between residents of Edgemere and Anne Arundel County, in the case of District 31. Neither set of Petitioners, however, has identified any instance where a representative of a shared district has failed to address the concerns of residents of a political subdivision within the district. Moreover, Southeastern Baltimore County and Baltimore City residents do share common interests, including common places of employment and a stake in the economic revitalization of waterfront areas along the Patapsco River and Inner Harbor. According to Senator Hoffman, a shared district provides effective representation to residents of the political subdivisions sharing the district. Even Petitioner Stone confirmed that the shared districts established in the 1992 redistricting have worked as well as could have been expected. Delegate Mohorovic testified that he could represent the residents of District 44 under the State's 2002 plan and would do his best to represent them if the Court approves the plan. No witness identified any instance where the representative of a district shared by Baltimore City and Baltimore County has failed to respond to concerns of residents of either political subdivision.

### The Stone Petitioners' Alternative Plan

Senator Stone's latest plan, submitted at the hearing on April 26, 2002, pairs 30 incumbent Delegates and six incumbent Senators; Delegates Kelly and Taylor in single member District 1C; Delegates Schenk and McGee in single member District 2A; Delegates Weir, Ports, DeCarlo and Hubers in District 6; Delegates Pielke, Klima and Kach in two member District 9B; Delegates Menes, Gaines, Moe, Frush and Gianetti in District 21; Senators Exum and Lawlah in District 24; Senators Mitchell and Hughes in District 40; Senators Sfikas and McFadden in District 46; Delegates Oaks, Nathan–Pulliam, Gladden and Phillips in District 41; Delegates Krysiak, Hammen, Dypski, Branch, Harrison and Davis in District 46;

Delegates Cole and McHale in single member Subdistrict 47A; Delegates Kirk and Paige in single member Subdistrict 47C.

Stone's latest plan also splits College Park, Frostburg, Greenbelt, Glenarden and Cheverly, among other municipalities. In addition, the latest Stone plan has discontiguous blocks in the Hagerstown area in precinct 10–007; eliminates the single member African American majority Subdistrict 23; and eliminates the single member subdistrict in Somerset County (District 37A in the State's plan). In the latest Stone plan, Baltimore City has five full districts and two single member districts (with the third piece being in Baltimore County), which is one less district than the State's plan. Baltimore City under the latest Stone plan has only four districts with a majority African American population, which is also one less district than the State's plan provides.

## The Golden Petitioners' Alternative Plan

The Golden Petitioners, together with the Petitioners in DeHaas (Misc. 31) and Smallwood (Misc. No. 32), have submitted an alternative plan ("Mohorovic Plan") with an number of serious deficiencies. Senate districts in the Mohorovic Plan deviate from the ideal district population by as much a s +6.9% (proposed District 47) and –7.02% (proposed District 46), for a total Senate district population variance of 13.99%, that exceeds the 10% maximum population variance required for *prima facie* validity under the equal protection clause of the United States Constitution and the substantially equal population requirement of the Maryland Constitution. Single member subdistricts in the Mohorovic Plan deviate from the ideal subdistrict population by as much as +6.9% (proposed District 21B) and –4.65% (proposed District 31C) for a total population variance of 13.99% among single member subdistricts. Two member subdistricts in the Mohorovic Plan deviate from the ideal subdistrict population by as much as +4.69 (proposed District 24A) and –9.08 (proposed District 46A) for a total population variance of 13.77% among two member subdistricts.

Three districts in the Mohorovic Plan include discontiguous territory: (1) District 30 contains discontiguous precinct 1–003, whose 6,953 residents would cause any adjoining district to exceed +5% deviation from the ideal district population; (2) District 24B contains discontiguous precinct 15–001; and (3) District 21A contains a small area that is discontiguous. The Mohorovic Plan proposes a new shared District 6 that joins a two member subdistrict 6A in South Baltimore City with a single member subdistrict 6B in Northern Anne Arundel County. The Mohorovic Plan splits College Park, Greenbelt, Cheverly, Bowie, Bladensburg, Rockville, Gaithersburg and Laurel, among other municipalities, and eliminates the single member subdistricts that have traditionally been provided in Western Maryland.

The Mohorovic Plan pairs nine incumbent Senators, including five incumbent Senators from Baltimore City, against each other. Senators Hughes, Blount and Mitchell in proposed District 3, and Senators Sfikas and McFadden in proposed District 5. It also pairs another incumbent Senator from Baltimore City, Senator Della, against an incumbent Senator from Anne Arundel County, Senator Jimeno, and pairs incumbent Senators Stone and Collins from Baltimore County in District 7. The Mohorovic Plan also pairs incumbent Delegates from Baltimore City in proposed District 1 (pairs incumbent Delegates Campbell, Doory, Marriott, Rawlings and Rosenberg), District 3 (pairs Delegates Fulton, Gladden, Phillips and Jones), District 4 (pairs Delegates Branch, Kirk, Paige and Nathan Pulliam), and District 5 (pairs Delegates Dypski, Hammen, Krysiak, Davis and Harrison), against each other.

## DeHaas Petition (Misc. No. 31)

The DeHaas Petitioners contend that in adopting the 2002 plan the State did not give due regard to natural boundaries and the boundaries of political subdivisions when it placed residents of Anne Arundel County in a shared District 23A with residents of Prince George's County. Due to the population of Anne Arundel County, it is not possible for all residents of Anne Arundel County to be placed in legislative districts

entirely within Anne Arundel County. Petitioners have not identified any instance where a representative of a shared district has failed to address concerns raised by residents of a political subdivision within the district; nor have they presented any evidence that the natural boundary specified in the Petition, the Patuxent River, poses any obstacle to travel or effective representation.

### Smallwood Petition (Misc. No. 32)

The Smallwood Petitioners contend that in adopting the 2002 plan, the State did not give due regard to the boundaries of political subdivisions when it placed residents of northwestern Anne Arundel County in a shared District 13 with residents of Howard County. The Smallwood Petitioners presented no testimony at the hearing nor did they identify any instance where a representative has failed to address concerns raised by a resident of a political subdivision within the district. The State's plan was based on appropriate criteria, including preserving the core of the existing districts in Anne Arundel County, recognizing the population restraints presented by District 22, which is close to the maximum allowable deviation, and not diluting the African American population in District 13. Moreover, the District 13/District 32 boundary line follows the Baltimore–Washington Parkway, which constitutes a natural boundary.

### Cole Petition (Misc. No. 33)

The Cole Petitioners, who consist of the members of the Caroline County Commission and a Caroline County Administrator, contend that, in adopting the 2002 plan, the State did not give due regard to natural boundaries and the boundaries of political subdivisions in apportioning Districts 34, 36, 37 and 38 on the Eastern Shore, as well as various other districts throughout the State's plan. According to the 2000 Census, the population of Caroline County is more than 20% below the ideal population for a single member subdistrict, and residents of Caroline County have shared a district with residents of other Counties in every legislative apportionment since 1966.

The Cole Petitioners acknowledge that either Caroline or Talbot County must be split between Districts 36 and 37, and argue that Talbot County, which is entirely within District 37 under the State's plan, should have been divided instead of Caroline County. Given that one of the two counties must be divided, the Committee's decision to divide Caroline County rather than Talbot County does not show any lack of due regard for political subdivisions or natural boundaries.

### Steele Petition (Misc. No. 29)

Petitioner Michael Steele, State Chairman of the Republican Party, maintains that in adopting the 2002 legislative redistricting plan as a whole, the State did not give due regard to natural boundaries and the boundaries of political subdivisions and communities of interest. Petitioner Steele has not identified any instance where a representative has failed to address concerns raised by residents of a political subdivision within the district. Nor has he presented any evidence that would justify abandoning the State's long-standing multi-member districts. Apparently, the true objective of Steele's challenge is partisan. According to James Lawrence Knighton, who drafted both Steele's original plan and the so-called "Steele II" plan, the original plan sought to maximize Republican gains, and the districts in Steele II are based on the districts in the original plan. The Steele II plan pairs 23 incumbent Democratic Senators against each other. Nor is that plan technically viable; the Steele II plan has two districts that are completely discontiguous by any test.

### Getty Petition (Misc. No. 34)

The Getty Petitioners maintain that the State's plan did not give due regard to the boundaries of political subdivisions in two respects: (1) by not placing an entire legislative district within Frederick County and Carroll County, respectively, and (2) by dividing the town of Hampstead between Subdistricts 5A and 5B. The Getty Petitioners, however, concede that, due to population, each of the five westernmost counties, Garrett, Allegheny, Washington, Frederick and Carroll, must be placed

in shared legislative districts with boundaries that cross county lines, that in all redistricting plans adopted since the 1960s, Frederick County and Carroll County have shared legislative districts with neighboring counties, and that Frederick County has never had a legislative district entirely within its county lines. The Getty Petitioners have not identified any instance where a representative of a shared district in Western Maryland has failed to respond to concerns of residents of a political subdivision within the district. The crossing of the Baltimore County and Carroll County line and the splitting of Hampstead were required to achieve substantial equality of population.

The State's plan responded to population changes and recognized municipalities when it created a district in the City of Frederick. That the Getty petitioners present no legally valid claim is confirmed by their alternative plan for that area, which advances partisan interests, but not constitutional requirements.

### Getty Petitioners' Alternative Plan

The Getty Petitioners have proposed an alternative plan that redraws only Districts 1 through 5. Under the alternative plan submitted by the Getty Petitioners, each of the five westernmost counties of Garrett, Allegany, Washington, Frederick and Carroll will have to share legislative districts with other counties. The alternative plan proposed by the Getty Petitioners would place Delegate Kevin Kelly and Speaker of the House Casper Taylor, both of whom are Democrats, in the same single member subdistrict, but would not require any incumbent Republicans to run against each other.

The Getty Petitioners acknowledge that the relief they are seeking in western Maryland will require changes in legislative district boundaries elsewhere in the State and will affect districts beyond those that are adjacent to the five western Maryland districts the Getty petitioners seek to reconfigure. However, the Getty Petitioners have not submitted a workable statewide plan nor any plan that purports to demonstrate how

the changes to other districts elsewhere in the State necessitated by their requested remedy can be made in a manner that satisfies the requirements of Federal and State law.

With respect to the State-wide Getty Plan ("Getty Plan"), Christian Cavey testified on behalf of the Getty Petitioners that he had not prepared a map, but he had prepared a spreadsheet which he believed to be the basis for the map submitted as Getty Exhibit 34–4. The map submitted as Exhibit 34–4, however, is both technically and substantively flawed. Under the Getty Plan, portions of Districts 6, 8A, 44A and 44B are discontiguous, and a deviation from the ideal district population range from –18.38% to +6.06% for a maximum population variance of 24.42%. Representation of Baltimore City residents is reduced to five districts and a two member subdistrict, with three majority black Senate districts, two majority white Senate districts, and a majority white two member subdistrict, connected to a majority white one-member subdistrict in Baltimore County.

Six incumbent Democratic Senators are paired with each other in District 7 (Sen. Collins and Sen. Stone), District 40 (Sen. Mitchell and Sen. Hughes), and District 47 (Sfikas and McFadden). No incumbent Republican Senators are paired in any district. Incumbent Democratic Delegates will run against each other in Districts 1, 7, 41, 42, 46 and 47A. No incumbent Republican Delegate need run against another Republican Delegate (in District 8A two Republican incumbents would be placed in a two member subdistrict with a Democratic incumbent, and in District 12A, Del. Murphy, a Republican, would be placed in a single member subdistrict with a Democratic incumbent).

### Brayman Petition (Misc. No. 27)

The Brayman Petitioners claim that the State did not give due regard to natural boundaries and the boundaries of political subdivision because, under the plan, the City of College Park is located in Districts 21 and 22. With the exception of the partial plan submitted by the Brayman Petitioners, every

third party plan splits College Park. The redistricting for the Prince George's County Council similarly splits College Park between proposed District 1 (containing precincts 01–02, 21–04, 21–05, and 21–10) and District 3 (containing precincts 21–01, 21–02, 21–15, and 21–17). The City of College Park is located in an area of Prince George's County where there are numerous, adjacent municipalities, including Berwyn Heights, Greenbelt, Hyattsville, and Riverdale Park. In order to create substantially equal districts, it is necessary to split the boundaries of some of these municipalities, as both the Brayman Petitioners' and the State's plan demonstrate.

In order to unite the City of College Park, the Brayman Petitioners propose, among other things, the relocation of three City of Laurel precincts (precincts 10–010, 10–011, and 10–007) from District 21 and District 23. *See* Brayman Exhibit 1. This would have the effect of splitting the City of Laurel, a political subdivision, among Districts 21 and 23. By contrast, the State's plan gives due regard to the City of Laurel, maintaining it wholly within District 21. While Mayor Brayman complained that prior redistricting plans did not have District 21 crossing the Patuxent River into Howard County, his plan does nothing to rectify the sharing of District 21 among Prince George's and Howard Counties. Under the Brayman Petitioners' plan, District 21 would still cross the Patuxent River into Howard County. This is because, as the State plan recognizes, population from Howard County is needed to make District 21 of substantially equal population.

### Gandal and Schofield Petition (Misc. No. 28)

Petitioners Gandal and Schofield maintain that the State did not give due regard to natural boundaries in Districts 18 and 20 or the boundaries of political subdivisions in that the plan divides neighborhoods and precincts. Petitioners Gandal and Schofield, and Delegate Grosfeld testified that the State's plan splits the neighborhood of Rollingwood, placing part of it in District 18 and part of it in District 20. Each testified that in the past, Rollingwood was located entirely within District 18. While Petitioners Gandal and Schofield testified that they

believed Rollingwood's ability to participate in the political process would be affected by the State's plan, Delegate Grosfeld testified that the residents of Districts 18 and 20 both would be represented by incumbent senior representatives, in terms of both tenure in Annapolis and leadership in the General Assembly. There was no evidence presented that the officials elected to office in Districts 18 and 20 would or could not be responsive to the needs of Rollingwood.

The State's plan does give due regard to natural boundaries and the boundaries of political subdivisions within Districts 18 and 20. The map shows that the entire eastern boundary of District 20 is the boundary between Montgomery and Prince George's County and that the bottom of the district is defined by the border between Montgomery County and the District of Columbia. Most of its remaining boundaries follow precinct lines, which in turn are based on roads and other natural boundaries. District 18 also follows natural boundaries. Its upper end is defined by Viers Mill Road on one side and a railroad on the other. It also used the county's border with the District of Columbia, Rock Creek Park, Wisconsin Avenue, Connecticut Avenue, University Boulevard and the Beltway for substantial stretches. While the district does not follow major roads for its entire boundary, the decision to use smaller roads on occasion is easily explained by the need to maintain population equality in this densely populated area.

### Dembrow Petition (Misc. No. 30)

The Dembrow Petition alleges that the State did not give due regard to natural boundaries by not using the "well recognized thoroughfare of Randolph/Cherry Hill" as the dividing line between Districts 14 and 20, and splitting precincts and dividing along residential streets well established neighborhoods, communities, and homeowners' associations. *See* Dembrow Petition, Misc. No. 30 at ¶ 1.C. In fact, Randolph Road has never been the sole dividing line for District 20. In the 1974 plan, the road went through District 20. In the 1982 plan, the line between Districts 14A and 20 followed Randolph Road for a short time, but crossed it on both the east and the

west side of the district. The same was true in the 1992 plan. The State's plan comes closer to following Randolph Road than any past plan.

The Petitioners in Misc. No. 22 (Golden), Misc. No. 25 (Stone), Misc. No. 33 (Cole), Misc. No. 29 (Steele), Misc. No. 34 (Getty) and Misc. No. 30 (Dumbrow) also allege that the State's plan violates Article III, § 4 of the Maryland Constitution which requires that legislative districts be "compact in form." I conclude with regard to these petitions that the State has met its burden of proving compliance with that constitutional mandate.

This Court has viewed "compactness as a requirement for a close union of territory (conducive to constituent-representative communication), rather than as a requirement which is dependent upon a district being of any particular shape or size." *In re Legislative Districting*, 299 Md. at 688, 475 A.2d 428. In determining the compactness of a district, the Court must give "due consideration" to "the 'mix' of constitutional and other factors which make some degree of noncompactness unavoidable," including "concentration of people, geographic features, convenience of access, means of communications, and the several competing constitutional restraints, . . . as well as the predominant constitutional requirement that districts be comprised of substantially equal population." *Id.* Although the districts under the State's plan that are attacked by the Petitioners in question may not be "visually compact," constitutional compactness is not determined by that test. *In re Legislative Districting*, 299 Md. at 680, 475 A.2d 428. Rather I am convinced that the State has given due consideration to "the mix of constitutional and other factors" in drawing the districts in question. I recommend that the Court deny the challenges alleging lack of compactness and failure to give due regard to boundaries of political subdivisions mounted in the above enumerated petitions.

On the other hand, I am not persuaded that the State has met its burden of proof that its plan complies with the constitutional requirements of compactness and due regard for

political boundaries in drawing Districts 37 and 38. I reject the State's reason for designing such noncompact districts based upon a more favorable split of the voters in Wicomico County and in the City of Salisbury so that those voters would supposedly enjoy a better chance of electing a senator of their choice.

Furthermore, District 38B proposed by the State includes portions of five counties: Caroline, Talbot, Dorchester, Wicomico and Worcester Counties stretching from the Atlantic Ocean to Caroline County. I do not believe that this configuration of District 38B demonstrates that its drafters gave due regard to the boundaries of political subdivisions. The State's configuration of Districts 37 and 38 divides Somerset County from Worcester County and part of Wicomico County. Those three areas have been aligned in one legislative district since 1966. No acceptable reason has been presented, in my view, to justify divergence from the longstanding tradition of including the lower shore counties in one legislative district. I recommend that the court grant the Stoltzfus petition and reconfigure Districts 37 and 38 so that, what was under the State's plan designated as single member District 38A would become 37A, and that single member District 37A would become 38A.

### E. Additional Claims

Some of the Petitioners have alleged that the State's plan deprives them of their rights under the First Amendment to the United States Constitution [3] and under Articles 2, 7 and 24 of the Declaration of rights of the Maryland Constitution.[4]

---

3. The First Amendment states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const., amend. I.

4. Article 2 states:

The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which

The evidence does not support these allegations, and I recommend that these claims be rejected.

Respectfully submitted,

Robert L. Karwacki

Special Master

May 21, 2002

shall be made, under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding.
Art. 2 of the Md. Declaration of Rights.
Article 7 states:
That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage.
Art. 7 of the Md. Declaration of Rights.
Article 24 states:
That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.
Art. 24 of the Md. Declaration of Rights.